

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

DMP:FJN/APW
F. #2021R00043

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

June 17, 2021

By E-Mail and ECF

The Honorable Edward R. Komitee
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

      Re:    United States v. Eduard Florea
                Criminal Docket No. 21-037 (EK)

Dear Judge Komitee:

      The government respectfully submits this letter in opposition to defendant Eduard Florea's motion to modify the order of detention entered by Magistrate Judge Sanket J. Bulsara in the above-captioned case.  See ECF No. 20 ("Def. Br.").  United States Pretrial Services also opposes the defendant's release on bond.  For the reasons set forth below, the defendant, who has repeatedly made violent threats against Members of Congress, and has a documented history of violence and a refusal to comply with court orders, should be detained pending trial.

I.      Factual Statement

      A.      The Defendant Threatens Violent Actions

      As detailed in the complaint and the Indictment, since January 6, 2021, the FBI has been investigating the defendant in connection with the attack on the United States Capitol (the "Capitol") and related threats to commit violent acts in Washington, D.C., including against Members of Congress.  The defendant, a 40-year-old naturalized United States citizen, operated a social media account on Parler that had the vanity name "LoneWolfWar" (the "Florea Parler Account").

      On January 5, 2021, the State of Georgia held run-off elections for its two United States Senate seats.  Raphael Warnock was a candidate for one of the Georgia Senate seats.  In the evening of January 5, 2021, the news media widely reported that Warnock had won election to the United States Senate.  On January 5, 2021, at approximately 8:40 p.m., the defendant posted on Parler, "We need to all come to an agreement….and go armed… and really take back Washington."  A few minutes later, the defendant posted on Parler, "Tomorrow may very be the

day war kicks off . . ."[1]  At approximately 8:53 p.m., the defendant posted on Parler in response to another Parler user, "I catch one of you fuckers in DC tomorrow…. definitely slicing a throat….I fucking promise you…"  At 11:53 p.m., the defendant posted on Parler, "Warnok is going to have a hard time casting votes for communist policies when he's swinging with the fucking fish…."  In the early morning hours of January 6, 2021, at approximately 12:42 a.m., the defendant commented on another user's Parler post, which stated, "FUCK RAPHAEL WARNOCK LOSER," by posting in response, "Dead men can't pass shit laws . . . . ."

During the morning of January 6, 2021, at approximately 9:43 a.m., the defendant posted on Parler, "Let's go…I will be reaching out to patriots in my area so we can come up with a game plan… Here in New York we are target rich. . . . but there is only one that comes to my mind that is the starting point.  Not sure where you are… but I would imagine you have one in mind too.  Dead men can't pass shit laws…. I will fight so help me god."

On January 6, 2021, a joint session of the United States Congress convened at the Capitol.  During the joint session, elected members of the United States House of Representatives and the United States Senate were meeting to certify the vote count of the Electoral College of the 2020 Presidential election.  Early in the day, a large crowd began to gather outside the Capitol perimeter and advanced to the building's exterior façade.  United States Capitol Police officers attempted to maintain order and stop the crowd from entering the Capitol.  Nonetheless, crowd members forced entry into the Capitol by breaking windows, ramming open doors, and assaulting United States Capitol Police officers.  In the course of these events and the re-taking of the Capitol by law enforcement and the National Guard, there were multiple fatalities, including one United States Capitol Police officer.  There were also dozens of serious injuries and millions of dollars in damage to the Capitol.

Between approximately 2:02 p.m. and 4:35 p.m. —while the Capitol was under siege—the defendant posted a series of messages on Parler, stating in substance and in part:

   a) "Mine are ready….I am ready…. we need to regroup outside of DC and attack from all sides… talking to some other guys….I will keep watching for the signal."

   b) "I am awaiting my orders…armed and ready to deploy…."

   c) "Guns cleaned loaded . . . got a bunch of guys all armed and ready to deploy . . . we are just waiting for the word"

   d) "There 3 car full of armed patriots heading in from NY…."

   e) "3 cars of armed patriots heading into DC from NY"

---

[1]   The language cited herein, including spelling, grammar, punctuation and spacing, appears as originally set forth in the Florea Parler Account.

    f)  "3 cars full of armed patriots are enroute from NY"

    g)  "The time for peace and civility is over. . . ."

    h)  "100%.... peace time is over…. these fuckers are trampling our rights and they are twisting our words… they use the laws against us while our leaders run as cowards…. Fucking kill them all…. And anyone who stands in the way…."

    i)  "Me and some guys are gearing up to head in. . . . where are you . . . 3 cars already are enroute . . . .all armed."

  On January 6, 2021, at approximately 6:00 p.m., the defendant posted on Parler, "It's time to unleash some violence." At approximately 8:28 p.m., the defendant posted on Parler, "I don't know why we keep advocating to fight fair with these fucks…we need to take them out …one by one…"

  The defendant's wife later told the FBI that the defendant had intended to travel to Washington, D.C. to participate in the January 6 protest, but that his ride did not pick him up. The defendant's wife reported that the defendant was in a frenzy to join the attack on the Capitol when he saw it unfolding on television on January 6. The defendant's wife described that the defendant got dressed in a tactical vest, armed himself with combat knives, packed a bag with more knives, and was ready to travel to Washington, D.C. The defendant's wife's statements are corroborated by text messages sent by the defendant and other evidence showing that both before and after the attack on the Capitol began, the defendant contacted other individuals to try to get to Washington, D.C. Ultimately, the defendant was unable to get a ride and thus did not travel to the Capitol on January 6.

  In the days following the Capitol attack, the defendant physically attacked his wife because she refused to help him raise money for the Proud Boys.[2] Specifically, the defendant wanted to raise money for the Proud Boys using a joint business account that he shared with his wife. The defendant's wife refused and told the defendant that he would have to do that in his name only because she did not want to be associated with violence. As a result of her refusal to support the Proud Boys, the defendant choked his wife, took out one of his combat knives and stated, in sum and substance, "what makes you think I won't fucking kill you?" The defendant's 8-year-old daughter and then-4-year-old son walked into the room while the defendant had his hands around his wife's neck.

---

  [2]  The Proud Boys is a nationalist organization with multiple U.S. chapters and potential activity in other Western countries. The group describes itself as a "pro-Western fraternal organization for men to refuse to apologize for creating the modern world; aka Western Chauvinists." Proud Boys members routinely attend rallies, protests, and other First Amendment-protected events, where certain of its members sometimes engage in acts of violence against individuals whom they perceive as threats to their values. The group has an initiation process for new members, which includes the taking of an "oath."

B.     <u>The Defendant Is Arrested for Illegal Possession of Ammunition and Ordered Detained Pending Trial</u>

On January 12, 2021, the FBI executed a search warrant at the defendant's home in Queens. The search revealed approximately 1,000 rounds of .22 caliber Winchester hollow points , 25 rounds of 12-gauge Remington shotgun slugs, and one round of .300 caliber Winchester Magnum. The FBI also recovered approximately 72 military-style combat knives, two hatchets, and two swords. The defendant admitted to the FBI that he was the operator of the Florea Parler Account and the owner of the ammunition and weapons. The defendant also told the FBI that he was a supporter of the Proud Boys and hoped to join their group. The defendant stated that he had traveled with Proud Boys members to Washington, D.C. in December 2020, where he saw Proud Boys members vandalize a church on December 12, 2020. The investigation has also revealed that in December 2020, the defendant—who is a software engineer—was working on a secure communications platform for the Proud Boys. The defendant wanted to create an encrypted platform for Proud Boys to communicate without infiltration.

The FBI arrested the defendant following the execution of the search warrant and the recovery of more than 1,000 rounds of ammunition. The defendant was charged with possessing ammunition as a previously convicted felon, in violation of 18 U.S.C. § 922(g). On January 13, 2021, the defendant appeared before Judge Bulsara and presented a bail package nearly identical to the one currently before the Court. Like now, the defendant's mother offered to post her home as collateral for the defendant's release. Judge Bulsara denied the defendant's motion for bail, found that the defendant posed a "significant danger to the community," and described the defendant's actions as "a deliberate plan to engage in potential serious violence." Judge Bulsara further noted that the defendant was "deeply incorrect" to suggest that his postings were simply internet chatter. <u>See</u> ECF No. 3.

On January 22, 2021, a grand jury indicted the defendant on one count of transmitting threats to injure, in violation of 18 U.S.C. § 875(c), and one count of possessing ammunition as a previously convicted felon, in violation of 18 U.S.C. 922(g).

C.     <u>The Defendant's Criminal History, History of Domestic Abuse, and Prior Violations of Court Orders</u>

The defendant has a prior firearms felony conviction, is a serial domestic abuser, and recidivist violator of court orders.

a.   <u>Prior Criminal History</u>

In 2014, the defendant was arrested on Staten Island for illegally possessing 13 firearms, including a AR-15 assault rifle and a semi-automatic shotgun. In that case, the police also recovered hundreds of rounds of ammunition. Notably, the defendant's proposed suretor—his mother—was also charged as a co-conspirator though the case against her was ultimately disposed of via a non-criminal disposition. The defendant's wife told the FBI that the defendant's mother was aware that her son illegally possessed the firearms.

4

b.  <u>Domestic Abuse and Violations of Court Orders</u>

The defendant is a serial perpetrator of domestic violence against his wife.  The defendant has repeatedly pointed firearms at his wife, held her at knifepoint, and otherwise physically and emotionally abused her, sometimes in front of their two minor children.  The defendant's wife reported to the FBI that the defendant began abusing her approximately six months to one year after they began dating in 2010, and that this abuse continued until mere days before the defendant's incarceration on the instant charges.  Some the abuse reported by the defendant's wife includes the following:

- Prior to the confiscation of his illegal firearms in 2014, the defendant regularly pointed the firearms at his wife.

- After he was released from prison on the firearms charges, the defendant regularly choked his wife and also threatened her with one of his combat knives.  In one incident, the defendant threw his wife onto their daughter's bed and then stabbed the bed with knife right next to her head.  The knife went through the comforter, sheets, and into the mattress mere inches from his wife's head.

- In approximately 2015, when the defendant's wife was pregnant with their son, she asked the defendant to promise that he would never lay hands on her again.  The defendant replied, "or else what?"  The defendant's wife replied "or else" she would call the police.  The defendant then grabbed a kitchen knife, held his wife down on the floor, and stated, in sum and substance, "there won't be a fucking next time."

- In 2016, approximately two months after the defendant's son was born via C-section, the defendant became angry at his wife.  Though she was recovering from labor and the C-section incision, the defendant grabbed his wife's wrist and held up his fist (as though he would strike her) to compel her to answer questions.  The defendant continued this abuse despite his wife's protestations that the stress position he was holding her in was hurting her C-section wound.

- In August 2020, the defendant's wife was recovering from surgery.  Approximately two weeks after the surgery, the defendant threw her to the ground.

- The defendant's wife also reported that the defendant frequently abused the family dog.  In one particularly gruesome incident in 2014, the family dog nipped the defendant's finger.  In response, the defendant took one of his combat knives and cut the dog's back so deeply that the dog's skin was visibly flapping.

5

- Most recently, since the defendant's arrest, the defendant's children reported to the defendant's wife that that the defendant had threatened to kill them with a metal ruler because the children had been misbehaving.

The defendant's wife's statements are corroborated by multiple orders of protection issued by the New York State Family Court against the defendant. These orders mandated that the defendant stop abusing his wife, and in some instances, stay away from his wife and children. Though the government has not yet been able to obtain official copies of the orders of protection, unofficial copies indicate that the defendant has admitted to violating court orders. The defendant's wife has also confirmed that the defendant violated multiple orders of protection.

The defendant's wife's statements are also corroborated by an audio recording made by the defendant's wife in May 2014. During that incident, the defendant and his wife got into an argument over a cup of water. According to NYPD and Richmond County court records, the defendant choked his wife while she was holding her then-19-month old daughter in her lap. The defendant stood over his wife and daughter with a knife in his hand and stated, "I will fucking kill you both. First her (the child) and then you." At that point, the defendant's wife was able to surreptitiously activate an audio recorder that captured the remainder of the incident. In the recording, the defendant admits to multiple acts of physical violence against his wife, including threatening to kill his wife and daughter. The defendant can also be heard physically and emotionally abusing his wife on the recording. The following are excerpts of statements made by the defendant to his wife on the recording:

- In response to the defendant's wife stating that the defendant may have broken her arm, the defendant responded, "[y]ou know what, you mother fucker, you know what man. Keep fucking pissing me off. Keep fucking pissing me off. You're fucking lucky your fucking face isn't fucking smashed."

- In response to the defendant's wife complaining that the defendant put his hands on her, the defendant responded, "And I'm gonna keep putting my fucking hands on you, because you—because—look at me, look at me. Because you have no fucking respect. You have no fucking respect. You want me to treat you with respect but you're not going to fucking respect me? Is that what you want? You want to say whatever the fuck it is you want to say to me, and me fucking do nothing? You want me to call you some fucking names right now? Is it going to make you feel better if I start calling you some fucking names?"

- In response to the defendant's wife audibly crying, telling the defendant to stop touching her, and saying that the defendant was hurting her in the recording, the defendant stated, "What the fuck do you wanna do? I'm gonna keep fucking hurting you until you make a fucking decision . . . I'm gonna put my sword through you."

- In response to the defendant's wife pleading with the defendant to stop his physical violence, the defendant stated, "Yes, you're right. You're right. And I'm gonna keep

6

fucking hurting you until you fucking understand what the fuck I'm trying to tell you. Do you understand me? Do you fucking understand me?"

- In response to additional pleas from the defendant's wife, the defendant began physically assaulting his wife on the recording, and stated, "Please fucking say something to me . . . before I break your fucking skull open. . . .Motherfucker I am going to break your arm. You fucking, you fucking piece of shit. Now I'm gonna call you some fucking names . . . you cunt, whore, piece of fucking garbage . . . You like that? You like these words? You like these fucking words? Miserable, fucking scumbag, fucking—you want me to say nasty fucking words to you? Do you like that? Does, do these words feel good?"

Notably, the defendant's wife can be heard screaming and crying in physical pain in various portions of the recording.

II. Legal Standard

Under the Bail Reform Act, Title 18, United States Code, Sections 3141 et seq., federal courts are instructed to order the pretrial detention of a defendant if, after a hearing, the judge "finds that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e)(1). A finding of dangerousness must be supported by clear and convincing evidence. See United States v. Ferranti, 66 F.3d 540, 542 (2d Cir. 1995); United States v. Chimurenga, 760 F.2d 400, 405 (2d Cir. 1985). A finding of risk of flight must be supported by a preponderance of the evidence. Chimurenga, 760 F.2d at 405.

The Bail Reform Act lists the following factors to be considered in the detention analysis: (1) the nature and circumstances of the offenses charged; (2) the weight of the evidence against the defendant; (3) the history and characteristics of the defendant; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the defendant's release. See 18 U.S.C. § 3142(g). As discussed below, these factors weigh heavily against pretrial release.

III. The Court Should Not Modify Judge Bulsara's January 13, 2021 Order of Detention

As discussed below, each of the factors set forth in Section 3142 weighs heavily against the defendant's pretrial release. Moreover, the bail package proposed by the defendant— essentially that he live with his mother and stay away from his wife and the Proud Boys—does not come close to addressing the danger he poses to the community or the risk of non-compliance with court-ordered conditions of release.

As a threshold matter, the government notes that the defendant's request to be released from prison is primarily premised on the claim that the defendant may have recently developed a kidney condition. The defendant has not previously sought the government's assistance or relief from the Court relating to this medical condition; accordingly, the government first learned of the defendant's claims when he filed his motion two days ago, on June 15, 2021. As a result, the government has not verified any of the defendant's medical

7

claims. But even assuming, for the sake of argument, that the defendant's complaints are true and that he requires additional medical treatment, the appropriate relief is not for the defendant to be released on a pretrial bond. Rather, the appropriate relief is for the Court to ensure that the defendant receives appropriate medical care. The Metropolitan Detention Center ("MDC") has health care personnel onsite to care for the defendant. If the onsite personnel are unable to meet the defendant's medical needs, the MDC regularly takes inmates to outside medical specialists for evaluation and treatment. Since receiving the defendant's motion, the government has contacted the MDC to inquire about the defendant's health and whether additional treatment is appropriate. The government has no objection to continuing to work with the MDC and report back to the Court with a treatment plan for the defendant. Other than the possible kidney condition, the defendant has failed to describe a single change in circumstances since Judge Bulsara entered an order of detention following the defendant's arrest.

      A.      <u>The Nature and Circumstances of the Offense Charged and the Weight of the Evidence</u>

The danger posed by the defendant is clear. Threatening to murder elected officials of the United States government is a frontal attack on both the individual officials and also on the democratic system of government that the public relies on to maintain order. These types of threats are particularly dangerous when made in a charged political environment that has already led to the overrunning of the United States Capitol and the interruption, for the first time in United States history, of the certification of a Presidential election. In <u>United States v. Hunt</u>, No. 21-CR-086 (PKC), the defendant was also charged with making threats of violence against Members of Congress in the wake of the Presidential election and attack on the Capitol. Hunt, who had no prior criminal history, proposed a similar bail package as that proposed by the defendant. Despite Hunt's lack of criminal history, United States Magistrate Judge Ramon E. Reyes, Jr. and United States District Judge Pamela K. Chen both found the threats Hunt made to Members of Congress were sufficiently dangerous to deny his motion for bail. Judge Chen specifically noted that threats like the ones made by Hunt create a danger to the community and create the risk of the defendant "continuing with threats or inciting violence against U.S. officials." (Mar. 1, 2021 Transcript at 10.)

Detention is even more appropriate here where the defendant made similar threats coupled with "a deliberate plan to engage in potential serious violence," as stated by Judge Bulsara. The defendant has admitted to illegally possessing thousands of rounds of ammunition, approximately 75 combat knives, and two swords. The defendant has also admitted to being a Proud Boys supporter, to traveling with them to Washington, D.C., and to being with them while they vandalized the church. The fact that the defendant traveled to Washington, D.C. to meet up with the Proud Boys, watched them commit crimes, and then returned home with aspirations of raising funds and creating an encrypted communication application for them indicates that the defendant remains unwilling to conform his conduct to the law. Additionally, both before and immediately after the attack on the Capitol, the defendant desperately attempted to get a ride to Washington, D.C., and to bring weapons to the already violent attack.

The weight of the evidence is also overwhelming. There is no dispute that the hundreds of rounds of ammunition were in the defendant's possession and there is no dispute that he is a convicted felon. Likewise, there is no dispute that the defendant made the threats

identified by the government. Nor is there any dispute that the statements would be deeply disturbing to any reasonable recipient of them, particularly in the context of the violent storming of the Capitol on January 6, 2021.

        B.        The Defendant's History and Characteristics and the Danger to the Community Posed by Release

The defendant's history and characteristics shows that he is an extremely violent individual with little to no ability to control his anger. The defendant continues to pose a severe and ongoing risk to the community, and he has a high likelihood of not complying with conditions of release. Federal and state laws prohibiting the possession of firearms and ammunition have not deterred him. A felony conviction and jail sentence for possessing firearms have not deterred him. Multiple orders of protection have not deterred him from abusing his wife and children. His proposed suretor—his mother—has not deterred him. The fact that she was aware of his illegal possession of firearms and was unable to prevent the criminal conduct is telling with regard to her ability to prevent the defendant from engaging in further criminal activity. The only thing that will deter the defendant from future crimes and/or acts of violence is a jail cell.

Simply put, the community should not be put at risk by giving the defendant the benefit of the doubt that this time things will be different, despite clear and repeated examples of the defendant's dangerousness.

        C.        Risk of Flight

The defendant continues to pose a significant flight risk, which cannot be overcome by home detention. Beyond the obvious risk of flight concern that the defendant's behavior establishes, the defendant faces up to 15 years' imprisonment on the current charges. The prospect of a lengthy term of incarceration may further incentivize the defendant to flee and thus establishes that he poses a serious risk of flight.

        D.        The Proposed Bail Package Is Insufficient To Mitigate the Danger To Community and Risk of Flight

Even if the defendant's danger to the community, risk of flight, or likelihood of noncompliance with conditions of release could be mitigated by some conditions of release, the defense has not proposed such conditions. Under the defense proposal, the defendant would be released without mental health evaluation to live with his mother. As explained above, the defendant's mother has, at times, directly enabled the defendant's criminal behavior. For example, the defendant's mother was aware that the defendant was in possession of multiple, illegal firearms in 2014. Indeed, the defendant's mother was initially charged with weapons offenses herself. According to the defendant's wife, the defendant's mother was also aware for years of the domestic violence that the defendant has meted out, including the incident that took place on or about January 9, 2021. In other words, the defendant's mother is either willing to turn a blind eye to criminal behavior or she lacks the moral suasion over the defendant to prevent him from breaking the law. In either instance, the defendant's mother is not an appropriate suretor.

Lastly, the defendant's proposal of a $100,000 bond is patently insufficient to dissuade him from fleeing or breaking the law. The defendant reported to Pretrial Services that his income prior to his arrest was $135,000. Additionally, the defendant's mother reports that her home is worth approximately $700,000 and that she owns it outright. Potentially losing $100,000 is simply insufficient deterrence to the defendant and his mother. IV. <u>Conclusion</u>

For all these reasons, the government respectfully submits that the Court should deny the defendant's motion to modify Judge Bulsara's January 13, 2021 order of detention.

                                                  Respectfully submitted,

                                                  MARK J. LESKO
                                                  Acting United States Attorney

By:    /s/ Francisco J. Navarro
        Francisco J. Navarro
        Andrew P. Wenzel
        Assistant United States Attorneys
        (718) 254-7000

cc:    Clerk of Court (EK) (by ECF)
       Mia Eisner-Grynberg, Esq. (by ECF)