# Federal Defenders
## OF NEW YORK, INC.

One Pierrepont Plaza-16th Floor, Brooklyn, NY 11201
Tel: (718) 330-1200 Fax: (718) 855-0760

David E. Patton
*Executive Director and*
*Attorney-in-Chief*

Deirdre D. von Dornum
*Attorney-in-Charge*

November 15, 2021

**Via Email and ECF**
The Honorable Eric Komitee
United States District Court
Eastern District of New York
United States Courthouse
225 Cadman Plaza East
Brooklyn, NY 11201

Re:   **United States v. Eduard Florea, 21-CR-37 (EK)**

Your Honor,

I write in anticipation of sentencing, currently scheduled for November 29, 2021.  Eduard Florea is a forty-one-year-old, self-taught software engineer.  More importantly, he is eight-year-old ███ and five-year-old ███'s devoted and loving dad; he was their sole financial provider until his arrest.  He is a proud United States citizen whose earliest memories are of his flight as a young boy from a totalitarian regime.  He is a student of history and politics, a collector, and a political conservative.  Without a doubt, while swept up in an unprecedented frenzy, intentionally fomented by government officials in an upside-down, toxic political environment, Mr. Florea overstepped the line between political expression and threatening speech.  And as a prohibited person based on a prior felony conviction, Mr. Florea clearly broke the law when, among boxes of assorted junk in his basement, he knowingly possessed old bullets, without possessing or having access to any firearms that could fire them.

For his two crimes, each well within the heartland of the sentencing guidelines that advise this Court, Mr. Florea faces a combined recommended sentence of 15 to 21 months' incarceration.  But the time Mr. Florea has served, too, has been unprecedented: while he suffered from untreated chronic kidney disease, the Federal Bureau of Prisons has failed—over and again, despite a court order—to provide him a basic level of care.  Despite his choice to become fully vaccinated (unlike the right-wing cartoon character portrayed in the media), the Federal Bureau of Prisons failed to protect him from a symptomatic COVID-19 breakthrough infection.  Also despite his choice to become fully vaccinated, the Federal Bureau of Prisons has kept Mr. Florea in prison conditions vastly less rehabilitative, and more isolating, than can be expected in a United States Prison.  The time he has served has been a shocking, life-altering wakeup call.  We respectfully submit that these ten-and-a-half months of incarceration, to be followed by an intensive period of post-release supervision, have been sufficient to meet the goals of sentencing.

1

## I.      Eduard Florea is a Dedicated Father, Whose Offenses Were Situational

### A.   Mr. Florea is an Accomplished Software Engineer, Chasing the American Dream

Eduard Florea is a hardworking father.  Born in 1980 in Bucharest, Romania, Mr. Florea was left at the age of three in the care of his grandparents, as his parents fled a totalitarian government as political refugees.  *See* Ex. A (Mitigation Report by Client and Mitigation Specialist Danielle Azzarelli).  For three years, he had no contact with his parents, reuniting with them only after boarding a plane alone as a six-year-old child.  He arrived all alone in a foreign country where he did not speak the language.  Then, at nearly ten, he was abandoned by his father.  Together, and alone, Mr. Florea and his mother navigated the waters of their new homeland.  He developed a love for this country, where he made every effort to pursue the classic American dream.  He taught himself computer programming, and became a successful software engineer.  Without a high school degree, at the time of his arrest, Mr. Florea had worked his way up in his field, and was earning $135,000 a year.

By all accounts, Mr. Florea is a dedicated and loving father.  Prior to his arrest, he was the sole financial provider for his children.  Throughout his incarceration, he has maintained constant contact with ███ and ██████, speaking with them by phone while they are in the care of their grandmother, and sending them letters and cards.  To keep connected and grounded in a challenging environment, Mr. Florea has additionally kept a notebook-length journal of daily letters to his children, expressing the lessons he has learned, and committing not to reoffend.  Losing daily contact with his children has been devastatingly painful, given the family history.  *See* Part II, post.  The opportunity to rebuild his two children's trust, to provide for them, and to show them his love for them is his most powerful rehabilitation incentive.

### B.   Mr. Florea's Possession of Ammunition, Absent Firearms, Was Incidental

As a boy, a young man, and an adult, Mr. Florea pursued lawful interests that are considered perfectly ordinary throughout wide swaths of the United States.  He is an avid student of politics and history, a voracious reader and repository of facts and movie quotes.  He is a collector.  He enjoys the outdoors.  As an adolescent, Mr. Florea learned to shoot squirrels, and as he grew older, would frequent legal shooting ranges on Long Island.  In 2014, Mr. Florea was arrested, charged with the possession of numerous firearms in his Staten Island home.  PSR ¶ 44.  He provided his records to the Staten Island District Attorney's Office, demonstrating that the firearms had been purchased lawfully, at licensed, registered gun stores.  Ultimately, he was convicted only of his possession of an AR-15 style rifle, legal to possess in New York State, but not so in the five boroughs, where he lived.  He served one year on Rikers Island, and lost the privilege of owning firearms—or even ammunition—ever again.  Mr. Florea knew the cost of his offense, and he abided by those restrictions, refusing opportunities to hunt and shoot with his friends and family, because he knew it was unlawful.

When Mr. Florea was arrested in 2014, the New York City Police Department seized firearms and ammunition from his Staten Island home.  Separately, prior to his arrest, he had lawfully possessed ammunition at his mother's residence, where he would meet up with her boyfriend—a father figure to Mr. Florea—to go to shooting ranges on Long Island.  This

2

residence was not searched, and nothing was seized.  After his release from custody, and long after he had left her home, some of that ammunition remained in his mother's garage, mixed in with his other possessions: old papers, baseball cards, and the like.  Eventually, Mr. Florea's mother moved out of that house, and moved the boxes into the basement of her business, a beauty salon.  The pandemic forced the closure of the business, and Mrs. Florea no longer had space for her grown son's belongings.  She brought the boxes to Mr. Florea's home, the house in Middle Village that he shared with his wife and two children.  *See* PSR ¶ 55.

Mr. Florea received the crates of his belongings from his mother, and he opened them. He observed the ammunition, and he panicked.  He knew that he was not permitted to possess it, and he didn't know what to do with it.  He knew that it was dangerous to throw ammunition in the trash, where it could be recovered by a child, or explode in the compactor of a garbage truck. He was afraid to bring it to a police precinct, where he would be effectively implicating himself in a federal crime.  He did not want to involve anyone else in his predicament.  And so he kept the ammunition in his basement, among all of his other boxes of junk, until he could figure out how to get rid of it:



On January 12, 2021, the FBI rolled down Mr. Florea's quiet residential street in an armored vehicle, looking for a man who had boasted online about a caravan of armed patriots heading from NY to DC on January 6, 2021—a man who they knew, at the time of their media stunt, had never left his basement that day, but perhaps, in the light most favorable to the FBI, would have an arsenal of firearms or bombs.  *E.g.*, Kevin Sheehan, *Stunning Photos Show the Moment Armed FBI Tank Rolls Down Quiet Queens Street*, New York Post (Jan. 13, 2021), *at* https://nypost.com/2021/01/13/photos-show-armed-fbi-tank-rolling-down-queens-street/.



The agents searched every drawer of every dresser, every box in the basement, in the nooks and crannies of his children's closets.  Notably, among the boxes of his own belongings, among his tools and his gardening equipment, Mr. Florea lacked a single firearm.  The agents seized limitless electronics, numerous personal and work computers, hard drives, flash drives, and phones, even the laptops the children were using for their pandemic remote learning.  And the agents found zero firearms, because there weren't any.  They found no evidence that Mr. Florea had used any ammunition since his June 2014 conviction.  And after searching his home, his devices, and trapping and tracing his phone, they found no evidence that he had access to firearms stored elsewhere, or that he was in a conspiracy to commit any other crime.

Mr. Florea's possession of ammunition—of 900 .22 long rifle rounds (what Wikipedia calls "by far the most common ammunition in the world today…ideal for training"), 25 shotgun rounds without a shotgun, and one, single .300 caliber round—was useless without firearms with which to shoot them.  Nonetheless, he knew that the possession of ammunition alone was unlawful.  Mr. Florea immediately admitted to it at the time of his arrest, and at his guilty plea. Inside of his home, in the basement where he worked, away from his children, Mr. Florea's possession of ammunition alone was the least aggravated way to violate the federal prohibition on possession by a person previously convicted of a felony.  His mother has corroborated his account of how the ammunition came to be in his possession.  PSR ¶ 55.  Despite a full investigation, the FBI has produced no evidence casting doubt on that account, because it is true.

C.  <u>While Members of Congress Directed "American Patriots [to] Start Taking Down Names and Kicking Ass," Asking if They Were Willing to "Sacrifice…Their Lives" "to Fight for America," Proclaiming "Today is 1776," and, Taking That Direction, 800 Other People Breached the Walls of the United States Capitol, Mr. Florea Worked from his Middle Village Home and Tweeted in His Basement</u>

To be sure, Mr. Florea is a political conservative.  He and his wife were ardent supporters of President Trump, and Mr. Florea has long voted for the Republican party.  The Florea family history was marked and defined by fleeing communism in Romania.  He was born into a country

in political upheaval, during which "the Communist Party intensified its control of mass organizations and intruded more deeply than ever before into the daily lives of citizens." *Communist Romania*, Encyclopedia Britannica, *at* https://www.britannica.com/place/Romania/Communist-Romania.  Failed efforts to settle foreign debts led to "extreme shortages of food, fuel, energy, medicines, and other basic necessities," which "drastically lowered living standards and intensified unrest." *Id*.  On a personal level, communism meant that Mr. Florea's parents fled, leaving him without them in the first years of his living memory, so that they could seek asylum.  Mr. Florea's political ideology deepened as he grew older, and like many, he felt the United States moving in a direction he did not support.  When President Trump lost re-election, and began to loudly, publicly, and incessantly doubt the veracity and validity of President Biden's election, Mr. Florea fell sway to the increasing frenzy.  His mother observed that, already an "obsessed" viewer of Fox News, Mr. Florea "transferred his obsession to Newsmax," the 24/7 rightwing cable news channel that ran a drumbeat of Trump's claims that the election was stolen from him.

On January 5 and 6, 2021, government officials—and prominent former government officials-turned-media personalities—openly encouraged treason, urging Americans to come to the United States Capitol and commit acts of violence.  It is true that on those days, Mr. Florea tweeted, or more specifically, "parleyed," out-of-control threats and false boasts amidst a grossly toxic atmosphere of tens of thousands of like-minded individuals.  He got into heated online arguments, fantastically saying he would "slice a throat" of an unknown poster who was trolling his wife's account if he encountered him in DC.  He piled on to other posters' comments about Senator-elect Warnock.  And he posted a patently false series of parleys about cleaning and loading his non-existent guns, about travelling in a caravan of armed patriots from NY to DC, while in reality he worked from home on his software engineering projects until 8:00 PM local time, and, from his basement desk, declared that it was time to unleash some violence.

Mr. Florea's social media posts were inappropriate and unacceptable, and the very few that amounted to threats—empty threats, nonetheless—were unlawful.  Again, he admitted to them immediately, and pled guilty.  But Mr. Florea's posts must be viewed in context of the language and posts of many those days, prominent government officials and members of Congress among them.  On January 5, 2021, while Mr. Florea was posting, "tomorrow may very well be the day war kicks off," President Trump's former chief strategist Steve Bannon was declaring, "All hell is going to break loose tomorrow.  Just understand this.  All hell is going to break loose tomorrow.  It's gonna be moving.  It's gonna be quick.  This is not a day for fantasy, this is a day for maniacal focus.  Focus, focus, focus.  We're coming in right over the target, okay?  Exactly – this is the point of attack we've always wanted."  *Steve Bannon Is Also Responsible for the Capitol Riot*, Act.tv (Feb. 11, 2021), *at* https://www.youtube.com/watch?v=t7rSZl0u2n4.

In Washington, Representative Mo Brooks of Alabama addressed the "Stop the Steal" rally, headlined by President Trump, and attended by thousands, not including Mr. Florea, directing them that "Today is the day American patriots start taking down names and kicking ass."  *Mo Brooks Gives Fiery Speech Against Anti-Trump Republicans, Socialists*, The Hill (Jan. 6, 2021), *at* https://www.youtube.com/watch?v=ZKHwV6sdrMk.  He urged the crowd that their ancestors had "sacrificed their blood" and "sometimes their lives," asking, "are you willing to do

the same?" and that "[his] answer is yes!"  *Id*.  He directed the crowds to "carry the message to Capitol Hill" where "the fight begins today!"  *Id*.  Feeding off the same torrent of energy, while Mr. Florea was falsely parleying that he was "armed and ready to deploy," Representative Lauren Boebert of Colorado was tweeting:



*See* https://twitter.com/laurenboebert/status/1346811381878845442.

Suffice to say, Mr. Florea's social media posts did not exist in a vacuum, nor in a normal political atmosphere.  His actions—his own, for which he is solely responsible, and has pleaded guilty—were of a sort, well within the norms of social media and similar or, at a minimum, plainly responsive, to those of elected members of Congress.  Indeed, as Mr. Florea sits at the MDC for tweeting "dead men can't pass shit laws" about then-Senator-elect Rafael Warnock, Representative Paul Gosar of Arizona was just last week tweeting an anime video of himself murdering Representative Alexandria Ocasio-Cortez by slashing her in the back of the neck. *E.g.*, Felicia Sonmez, *Rep. Paul Gosar Tweets Altered Anime Video Showing Him Killing Rep. Ocasio-Cortez and Attacking President Biden*, The Washington Post (Nov. 8, 2021), *at* https://wapo.st/3oqStel; *see also* https://twitter.com/KeithEdmonson61/status/1457785339058081800?s=20 (preservation of since-deleted video from Rep. Gosar's tweet).  To be sure, none of these political messages are acceptable, and the members of Congress spouting them should be ashamed, if not prosecuted themselves.  But they help explain the context in which Mr. Florea was expressing his own anger—which was just that: anger, and nothing more.

While incarcerated at MDC Brooklyn, Mr. Florea has had ample opportunity to reflect on his political views, the January 6 riot of which he played no part, and the current political situation in the United States.  The one positive to come of his incarceration during a pandemic is that, by definition, he is in close quarters with men quite unlike himself.  He has forged common ground and peacefully coexisted with inmates of all races who possess myriad views and are charged with or are serving sentences for having committed all manner of offenses.  This experience has opened his eyes to worlds and perspectives he had not known.  He has taught the men on his unit computer coding, hoping to spread knowledge of a skill that could lead to gainful and lawful employment for them.  He has brainstormed future work collaboration.  On his own time, Mr. Florea has continued to read voraciously, teaching himself a new computer programming language, challenging himself with complex mathematics equations, and reading every book he can get his hands on.  Faced with zero programming twenty months into the pandemic—inexplicably, as inmates are kept in consistent cohorts—Mr. Florea did the one thing he could do on his own: he studied for and passed the High School Equivalency examination, fulfilling a decades-old promise he made to himself.  At this point of his life, Mr. Florea has no interest in or need to be part of toxic communities.  He is laser focused only on getting back to work and getting back to his children.

## II.     Objections to the Presentence Investigation Report

Mr. Florea raises several objections to the Presentence Investigation Report ("PSR").[1] Though the PSR accurately calculates Mr. Florea's criminal history and advisory sentencing guidelines, and accurately relays his family history, it is replete with narration that is either irrelevant to the instant offense or simply incorrect.  Here, we seek to add context where appropriate, and to make necessary corrections that may impact the Probation Department's recommended sentence.

*First*, we move to strike paragraphs 10-13.  As explained in Part I, and unchallenged by the government, at all times on January 6, 2021, Mr. Florea was inside of his home in Middle Village, Queens, New York.  The existence of a security perimeter around the United States Capitol building in Washington, DC (¶ 10), the breach of the Capitol by other, unrelated individuals, causing the evacuation of Congress (¶ 11), the planning of the protest by other individuals (¶ 12), and the fatalities and injuries that occurred (¶ 13) are plainly irrelevant to Mr. Florea's crimes of posting online threats and possessing ammunition.  The only relevant sentence in this section of the PSR is, "Of note, the defendant did not participate in this riot."  *Id.* ¶ 13. Mr. Florea played no role whatsoever in the violent conduct that occurred that day at the Capitol. The inclusion of these paragraphs serves only to prejudice him with behaviors wholly outside his control.

*Second*, the PSR appears to fully misapprehend that Mr. Florea was arrested on June 16, 2014, and prosecuted for felony domestic violence.  In paragraph 48, the PSR recounts "Other Arrests: none."  In paragraph 60, despite apparently crediting, by copying and pasting, the government's opposition to Mr. Florea's bail motion, quoting, "according to NYPD and Richmond County court records," the PSR then, in footnote 2, denies the existence of those records.  Finally, in paragraph 98, the Probation Officer asks this Court to consider an upward departure, to punish Mr. Florea for "additional criminal conduct, for which the defendant has never been held accountable."  Each of these paragraphs are mistaken.

On June 16, 2014, while in custody for his June 14, 2014 firearms arrest, Mr. Florea was rearrested for the conduct described in PSR ¶ 60.  *See* Ex. B (Criminal Court Records).  The record of that arrest shows that, as indicated by the narrative, he was charged with felony strangulation and other related offenses.  *Id.* at B1 (Fingerprint Response).  The criminal court complaint relays the same facts as PSR ¶ 60.  *Id.* at B2 (Complaint) (first page cut off in file record).  The Court's notes on the Complaint indicate that the District Attorney moved to dismiss

---

[1] Undersigned counsel acknowledges that these objections are raised slightly beyond the fourteen-day time period contemplated by Fed. R. Crim. P. 32(f)(1).  The reason for the delay was counsel's surprise that the PSR denied the existence of arrest and police records for Mr. Florea's June 16, 2014 arrest and prosecution in Richmond County Supreme Court.  *See* PSR ¶¶ 48, 60 (footnote 2), and 98.  The fact of that prosecution was known to the government since the inception of the case against Mr. Florea, and publicized in the local news media.  Retrieving the state court files required filing releases and requests, and awaiting responses, from Richmond County Supreme, Criminal, and Family Courts.  We file these objections as soon as possible after receiving those records, and two weeks before sentencing.

the felony charge of strangulation. *Id*. The District Attorney spokesman informed the local media that the prosecutor had done so after the defendant's wife, after first signing an affirmation under penalty of perjury that she had lost consciousness, Ex. B3, later cast doubt on her own allegation. Zak Koeske, *Tottenville man accused of choking wife, menacing baby daughter could have charges dismissed*, SI Live (Oct. 4, 2014), *at* https://www.silive.com/southshore/2014/10/tottenville_man_accused_of_cho.html. Eventually, on September 30, 2014, Mr. Florea's case was adjourned while he served the one-year prison sentence on the firearms offense. On March 27, 2015, after he had fulfilled his promise not to contact his wife, the District Attorney moved to dismiss the domestic violence case. *See id*. (reporting on the terms of the negotiated disposition); Ex. B4 (Certificate of Disposition).

The context of prosecutor's motion to dismiss the case on March 27, 2015 is critical. First, following his arrest on the charges, Mr. Florea served one year in custody on the firearms charge. Having determined that the domestic violence allegation amounted to, at best, a misdemeanor offense, Mr. Florea faced no more than a one-year sentence on those charges. While the time could have been served consecutively, it is by no means unusual that the one year of imprisonment effectively incapacitated Mr. Florea for the same period. Notably, the prosecutor did not offer to adjourn the case in contemplation of dismissal until after Mr. Florea pled guilty, on July 22, 2014, and was sentenced, on August 18, 2014, on the firearms case. *See* Ex. C (Supreme Court Certificate of Disposition).

Most importantly, it is wholly inaccurate that Mr. Florea "has never been held accountable" for the May 2014 incident, for which he was prosecuted. In addition to being arrested and remanded, the government moved in Richmond County Family Court to remove Mr. Florea's daughter from his care as a victim of neglect. *See* Ex. D (Family Court Records). On June 17, 2014, the day after his arrest, the Commissioner of the Administration for Children's Services filed a petition, based on the same event described in PSR ¶ 60. On March 9, 2015, after Mr. Florea completed his one-year sentence (released with good conduct time), the Family Court conducted a dispositional hearing. ████, then two years old, was placed in her mother's care, and Mr. Florea was issued a stay away order prohibiting any contact with her. He was ordered under the supervision of ACS-Richmond until March 9, 2016, and required to complete parenting skills classes, anger management counseling, a batterer's program, and mental health evaluation and treatment. On March 2, 2016, the order of supervision was extended until March 30, 2016. Then, it was extended to March 29, 2017. As he engaged, under the supervision of ACS, in all of the above programming, Mr. Florea and his wife attended years of couples' counseling. They decided to reconcile and have another child. As soon as their son was born, ACS moved to include him in the order of supervision. On July 14, 2016, following a dispositional hearing, the Family Court judge extended the order of supervision to include both of Mr. Florea's children, and required him to complete the same services in the original disposition order, likewise through March 29, 2017. On June 26, 2017, the Court again extended the order of supervision, this time to March 29, 2018.

All told, Mr. Florea, Mrs. Florea, and their children were under the supervision of ACS and the Richmond County Family Court from June 17, 2014 until March 28, 2018—nearly four years. For four years, Mr. Florea was forbidden to live with his wife and children, even when they had reconciled, and even when she was caring for a newborn. For four years, he attended

intensive programming, individual and group counseling, and couples counseling, having his every move and all aspects of his marriage picked through by forensic examiners, case workers, and the court.  His visits with his children were supervised.  When Mr. Florea was finally permitted to move back home to rejoin his family, his son was two and his daughter was five and a half.  To say that he was "not held accountable" because he did not serve additional time in jail wildly fails to misunderstand the intrusion of ACS in Mr. Florea's and his family's life for four very long and extraordinarily painful years.

The Criminal, Supreme, and Family Court records provide the basis for Probation to consider, and the Court to strike, PSR ¶ 98.  Policy statement 4A1.3 requires, upon "reliable information," an upward departure for delineated categories of adjudicated prior conduct.  The Court may vary upward for prior, <u>similar</u> misconduct established by civil adjudication, or prior, <u>similar</u> misconduct not resulting in a criminal conviction.  *Id*.  Mr. Florea's adjudicated domestic violence incident in May 2014 is in no way similar to the threats he posted on Parler or the possession of ammunition.  Due process and the parsimony clause require that courts sentence defendants for the crimes with which they are currently convicted, taking into account their criminal history and characteristics.  Respectfully, it is inappropriate and wrong for this Court to increase Mr. Florea's sentence for actions taken in January 2021 out of the federal Probation department's unsupported belief that he was insufficiently punished in 2014.

In the same vein, we move to strike PSR ¶ 60.  To be perfectly clear, Mr. Florea does not deny the veracity of the recording.  His actions, seven years ago, were shameful and in a word, horrifying.  He spent four years working to begin to undo that harm.  But the page-long narration of an event that was fully adjudicated in two courts is not relevant to the instant offense.  Mr. Florea was charged and convicted for making politically motivated threats on Parler.  He was charged and convicted for possessing ammunition as a previously convicted felon.  As his wife advises the Court, "the fact is that our marriage as good or bad as it is, has nothing to do with this case."  Ex. E (Letter from Joni Florea).  She's right.  Likewise, we move to strike PSR ¶¶ 58-59.  The allegations in these paragraphs are uncorroborated hearsay, and do not meet the government's burden of proof.  Notably, Mr. Florea's wife was investigated alongside Mr. Florea, making her own social media posts entirely unconnected from him, posting, e.g., "We will out gun them by a longshot… Unfortunately, some good men are going to have to do some bad things… But it may be a last resort... I pray not;" "There is a civil war brewing," "I hope you have enough ammo," and "we are going to war either way."  Ex. F (excerpts from sworn search warrant affidavit).  That she "did not want to be associated with violence," PSR ¶ 58, is incredible in light of these posts.

The fact is, like many human relationships, Eduard and Joni Florea's marriage was complex.[2]  Together, they have produced and parented two children they both love dearly.  But they have also brought out each other's worst characteristics, and their partnership was toxic.  Over the course of this year, once they stopped communicating, both of them have realized that their marriage needed to come to an end.  They do not plan to reconcile.  Instead, upon his

---

[2] In Paragraph 57, the PSR indicates that Joni Florea "is not supportive."  That was true at the time of the presentence interview.  On November 13, 2021, undersigned counsel received Ex. E, in which Joni Florea indicates her support for Eduard.

release, Mr. Florea will reside with his mother in the Bronx.  The two will resolve custody and visitation so that they are both parenting their children, but apart from one another.

## III.    The Sentencing Guidelines Recommendation is Appropriate, In Ordinary Times

The PSR adopts the plea agreement's sentencing guidelines calculations, which were agreed upon by the parties.  This is a straightforward case.  The only applicable enhancement in the threats count arises from making more than two of them.  Accordingly, the adjusted offense level is 14.  The ammunition charge is even more uncomplicated.  Mr. Florea was a prohibited person, but had no prior crime of violence or drug offense, resulting in a base offense level of 14.  No enhancements apply to the possession of ammunition in his basement.  Because the two offenses are unrelated, they are not grouped.  Instead, their "units" are combined, resulting in a combined adjusted offense level of 16, from which 3 points are deducted for acceptance of responsibility.  As a result, the total offense level is 13.  At criminal history category II—only two points—the advisory guidelines sentence is 15 to 21 months.

The lack of applicable enhancements, on both counts, is notable.  The sensationalism surrounding Mr. Florea's arrest, and its connection to the January 6, 2021 riot that he did not attend, does not match his actual conduct.  At bottom, Mr. Florea made online threats, from his basement, into the internet ether.  He did not contact directly any congressperson or other government official, nor any member of their staff.  He did not incite other individuals to commit acts of violence.  He issued bursts of anger onto Parler for other angry social media consumers to consume.  His possession of ammunition was unconnected and even less aggravated, in connection with no other offense.  The resulting, relatively low guidelines are appropriate to fit the offense conduct.

Data collected by the United States Sentencing Commission illustrates the point.  Over the last five years, fourteen defendants in the Eastern and Southern Districts of New York have been prosecuted for making online threats.  Their average sentence was 13 months; their median sentence was 11 months:



**Average and Median Sentence Length**
Fiscal Year 2016,2017,2018,2019,2020

Sentence Length (Average Months)    Sentence Length (Median Months)

The figure includes the 14 cases reported to the Commission. Cases missing information necessary to complete the analysis were excluded from this figure. Sentences of 470 months or greater (including life) and probation were included in the sentence average computations as 470 months and zero months, respectively. Sentences of probation only are included here as zero months. The information in this figure includes conditions of confinement as described in USSG §5C1.1.
FILTER:
Fiscal Year: 2016,2017,2018,2019,2020; Circuit: 2nd Circuit; State: All; District: New York, Eastern,New York, Southern; Race: All; Gender: All; Age: All; Citizenship: All; Education: All; Crime Type: All; Guideline: §2A6.1; Drug Type: All; Sentencing Zone: All; Criminal History: All; Career Offender Status: All

Data for firearms possession is also helpful, but distinguishable.  Over the same five-year period, limited to defendants in Mr. Florea's criminal history category II, 68 defendants were sentenced pursuant to guideline 2K2.1.  Among them, the average sentence was 24 months; the median was 22 months:



**Average and Median Sentence Length**
Fiscal Year 2016,2017,2018,2019,2020

The figure includes the 68 cases reported to the Commission. Cases missing information necessary to complete the analysis were excluded from this figure. Sentences of 470 months or greater (including life) and probation were included in the sentence average computations as 470 months and zero months, respectively. Sentences of probation only are included here as zero months. The information in this figure includes conditions of confinement as described in USSG §5C1.1.
**FILTER:**
Fiscal Year: 2016,2017,2018,2019,2020; Circuit: 2nd Circuit; State: All; District: New York, Eastern,New York, Southern; Race: All; Gender: All; Age: All; Citizenship: All; Education: All; Crime Type: All; Guideline: §2K2.1; Drug Type: All; Sentencing Zone: All; Criminal History: II; Career Offender Status: All

This data includes defendants who possessed loaded firearms, rather than ammunition alone.  It includes defendants with higher base offense levels, for drug and violent prior offenses.  It includes defendants with enhancements for use of a firearm, or connection to another offense.  Indeed, when a shooting of another person is prosecuted in this district, and charged under 18 U.S.C. § 922(g), those sentences fall into these averages, with cross-references, depending on the facts, for attempted murder.  Even still, the average sentence of 24 months is just slightly above the guidelines range indicated here, where the possession was not in any way aggravated.

## IV.  The Court's Sentence Should Avoid Unwarranted Disparities

### A.  January 6, 2021 Capitol Rioters

As discussed, Mr. Florea's offense conduct is far attenuated from the insurrectionists who breached the Capitol walls, following the direction of their government leaders to "kick ass and take names," and to be willing to give their lives to this supposed civil war.  Oddly, though, the United States government seeks a significantly higher sentence for Mr. Florea, who tweeted lies from his basement about being en route from New York "to unleash some violence," than for the many hundreds of individuals who in fact unleashed violence on sitting members of Congress.  On November 12, 2021, in the District of the District of Columbia, the government filed a sentencing memorandum in the case of *United States v. David Charles Mish, Jr.*, 21-CR-112 (D.D.C.).  In ECF No. 38-1, the government reviewed every sentence so far imposed on the Capitol rioters—people who did not just bluster with threats, but actually entered the building, committed crimes therein, and in many cases, posted the evidence against themselves on social media.  In the majority of these cases, the government recommended probation sentences, and the courts imposed them.  *Id*.  In only some, the government recommended and courts imposed days or up to six months of incarceration.  *Id*.  Only one defendant has been sentenced to a

11

significant term of incarceration: Scott Fairlamb, who assaulted a Capitol police officer.  12-CR-120 (RCL) (DDC).

In *United States v. Dawn Bancroft*, 21-CR-271 (D.D.C.), the defendant entered the Capitol through a window.  *See* ECF No. 1 (Complaint).  Upon exiting, she filmed herself saying "we broke into the Capitol…we got inside, we did our part.  We were looking for Nancy [Pelosi] to shoot her in the friggin' brain but we didn't find her."  Despite having threatened to murder the Speaker of the House, after burglarizing the Capitol, the government did not charge Ms. Bancroft with making threats.  Rather, the government extended to her a plea to a misdemeanor with a maximum sentence of six months' jail.  It is inconceivable that tweeting "dead men can't pass shit laws" from New York City requires, or warrants, greater punishment than breaking into the United States Capitol, and while therein, seeking to murder the House Speaker.

## B.  Other Comparable Cases

Instead, Mr. Florea's case is more similar—or significantly less aggravated—than other similar cases in this District and elsewhere.  In *United States v. Lucio Celli*, 19-CR-127 (E.D.N.Y.), the defendant emailed Chief Judge Brodie, Judge Cogan, and the late Judge Katzmann, "promising" to "hunt down and kill" them.  Though the guidelines suggested a range of 24 to 30 months, the government sought a sentence of time served—4.5 months—which the Court imposed.  *See* ECF No. 175 (government's sentencing letter).  In *United States v. Brogan*, 19-CR-207 (E.D.N.Y.), the defendant left a voicemail for a sitting senator, threatening to "light her up with bullets."  ECF No. 21 (government's sentencing letter).  He was sentenced to three years of probation, despite two prior convictions.  ECF No. 27 (judgment).

In *United States v. Troy Smocks*, 21-CR-198 (D.D.C.), the defendant—who, unlike Mr. Florea, travelled to Washington, DC—posted a message on January 5, 2021, threatening to injure law enforcement officers, falsely purporting to be a retired military officer, and reached tens of thousands of users with the threat.  ECF No. 59 (government's sentencing letter).  After the riot, the defendant sent an additional threat to "hunt down" and murder "RINOS, Dems, and Tech Execs over the next 24 hours."  *Id.*  He had 18 prior criminal convictions.  *Id.*  The government sought a sentence of 8-10 months' imprisonment; the Court imposed 14 months, to be followed by 3 years of supervised release.  Minute Entry dated October 21, 2021.

*United States v. James Dale Reed*, 20-CR-406 (D. Maryland) is similar to Mr. Florea's case, but more aggravated.  There, the defendant mailed death threats against President Biden and Vice President Harris to homes with democratic signs in their yards.  ECF No. 35 (government's sentencing letter).  He had previously made death threats against then-President Obama, Michelle Obama, then-Governor Cuomo, and former Mayor Bloomberg.  When police searched his home, they found a nine millimeter pistol, a 9 millimeter rifle, a 12-gauge shotgun, ammunition for each of these weapons, and grenades.  For his conduct, the government sought an 18-month sentence, and the court imposed 7 months' incarceration, consecutive to a 4 month sentence he was already serving.  Mr. Florea compares favorably to all of these defendants.

## V.      Mr. Florea's Conditions of Confinement Justify a Downward Variance

The guidelines recommendation of 15 to 21 months is a reasonable one, for all of the reasons explained above.  But Mr. Florea's individual circumstances compel a lesser sentence, because of his conditions of confinement, and their inexcusable impact on his health.

### A.      MDC Brooklyn Has Failed to Treat Mr. Florea's Apparent Chronic Kidney Disease, Despite a Court Order

Upon his arrival at MDC Brooklyn, Mr. Florea began exhibiting symptoms of chronic kidney disease.  For four months, from February through May 2021, he exhibited blood in his urine.  *See* ECF No. 20 at 2-3 and sealed attachments.  From May to June, he experienced episodes of intermittent right flank pain of one or more minutes before abating.  Despite myriad requests for treatment, Mr. Florea was simply given blood tests and urinalyses; he did not see a specialist and he was given no medication.  Blood tests showed a consistent eGFR (Estimated Glomerular Filtration Rate, which measures the level of kidney function) suggesting chronic kidney disease, and heightened creatinine levels.

A nephrologist consulted by undersigned counsel suggested that imaging was necessary immediately, and on June 30, 2021, Judge Bloom ordered the MDC to take Mr. Florea to a nephrologist.  ECF No. 26.  In violation of the order, the MDC sent a letter indicating that the eGFR had come into a normal range, and that no consult was necessary.  ECF No. 27.  Again, on July 2, 2021, Judge Bloom ordered Mr. Florea to be seen by a specialist.  ECF No. 28.  Instead, the MDC sent him to the ER.  On July 13, 2021, rather than seeing Mr. Florea, as Judge Bloom had ordered, a nephrologist reviewed Mr. Florea's medical records with his MDC doctor by telehealth.  *See* Ex. G (medical records of nephrology telehealth consult).  Dr. Singh noted that Mr. Florea's eGFR had improved, but indicated that Mr. Florea should be seen if his symptoms worsen.

Just days later, on July 19, 2021, Mr. Florea's eGFR was back to 52, suggesting even worse kidney function than in March of 2021, and his creatinine level was back to 1.49.  Ex. H (July 19, 2021).  But Mr. Florea's medical records demonstrate that he has never been seen or treated for his kidney disease since, whether inside or outside the facility, despite nephrologist Dr. Singh's clear directives.

### B.      Despite Being Fully Vaccinated, Mr. Florea Contracted COVID-19, From Which He Was at Heightened Risk of Severe Illness or Death

Mr. Florea has been incarcerated for the last ten months at MDC Brooklyn during a global pandemic, which has only just begun—perhaps—to loosen its grip on the United States. Throughout his incarceration, Mr. Florea has been at heightened risk for the worst effects of the COVID-19 virus.  He has several comorbidities that the Centers for Disease Control and Prevention list as heightening risk for severe illness: chronic kidney disease, hypertension, and obesity.  *See People with Certain Medical Conditions*, Centers for Disease Control and Prevention (Oct. 14, 2021), *at* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html.  During his incarceration, in an effort to

13

protect his health given his comorbidities, Mr. Florea chose to receive both doses of the COVID-19 Pfizer vaccine.  *See* Ex. I (vaccination records).  He received the first shot on April 22, 2021, and the second on May 13, 2021.  *Id*.  Within five months, though, on October 21, 2021, Mr. Florea—alongside numerous members of his housing unit—contracted a breakthrough case of symptomatic COVID-19.  *See* Ex. J (medical records).  He suffered fatigue, aches and pains, headaches, persistent chest pain, and lost his taste and smell.

Mr. Florea's experience echoes the findings of the Centers for Disease Control and Prevention, examining the widespread outbreak of the Delta variant of COVID-19 among a highly vaccinated housing unit in a federal prison in Texas.  *See* Liesl M. Hagan et al., *Outbreak of SARS-CoV-2 B.1.617.2 (Delta) Variant Infections Among Incarcerated Persons in a Federal Prison – Texas, July-August 2021*, Centers for Disease Control and Prevention (Sept. 24, 2021), *at* https://www.cdc.gov/mmwr/volumes/70/wr/mm7038e3.htm.  In the Texas federal prison, 129 of 185 fully vaccinated prisoners on the housing unit nonetheless contracted the virus.  As with Mr. Florea and his unit, the mitigation strategies (if any) that were employed by the Federal Bureau of Prisons failed to keep him safe, despite his vaccination.  Mr. Florea is fortunate, but only lucky, that the worst did not occur in his case.

Mr. Florea is just one of more than 45,000 federal inmates currently incarcerated in the BOP (and thousands more who have since been released), who have had contracted COVID-19. *See COVID-19: Coronavirus*, Federal Bureau of Prisons (June 29, 2021), at https://www.bop. gov/coronavirus/.  As of November 15, 2021, 266 federal inmates have died from the virus.  *Id.* The "rate of infection in the Bureau of Prisons is almost six times higher than the national average."  *United States v. Lockhart*, 2020 WL 4333010, at *2 (E.D.N.Y. July 29, 2020).

Because he was incarcerated during the pandemic, and because of choices made by the Bureau of Prisons, Mr. Florea has been incarcerated in prison conditions vastly more dangerous, less rehabilitative, and more isolating than can be reasonably expected in the Federal Bureau of Prisons.  Many BOP facilities have suffered widespread outbreaks of hundreds—indeed, thousands—of cases, spread all throughout the country.  MDC Brooklyn, where Mr. Florea has been housed, is among them: 418 inmates (including Mr. Florea) and 129 staff members have contracted the virus; 1 inmate has died. *See November 9, 2021 Report Pursuant to Admin. Order No. 2020-14*, Federal Bureau of Prisons (Nov. 9, 2021), *at* https://www.nyed.uscourts.gov/pub/ bop/20211109_MDC_Report.pdf.

In an effort—and not a particularly successful effort—to mitigate the spread of the virus, the BOP has enacted significant measures restricting the liberty of inmates.  Mr. Florea has spent much of the last year in near-isolation conditions tantamount to unwarranted disciplinary segregation.  For much of his incarceration, inmates have been confined to their cells 24 hours a day, 7 days a week, with the exception of 30 minutes, three times a week, for showers, or in lieu of a shower, a quick telephone call.  Conversely, prior to the pandemic, inmates were permitted out of their cells from 6:00 AM until 3:30 PM, and then again from 5:00 PM until 9:30 PM. During that time, they could exercise, engage in programming, speak with their families, visit with their families, and seek meaningful rehabilitation.  Since the onset of the pandemic, defendants are quarantined for lengthy periods of time before being assigned to a unit, and then must test negative to enter the unit.  There, they are cohorted with a set group of individuals.

The restriction, during waking hours, from 14 hours a day, seven days a week out of the cell to 30 minutes a day, three times a week, is significantly harsh, and unwarranted.  It has meant that time served during this period is undeniably more difficult, in every way, than prior to the pandemic.

The failures of the MDC have had a direct impact on Mr. Florea's criminal case and his representation.  The first time he was scheduled to appear for his guilty plea, after significant preparation and understandable anxiety, the jail failed to connect him to the video server.  A software engineer by trade, Mr. Florea begged the officer to allow him to access the Webex program to correct their inability to access the hearing, but he was not permitted to do so, and the hearing was adjourned.  On the next scheduled date, the video again failed to connect.  Mr. Florea entered his plea by telephone.  Numerous legal calls and visits have been thwarted by incompetence or incomprehensible policies at the MDC.  Most recently, on November 3, 2021, undersigned counsel went to the MDC to review the PSR with Mr. Florea—a critical aspect of a criminal case.  But I was barred entry and told the Mr. Florea's unit was still in quarantine, more than three weeks after it began, and after he personally had tested negative and been released from isolation.  These delays are cumulative, and take a mental and practical toll.  And they are wholly unnecessary at this point in the pandemic.

In determining whether and how much longer Mr. Florea need be incarcerated in these conditions, the court should weigh the increased danger and diminished conditions to which he would be subjected when determining the "total harm and benefits to prisoner and society" that additional imprisonment would yield.  *United States v. D.W.*, 198 F. Supp. 3d 18, 23 (E.D.N.Y. 2016); *see Davis v. Ayala*, 135 S. Ct. 2187, 2209 (2015) (Kennedy, J., concurring) (calling for heightened judicial scrutiny of the projected impact of jail and prison conditions on a defendant); *United States v. Mateo*, 299 F. Supp. 2d 201, 212 (S.D.N.Y. 2004) (reducing sentence where defendant's pretrial conditions were "qualitatively more severe in kind and degree than the prospect of such experiences reasonably foreseeable in the ordinary case"); *United States v. Francis*, 129 F. Supp. 2d 612, 619-20 (S.D.N.Y. 2001) (reducing sentence in acknowledgment of "the qualitatively different, substandard conditions to which the Defendant was subjected" in pretrial detention).  As Judge Rakoff held, "The pandemic, aside from posing a threat to [the defendant's] health, has made…incarceration harsher and more punitive than would otherwise have been the case.  This is because federal prisons, as 'prime candidates' for the spread of the virus (citation omitted), have had to impose onerous lockdowns and restrictions that have made the incarceration of prisoners far harsher than normal." *United States v. Rodriguez*, 2020 WL 5810161, at *3 (S.D.N.Y. Sept. 30, 2020).

In recognition of the excessively punitive conditions of pretrial detention during the pandemic, judges in this and the Southern District have granted leniency in similar or even more serious cases.  Judges have acknowledged that the unusual harshness of incarceration during these times diminishes the retributive or deterrent need for a guidelines sentence.  And they have imposed terms of imprisonment that are substantially less than the bottom of the defendants' advisory ranges, including in this Court.  *E.g.*, *United States v. Colon*, 15-CR-317 (MKB) (E.D.N.Y. Nov. 20, 2020) (imposing 18 months, consecutive to defendant's 18-month state sentence, where bottom of guidelines was 100 months); *United States v. Shi*, 19-CR-451 (PKC) (E.D.N.Y. Nov. 2, 2020 (imposing no prison where guidelines range was 12-18 months); *United*

*States v. Piper*, 18-CR-008 (AMD) (E.D.N.Y. June 25, 2020) (imposing time-served sentence on resentencing where defendant had served approximately 24 months and bottom of guidelines range was 63 months); *United States v. Vinas*, 20-CR-44 (EK) (imposing three-month sentence where bottom of guidelines range was eight months) (E.D.N.Y. Apr. 20, 2020). *See also, e.g.*, *United States v. Almonte*, 19-CR-621 (RA) (S.D.N.Y. Jan. 14, 2021) (imposing 15-month sentence where bottom of guidelines range was 51 months); *United States v. Garcia*, 19-CR-593 (PAC) (S.D.N.Y. Dec. 3, 2020) (imposing 48-month sentence where bottom of guidelines range was 110 months); *United States v. Camacho*, 19-CR-389 (CM) (S.D.N.Y. Nov 19, 2020) (imposing time-served sentence where bottom of guidelines range was 57 months); *United States v. Paulino*, 19-CR-607 (AJN) (S.D.N.Y. Oct. 21, 2020) (imposing time-served sentence where bottom of guidelines ranges was 27 months); *United States v. Cirino*, 19-CR-323 (JSR) (S.D.N.Y. July 21, 2020) (imposing 10-month sentence where bottom of guidelines range was 57 months); *United States v. Aracena de Jesus*, 20-CR-19 (PAE) (S.D.N.Y. July 1, 2020) (imposing time-served sentence where bottom of guidelines range was 30 months); *United States v. Casillas*, 19-CR-836 (S.D.N.Y. May 4, 2020) (imposing time-served sentence where bottom of guidelines range was 15 months).

## VI.    A Sentence of Time Served Meets the Goals of Sentencing

Mr. Florea is supported by a generous community of family members and friends. *See* Ex. K (letters of support). He is well known for the love, care, and support he provides for his young children. They are the reason he will not reoffend. Mr. Florea is certainly under no illusions that any possession of ammunition or firearms is totally out of the question. And he is very much looking forward to closing his social media accounts and living his life, his real life, in-person with his mother and his children. He deeply regrets the immature and unacceptable behavior that has deprived him of his freedom. He will be closely monitored by the probation department, and will continue to have the support of his Federal Defenders mitigation specialist, who whom he has engaged in counseling throughout his incarceration.

At the time of sentencing, Mr. Florea has been incarcerated for ten and a half months, and has earned all of his good time. For all of the above reasons, his personal circumstances, measured against the conditions of his confinement, support a modest downward variance from the advisory guidelines. A sentence of time served, to be followed by a significant period of supervised release, meets all of the goals of sentencing. Thank you for your consideration.

Respectfully submitted,

/s/

Mia Eisner-Grynberg, Esq.
Assistant Federal Defender
Eastern District of New York
(718) 330-1257

cc:    AUSA Francisco Navarro (by email and ECF)
       AUSA Andrew Wenzel (by email and ECF)
       United States Probation Officer Steven Guttman (by email)

# <u>EXHIBIT A</u>

# Federal Defenders
## OF NEW YORK, INC.

One Pierrepont Plaza-16th Floor, Brooklyn, NY 11201
Tel: (718) 330-1200 Fax: (718) 855-0760

David E. Patton
*Executive Director and*
*Attorney-in-Chief*

Deirdre D. von Dornum
*Attorney-in-Charge*

November 15, 2021

The Honorable Judge Eric R. Komitee
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

*Re: United States of America v. Eduard Florea*
*21-CR-00037*

Dear Honorable Judge Komitee:

Eduard Florea was supposed to achieve the American Dream. Born in a communist country to parents wanting to provide a better life in the United States, with a keen intellect, ambition and friendly nature, Mr. Florea was supposed to have better, do better, and be better. But Mr. Florea's path to the American Dream was marked by struggle and trauma. Repeatedly, he was derailed.

Yet after each time he veered off course, Mr. Florea utilized his internal resilience and many strengths to get back on track. This time has been no different. Held at the MDC Brooklyn during the COVID-19 pandemic, Mr. Florea has engaged in active self-inquiry, developed friendships with people of various political backgrounds, and obtained his High School Equivalency.

Yet while Mr. Florea worked incredibly hard to get his life on track, his family has suffered. His daughter and son continue to experience behavioral issues in their father's absence. Mr. Florea's mother has been working extremely hard to support them financially and emotionally, but she is in dire need of assistance. The family needs to heal from the unresolved wounds of their past and the current tragedy that has broken their family apart.

The road has been long for Mr. Florea, and it will continue upon his release. We respectfully submit that a sentence of time served is appropriate in his case so that he may reunite with and provide for his children, help support his mother, and pick up the pieces of his life.

## The Florea's immigration story

Eduard Florea was born on July 29, 1980 in communist, totalitarian Romania. Since 1974 dictator Nicolae Ceausescu controlled the country as President of the Republic and gave his wife Elena the role of Deputy Prime Minister.[1]

---

[1] Siani-Davies, P. 2005. *The Romanian Revolution of December 1989*. Cornell University Press.

The 1980s were marked by poverty, violence and civil unrest in the country, particularly in Bucharest, where the Floreas lived. Years of economic austerity and food scarcity plunged the Romanian people into dire straits. Eduard's mother, Ioana Florea, vividly remembered the lines for food rations.

Dissent was growing among the Romanian people. While they were "blighted by a lack of basics such as food, heating and lighting…Ceausescu and Elena lived in luxurious homes"[2] and commissioned massively opulent building projects.[3]

Mr. Florea's hardworking parents wanted him to have the opportunities they did not and could not have there. They thought Eduard could thrive in the America and believed he would have a chance at a life impossible to achieve in Romania.

Mrs. Florea worked as an accountant at the premier hotel in Bucharest, exclusive to foreign dignitaries. She was highly educated and worked hard. Her boss recognized how volatile the country was becoming, and encouraged her to seek political asylum in Turkey. Mrs. Florea proposed the idea to Eduard's father, a successful engineer. After a lot of deliberation, the couple made the difficult decision to put young Eduard in the care of his maternal grandparents while they traveled across the world seeking asylum.

Mrs. Florea's parents lived on a farm in rural Romania. They were largely spared the debilitating poverty of the city, because they grew their own food and sustained themselves. Eduard was loved and cared for by his grandparents, but they were not his parents.

While many immigrant families come to the United States together, a sizable population of children are first separated before reuniting with their families. However, studies show that "immigrant children who were once separated from their parents exhibited poorer literacy and higher rates of emotional and behavioral problems than those who migrated with their parents."[4]

Further studies show that emotional and behavioral distress can manifest in children separated from their parents even if they are cared for by others.[5] The Floreas believed leaving Eduard with his grandparents was the best decision for the family, but that decision came with potential negative consequences that could unfold over the course of his life.

In 1989, after giving Eduard to his grandparents, Mr. and Mrs. Florea fled Romania for Istanbul, Turkey. On Christmas Day of that very same year, the country's dictator Nicolae Ceausescu and his wife Elena were executed by firing squad. They left during the height of the revolution.

Mr. and Mrs. Florea temporarily remained in Istanbul before being sent to Rome, Italy to complete their visa process. It was here in Rome that Mrs. Florea decided to leave her abusive husband. Mrs. Florea came to the United States alone, prepared to work hard to save enough money to send for Eduard and apply for U.S. citizenship.  Six-year-old Eduard flew to the United States all by himself.

---

[2] McGrath, Stephen. December 25, 2019. "Executing a dictator: Open wounds of Romania's Christmas Revolution." BBC News. Retrieved on November 3, 2021 from: https://www.bbc.com/news/world-europe-50821546
[3] Ibid.
[4] Lu, Y., He, Q. & Brooks-Gunn, J. October 19, 2018. Diverse Experience of Immigrant Children: How Do Separation and Reunification Shape Their Development? *Child Development*.
[5] Ibid.

## Life in America

Once young Eduard arrived in the United States at age six, he was finally reunited with his devoted mother in New York City. Mrs. Florea had guilt and regret for leaving her son in Romania for three years, and she believed she spoiled him with love and material things to compensate for her absence. For instance, she gave Eduard an expensive IBM computer before any of his friends had a computer. She wanted him to feel loved and safe, at last.

Eduard frequently visited his father in St. Louis from age six to ten. At age ten, however, his father disappeared from his life. They have not been in contact ever since. A father's abandonment is traumatic and the consequences are serious. An Adverse Childhood Experience (ACE), parental neglect or abandonment can prime a child for severe long-term consequences including adverse health conditions, behavioral issues, and early death.[6] The sudden loss of his father during such an important developmental phase was a significant turning point in young Eduard's life.

Fortunately, Eduard had steadfast love and devotion from his mother which contributed to his ability to meet his developmental milestones. According to his mother and childhood friend George, Eduard was a loving, happy child. He had friends, played in the neighborhood, and helped people in the community. When he got to high school, however, he struggled to maintain his attention in class and he dropped out to get a job as a computer programmer. Since then, Eduard has worked at numerous businesses and organizations and developed a solid career that he looks forward to resuming once home.

## Incarceration at MDC

Mr. Florea has held himself accountable for his actions and regretted the impact they have had on his children and family. He wanted to demonstrate through both his words and his actions that he understood the impact of his choices. Resolved not to waste his time while at MDC, Mr. Florea used his time in detention to turn his life around.

Despite enduring incarceration during the COVID-19 pandemic, Mr. Florea studied and worked hard to obtain his High School Equivalency (HSE) diploma. He will have a graduation ceremony later this month to commemorate the milestone and will be offered the opportunity to take photos in a cap and gown. After years of working as a successful computer programmer writing code and not prioritizing the HSE, Mr. Florea was able to achieve this goal in the most difficult of environments.

While at the MDC, Mr. Florea has taught several men on his unit how to code. He is deeply passionate about sharing with others his knowledge of coding. When asked what motivated him to do this, Mr. Florea responded that giving people a skill would hopefully lead to better job opportunities that would prevent them from ever coming back to jail.

Mr. Florea takes pride in identifying as logical and rational. These traits, along with his social disposition, have allowed him to develop friendships with people of different political persuasions while at the MDC. Mr. Florea recounted to our office his friendship with a man on his unit who was passionate about the current social and racial justice movement following the murder of George

---

[6] Felitti, V. et all. May 1, 1998. Relationship of Childhood Abuse and Household Dysfunction to Many of the Leading Causes of Death in Adults: The Adverse Childhood Experiences (ACE) Study. Retrieved on November 9, 2021 from: https://www.ajpmonline.org/article/S0749-3797(98)00017-8/fulltext

Floyd. While Eduard and this gentleman disagreed on many points, they too found common ground together and have a solid relationship based on respect. The gentleman on the unit even gave Mr. Florea free haircuts.

Mr. Florea's incarceration has not been easy and was worsened by the COVID-19 pandemic. His unit was repeatedly locked down which severely restricted his movement and ability to engage in any sort of meaningful programming. He has not seen his children since his arrest and has had sporadic visits with his mom. And even though he received two doses of the Pfizer vaccine, Mr. Florea contracted COVID-19 in October. He experienced flu-like symptoms and was quarantined for weeks. Jail is immensely challenging even in normal times, and Mr. Florea was there during unusually challenging circumstances.

**Conclusion**

Since his arrest, Mr. Florea's family has been in shambles. His mother has dipped into her savings account to provide for his children. According to Mrs. Florea, his children miss him very much and exhibit behavioral issues since his arrest. Yet each time Mr. Florea experienced a challenge in his life, whether it was his separation from his parents or the abandonment of his father, he persevered. It is our hope he can be given the chance to return home right away to make amends with his children and charter a new course for his life.

Respectfully submitted,

_____/s/_____
Danielle Azzarelli, LMSW
Client and Mitigation Specialist
Federal Defenders of New York, Inc.

# **EXHIBIT B1**

# Fingerprint Response Summary

NYSID: 12711391P   ORI: NY03030S0   NYCPD PCT 120

| | |
|---|---|
| **NYSID:** 12711391P **Fax Number:** 14579 **Probation Client ID#:** | **FBI Number:** **Current Arrest Number:** S14607087 **III Status:** Status in other states unknown **Current Transaction Name:** EDWARD FLOREA **DOB:** July 29, 1980 |

## ⦿ Alerts

\* See **Additional Information** at the bottom of this response for more banners pertaining to the criminal history

**Violent Felony** offense(s) on file

## ⦿ New York State Arrest/Conviction/Warrant Information

**Total Arrests:** 2     **Date of Earliest Arrest:** June 14, 2014     **Latest Prior Arrest Date:** June 14, 2014

| Total Arrests: | 2 |
|---|---|
| Felony: | 2 |
| Violent Felony: | 2 |
| Firearm: | 1 |
| Misdemeanor: | 0 |
| Other: | 0 |

| Total Arraigned Arrests: | 1 |
|---|---|
| Felony: | 0 |
| Violent Felony: | 0 |
| Firearm: | 0 |
| Misdemeanor: | 0 |
| Other: | 0 |

| Total Open Cases: | 1 | Cycles (max 5) |
|---|---|---|
| Felony: | 1 | 1 |
| Violent Felony: | 1 | 1 |
| Misdemeanor: | 0 | |
| Open ACD: | 0 | |
| Non Docketed Cases: | 1 | 2 |
| Other: | 0 | |

| Total Convictions: | 0 | Cycles (max 5) |
|---|---|---|
| Felony: | 0 | |
| Violent Felony: | 0 | |
| Firearm: | 0 | |
| Misdemeanor: | 0 | |
| Other: | 0 | |
| YO Adjud.: | 0 | |

| Warrant Information: | | Cycles (max 5) |
|---|---|---|
| Failure to Appear Counts: | 0 | |
| Total Open: | 0 | |
| Active NYC: | 0 | |

| DOC Classification: | | Cycles (max 5) |
|---|---|---|
| Escape Charges: | 0 | |
| Sex Offender Convictions: | 0 | |
| Probation Revoc: | 0 | |
| Parole Revoc: | 0 | |

## ⦿ Identification Information



**Name:**
EDWARD FLOREA
**Date of Birth:**
July 29, 1980

| **Sex:** Male | **Race:** White | **Ethnicity:** Not Hispanic | **Skin Tone:** Light / Dark |
|---|---|---|---|
| **Eye Color:** Brown | **Hair Color:** Black | **Height:** 5' 11" | **Weight:** 240 |

**SSN:**
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
**Place of Birth :**
New York          USA

Cycle 1
Arrest Date June 15, 2014

**Latest Arrests(Max 10):**

| Arrest Date | Name | Date of Birth | Address |
|---|---|---|---|
| June 16, 2014 | EDWARD FLOREA | July 29, 1980 | 208 BETHEL AVENUE, STATEN ISLAND, NY 10307 |

June 16, 2014 11:56:54 am

June 14, 2014    EDWARD FLOREA                    July 29, 1980        208 BETHEL AVENU, STATEN ISLA,
                                                                       NY

# *Fingerprint Response*

ORI: NY03030S0
NYCPD PCT 120
NYSID: 12711391P

| Identification | Summary | Criminal History | Job/License | Wanted | Missing | NCIC/III |
|---|---|---|---|---|---|---|

## ◕ Transaction Data                                                                    ✦



**Name:**                          EDWARD FLOREA
**Transaction ID:**                27767157
**Agency ORI:**                    NY03030S0
**SSN:**                           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
**Type of Submission:**            **ARREST**
**Date Fingerprinted:**            June 16, 2014
**Reason Fingerprinted:**          Adult Arrest

## Arrest/Charge Information
Arrest Date:June 16, 2014 10:55 am (10:55:00)

| | |
|---|---|
| **Name:** | EDWARD FLOREA |
| **Date of Birth:** | July 29, 1980 |
| **US Citizen:** | |
| **Sex:** | Male |
| **Race:** | White |
| **Ethnicity:** | Not Hispanic |
| **Height:** | 5' 11" |
| **Weight:** | 240 |
| **SSN:** | 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 |
| **Age at time of crime/arrest:** | 33 |
| **Address:** | 208 BETHEL AVENUE , STATEN ISLAND , NY 10307 |
| **Fax Number:** | I4579 |
| **Place of Arrest:** | NYCPD 120 |
| **Arrest Type:** | Unknown |
| **Date of Crime:** | May 07, 2014 |
| **Place of Crime:** | NYCPD 123 |
| **Criminal Justice Tracking No.:** | 66665075M |
| **Arresting Agency:** | NYCPD PCT 120 |
| **Arresting Officer ID:** | 925756 |
| **Arrest Number:** | S14607087 |
| **Arraignment:** | Richmond County Criminal Court |

**Arrest Charges:**

-- Strangulation 2nd-Obstruct Breath/Blood Circ-Cause Physical Injury

| | | | | |
|---|---|---|---|---|
| PL121.12 | Class D | Felony | Degree 2 | NCIC 1399 |

-- Act In Manner Injure Child Less Than 17

| | | | | |
|---|---|---|---|---|
| PL260.10    Sub 01 | Class A | Misdemeanor | Degree 0 | NCIC 3801 |

-- Menacing-2nd:Weapon

2

— Criminal Possession Weapon-4th:Firearm/Weapon
PL265.01    Sub 01                          Class A          Misdemeanor    Degree 4                    NCIC 5212

## ● Transaction Status Information

| Activity | Date/Time | Elapsed |
|---|---|---|
| Initial Transaction Received | June 16, 2014 11:55:41 am | |
| Online Data Received | June 16, 2014 11:55:41 am | |
| Transaction Completed | June 16, 2014 11:56:43 am | 0 Hour(s) 1 Minute(s) |
| Rapsheet Produced | June 16, 2014 11:56:54 am | |

## ● NYS Criminal History Information



**Name:**
EDWARD FLOREA

**Date of Birth:**
July 29, 1980

**Place of Birth :**
New York        USA

Cycle 1
Arrest Date June 15, 2014

**Address:**
208 BETHEL AVENUE, STATEN ISLAND, NY 10307
208 BETHEL AVENU, STATEN ISLA, NY

| Sex: | Race: | Ethnicity: | | Skin Tone: |
|---|---|---|---|---|
| Male | White | Not Hispanic | | Light / Dark |
| **Eye Color:** | **Hair Color:** | **Height:** | **Weight:** | |
| Brown | Black | 5' 11" | 240 | |

**SSN:**
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

| **NYSID#:** | **FBI#:** | **NCIC Classification#:** |
|---|---|---|
| 12711391P | | |
| **III Status:** | Status in other states unknown | |

**US Citizen:**

## ⬇ Cycle 2
## Violent Felony Offense

### Arrest/Charge Information
Arrest Date:June 16, 2014 10:55 am (10:55:00)

| | |
|---|---|
| **Name:** | EDWARD FLOREA |
| **Date of Birth:** | July 29, 1980 |
| **US Citizen:** | |
| **Sex:** | Male |
| **Race:** | White |
| **Ethnicity:** | Not Hispanic |
| **SSN:** | 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 |
| **Age at time of crime/arrest:** | 33 |
| **Address:** | 208 BETHEL AVENUE, STATEN ISLAND, NY 10307 |

**Place of Arrest:** NYCPD 120
**Arrest Type:** Unknown
**Date of Crime:** May 07, 2014
**Place of Crime:** NYCPD 123
**Criminal Justice Tracking No.:** 66665075M
**Arresting Agency:** NYCPD PCT 120
**Arresting Officer ID:** 925756
**Arrest Number:** S14607087
**Arraignment:** Richmond County Criminal Court

**Arrest Charges:**

-- Strangulation 2nd-Obstruct Breath/Blood Circ-Cause Physical Injury

| | | | | | |
|---|---|---|---|---|---|
| PL121.12 | | Class D | Felony | Degree 2 | NCIC 1399 |

-- Menacing-2nd:Weapon

| PL120.14 | Sub 01 | Counts: 2 | Class A | Misdemeanor | Degree 2 | NCIC 1316 |
|---|---|---|---|---|---|---|

-- Act In Manner Injure Child Less Than 17

| PL260.10 | Sub 01 | Class A | Misdemeanor | Degree 0 | NCIC 3801 |
|---|---|---|---|---|---|

-- Criminal Possession Weapon-4th:Firearm/Weapon

| PL265.01 | Sub 01 | Class A | Misdemeanor | Degree 4 | NCIC 5212 |
|---|---|---|---|---|---|

**No Court Reported Information**

---

## Cycle 1 ♠
## Violent Felony Offense

### Arrest/Charge Information
Arrest Date:June 14, 2014 10:20 pm (22:20:00)

**Name:** EDWARD FLOREA
**Date of Birth:** July 29, 1980
**US Citizen:**
**Sex:** Male
**Race:** White
**Ethnicity:** Not Hispanic
**SSN:** 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
**Age at time of crime/arrest:** 33
**Address:** 208 BETHEL AVENU, STATEN ISLA, NY I4548
**Fax Number:**
**Place of Arrest:** NYCPD 123
**Arrest Type:** Unknown
**Date of Crime:** June 14, 2014
**Place of Crime:** NYCPD 123
**Criminal Justice Tracking No.:** 66663618Y
**Arresting Agency:** NYCPD PCT 123
**Arresting Officer ID:** 943905
**Arrest Number:** S14607052
**Arraignment:** Richmond County Criminal Court

**Arrest Charges:**

-- Criminal Possession Of A Weapon- 2nd Degree: Machine Gun

| PL265.03 | Sub 01A | Class C | Felony | Degree 2 | NCIC 5299 |
|---|---|---|---|---|---|

-- Criminal Possession Weapon-4th:Firearm/Weapon

| PL265.01 | Sub 01 | Class A | Misdemeanor | Degree 4 | NCIC 5212 |
|---|---|---|---|---|---|

-- General Violation Of Local Law

| LOC | Class A | Misdemeanor | Degree 0 | NCIC 7399 |
|---|---|---|---|---|

-- General Violation Of Local Law

| LOC | Counts: 6 | Violation | Degree 0 | NCIC 7399 |
|---|---|---|---|---|

### Court Case Information

**--Court:** Richmond County Criminal Court   **Case Number:** 2014RI005990

June 16, 2014

## ● Other History Related Information

There is no Other History Related Information associated with this history.

## ● Job/License Information

There is no Job/License Information associated with this history.

## ● Wanted Information

There is no NYS Wanted Information associated with this history.

## ● Missing Person Information

There is no NYS Missing Information associated with this history.

## ● Additional Information

Sentencing - Where an individual is sentenced June 1, 1981 or later on more than one charge within a docket, the sentence may be considered to be concurrent unless identified as consecutive.

Courts Please Note: Pursuant to CPL 160.40 (02) one copy of a fingerprint based rapsheet must be provided to the Defense Attorney.

According to our files, this individual does not appear to have History in III. However this does not preclude the possibility that the FBI does have a record. If you desire this information, please submit a request directly to the FBI.

Summary Counts: The Transaction data may also be included in a cycle in the rap. If it is included, information from the transaction will be used in calculating the Summary section. If it is not included in any of the cycles then the transaction information will not be part of the Summary section data.

## Federal NCIC, III and/or FBI Response

The outstanding response(s) indicated below will be forwarded to your in-box upon receipt by DCJS. If you do not receive one or more of the indicated responses, please contact that state or agency directly.

## ● NCIC Information

The following information is provided in response to your request for a search of the NCIC Person files based on:

| Name: | EDWARD FLOREA |
|---|---|
| Sex: | Male |
| Race: | White |
| Date of Birth: | July 29, 1980 |
| Social Security number: | 129708517 |

NY0303000

```
***MESSAGE KEY QW SEARCHES WANTED PERSON FILE FELONY RECORDS REGARDLESS OF
EXTRADITION AND MISDEMEANOR RECORDS INDICATING POSSIBLE INTERSTATE
EXTRADITION FROM THE INQUIRING AGENCY'S LOCATION. ALL OTHER NCIC PERSONS
FILES ARE SEARCHED WITHOUT LIMITATIONS.
*** SEX OFFENDER REGISTRY INFORMATION ***
THE SUBJECT IDENTIFIED IN THE FOLLOWING RECORD WITH NIC/X771711870
IS REGISTERED AS A SEX OFFENDER. DO NOT SEARCH, DETAIN, OR
ARREST BASED SOLELY ON THIS RECORD. ADDITIONAL INFORMATION REGARDING
SUBJECT MAY BE AVAILABLE FROM THE INTERSTATE IDENTIFICATION INDEX.

MKE/SEXUAL OFFENDER
OFS/BI - REGISTERED
ORI/TX1520000 NAM/FLORES,RAUL SEX/M RAC/W ETN/H POB/TX
DOB/19800729 HGT/508 WGT/120 EYE/BRO HAI/BLK FBI/851250TC6 CTZ/YY
```

Page 5 of 6

OLN/24374056 OLS/TX OLY/2014
ORD/20121004 ERD/NONEXP SXP/N CRR/SEX OFFENSE - AGAINST CHILD-FONDLING
CON/20120927 PLC/TX
AOV/05 SOV/F
OCA/08040829
VLD/20140520
MIS/INDECENCY WITH A CHILD SEXUAL CONTACT
LIC/CTB8364 LIS/TX LIY/2014 LIT/PC
VIN/1G2NF52T0YM830513 VYR/2000
VMA/PONT VMO/GRM VST/4D VCO/WHI
DNA/N
SNU/17014 SNA/CNTY RD 2220
CTY/LUBBOCK STA/TX ZIP/79423
COU/LUBBOCK
TNO/806 448-0286
EMP/FARMERS COOP
OCP/GRADERS AND SORTERS, AGRICULTURAL PRODUCTS
ORI IS LUBBOCK COUNTY SHERIFF'S OFFICE LUBBOCK 806 775-1480
AKA/FLOREZ,RAUL
AKA/FLOREZ,RAUL P
AKA/FLOREZ,RUAL P
SMT/TAT R ARM
SMT/TAT R FGR
SMT/TAT UR ARM
NIC/X771711870 DTE/20121023 0503 EDT DLU/20140520 0514 EDT

***** END OF SEX OFFENDER REGISTRY INFORMATION *****

NO NCIC WANT SOC/129708517

---

**WARNING:** Release of any of the information presented in this computerized Case History to unauthorized individuals or agencies is prohibited by federal law TITLE 42 USC 3771b.
This report is to be used for this one specific purpose as described in the Use and Dissemination Agreement your agency has on file with DCJS. **Destroy after use and request an updated rap sheet for subsequent needs.**
All information presented herein is as complete as the data furnished to DCJS.

---

New York State Division of Criminal Justice Services
4 Tower Place
Albany NY 12203-3764
Tel: 1-800-262-DCJS
Michael C. Green, Executive Deputy Commissioner of the NYS Division of Criminal Justice Services

# **EXHIBIT B2**

2014cca20628

CRIMINAL COURT OF THE CITY OF NEW YORK
COUNTY OF RICHMOND

THE PEOPLE OF THE STATE OF NEW YORK,

-against-

**FELONY**

1. EDWARD FLOREA (M 33)

-defendant(s)-

2014R1006028

STATE OF NEW YORK )
) ss.:
COUNTY OF RICHMOND )

Det. Charles Kazak, shield # 3898 of the 123 Squad, deposes and says as follows

On 05-07-2014 at approximately 3:30 PM inside of 208 Bethel Ave., 2nd Floor, in Staten Island New York in the County of Richmond and State of New York, the defendant committed the offenses of:

1. P.L. 121.12        Strangulation in the second degree
(defendant #1, 1 count(s))

2. P.L. 121.11 (a)    Criminal Obstruction of Breathing or Blood Circulation
(defendant #1, 1 count(s))

3. P.L. 120.00(1)     Assault 3rd degree
(defendant #1, 1 count(s))

4. P.L. 120.14(1)     Menacing in the Second Degree
(defendant #1, 1 count(s))

5. P.L. 265.01(2)     Criminal Possession of a Weapon 4th degree
(defendant #1, 1 count(s))

6. P.L. 260.10(1)     Endangering the Welfare of a Child
(defendant #1, 1 count(s))

7. P.L. 240.26(1)     Harassment 2nd degree
(defendant #1, 1 count(s))

intent to use the same unlawfully against another; knowingly act in a manner likely to be injurious to the physical, mental or moral welfare of a child less than seventeen years old or direct or authorize such child to engage in an occupation involving a substantial risk of danger to his/her life or health; and with intent to harass, annoy or alarm another person struck, shoved, kicked or otherwise subjected such other person to physical contact, or attempted or threatened to do the same.

The offenses were committed under the following circumstances:

Deponent states that he is informed by JONI YGLESIAS that the defendant, with intent to impede the normal breathing of informant, did place both of his hands around informant's neck and did squeeze, causing informant to lose consciousness and to experience substantial pain, annoyance and alarm and defendant did thereafter intentionally cause informant to be in reasonable fear of physical injury in that defendant did remove a pocket knife from his pocket and did approach informant and did state in sum and substance: "I WILL FUCKING KILL YOU BOTH - FIRST HER (CHILD) AND THEN YOU" causing informant to experience fear for her safety as well as annoyance and alarm.

Deponent further states that the defendant did knowingly act in a manner likely to be injurious to the physical, moral and mental welfare of a child less than seventeen years old in that deponent is informed by informant that defendant committed the above described acts while informant was holding her child, and said threats were also directed at informant's child, OLIVIA FLOREA, whose date of birth is November 19, 2012, aged 1 years old

False statements made herein are punishable as a class A misdemeanor pursuant to section 210.45 of the Penal Law.

Sworn to before the on June 16, 2014

_____
Deponent

# **EXHIBIT B3**

| CRIMINAL COURT OF THE CITY OF NEW YORK | X | |
|---|---|---|
| COUNTY OF RICHMOND: PART AP | X | |
| | X | |
| | ------X | |
| | X | |
| THE PEOPLE OF THE STATE | X | **SUPPORTING DEPOSITION** |
| OF NEW YORK | X | |
| | X | |
| *-against-* | X | **DOCKET NUMBER:** |
| | X | |
| | X | 2014RI006028 |
| | X | |
| EDNARD ƒlorer | X | |
| | X | |
| | X | |
| | X | |
| | X | |
| *-defendant(s)-* | X | |
| | X | |
| | ------X | |

I, Joni Yglesias, of an address ,known to the District Attorney, County of Richmond, State of New York, being duly sworn, depose and state that I have read the Accusatory Instruments filed in the actions against the above titled defendants and state that the facts therein stated to be on information furnished by myself are true upon my personal knowledge.

FALSE STATEMENTS MADE HEREIN ARE
PUNISHABLE AS A CLASS A MISDEMEANOR
PURSUANT TO SECTION 210.45 OF THE PENAL
LAW.

✗ Joni Yglesias

DATED:        6/19/14
              Staten Island, NY

# **<u>EXHIBIT B</u>**

CRIMINAL COURT OF THE CITY OF NEW YORK
COUNTY OF RICHMOND

CERTIFICATE OF DISPOSITION
NUMBER:   31876

THE PEOPLE OF THE STATE OF NEW  YORK
VS

FLOREA, EDWARD
Defendant

07/29/1980
Date of Birth

208  BETHEL AVENUE
Address

12711391P
NYSID Number

STATEN ISLAND       NY
City            State  Zip

06/16/2014
Date of Arrest/Issue

Docket Number: 2014RI006028              Summons No:

PL 121.12 00 DF, PL 120.14 01 AM, PL 260.10 01 AM, PL 121.11 0A AM,
PL 120.00 01 AM, PL 265.01 02 AM, PL 240.26 01 V,
--------------------------------------------------------------------
Arraignment Charges

Case Disposition Information:

| Date | Court Action | Judge | Part |
|------|--------------|-------|------|
| 09/30/2014 | ADJOURNED - CPL SECTION 170.55 | MATTEI, M | AP2 |
| 03/27/2015 | DISMISSED - CPL SECTION 170.55 | MEYER, A J | AP1 |

**NO FEE CERTIFICATION**

_ **GOVERNMENT AGENCY**      _ **COUNSEL ASSIGNED**

_ **NO RECORD OF ATTORNEY READILY AVAILABLE. DEFENDANT STATES COUNSEL WAS ASSIGNED**

**SOURCE**  _ **ACCUSATORY INSTRUMENT** _ **DOCKET BOOK/CRIMS** _ **CRC3030[CRS963]**

      I HEREBY CERTIFY THAT THIS IS A TRUE EXCERPT OF THE RECORD ON FILE IN
THIS COURT.

MEYER, L
COURT OFFICIAL SIGNATURE AND SEAL

11/10/2021
DATE        FEE: NONE

All marijuana convictions under PL 221.05, PL 221.10, PL 221.15, PL 221.20,
PL 221.35 or PL 221.40 - including any appearing on this certificate of
disposition - are vacated, dismissed, sealed, and expunged.  It is an
unlawful discriminatory practice for any entity to make any inquiry about
such an expunged conviction or to use such an expunged conviction adversely
against an individual in any form of application or otherwise - unless
specifically required or permitted to do so by statute.

Pursuant to section 70.15 of the Penal Law, any misdemeanor sentence with
a jail term of "1 year", "12 months", or "365 days" is, by operation of
law, deemed to be a sentence of 364 days. Any Certificate of Disposition
indicating a jail sentence of "1 year", "12 months", "52 weeks", or

ys" for a misdmeanor conviction shall be interpreted as a sentence
days.

TION: THIS DOCUMENT IS NOT OFFICIAL UNLESS EMBOSSED WITH THE COURT
SEAL OVER THE SIGNATURE OF THE COURT OFFICIAL.)

# **EXHIBIT C**

SUPREME COURT OF THE STATE OF NEW YORK      NO FEE
RICHMOND COUNTY
COUNTY COURT HOUSE
18 RICHMOND TERRACE
STATEN ISLAND, NY 10301

CERTIFICATE OF DISPOSITION - SUPERIOR COURT INFORMATION

DATE: 11/09/2021                  CERTIFICATE OF DISPOSITION NUMBER: 7995

PEOPLE OF THE STATE OF NEW YORK      CASE NUMBER:         SCI-90157-2014
                  VS.               LOWER COURT NUMBER(S): 2014RI005990
                                    DATE OF ARREST:       06/14/2014
                                    ARREST #:             S14607052
                                    DATE OF BIRTH:        07/29/1980
FLOREA,EDUARD
FLOREA,EDWARD(AKA)

_____
          DEFENDANT

I HEREBY CERTIFY THAT IT APPEARS FROM AN EXAMINATION OF THE RECORDS
ON FILE IN THIS OFFICE THAT ON 07/22/2014 BEFORE THE HONORABLE
MEYER,A J    THEN A JUDGE OF THIS COURT, THE ABOVE NAMED DEFENDANT
ENTERED A PLEA OF GUILTY TO THE CRIME(S) OF

CRIMINAL POSSESSION OF A WEAPON 3rd DEGREE PL  265.02 07 DF (GUN)

THAT ON 08/18/2014 THE ABOVE NAMED DEFENDANT WAS SENTENCED
BY THE HON. MEYER,A J ,THEN A JUDGE OF THIS COURT TO

CRIMINAL POSSESSION OF A WEAPON 3rd DEGREE PL  265.02 07 DF (GUN)
IMPRISONMENT =   1 YEAR(S)

CVAF = $25 (OTHER AGENCY TO COLLECT)
DNA  = $50 (OTHER AGENCY TO COLLECT)
SURCHARGE = $300 (OTHER AGENCY TO COLLECT)

IN WITNESS WHEREOF, I HAVE HEREUNTO SET MY HAND AND AFFIXED MY
OFFICIAL SEAL ON THIS DATE 11/09/2021.

_____
          CLERK OF COURT

_____
          COURT CLERK

All marijuana convictions under PL 221.05, PL 221.10, PL 221.15, PL 221.20,
PL 221.35 or PL 221.40 - including any appearing on this certificate of
disposition - are vacated, dismissed, sealed, and expunged.  It is an
unlawful discriminatory practice for any entity to make any inquiry about
such an expunged conviction or to use such an expunged conviction adversely
against an individual in any form of application or otherwise - unless
specifically required or permitted to do so by statute.

Pursuant to section 70.15 of the Penal Law, any misdemeanor sentence with
a jail term of "1 year", "12 months", or "365 days" is, by operation of

law, deemed to be a sentence of 364 days. Any Certificate of Disposition indicating a jail sentence of "1 year", "12 months", "52 weeks", or "365 days" for a misdmeanor conviction shall be interpreted as a sentence of 364 days.

# **EXHIBIT D**

Secs. 1012, 1031 F.C.A.                          (Child Protective)

FAMILY COURT OF THE STATE OF NEW YORK
CITY OF NEW YORK, COUNTY OF RICHMOND

Attorney: GRAZIANO, D
Judge:   LIM, A
------------------------------------x
       In the Matter of        :   Docket No: <u>NN-02512-14</u>
                                    :
    ███  FLOREA                   :
                                      :   PETITION NEGLECT CASE
                                    :
A Child Under Eighteen Years        :
of Age Alleged to be Neglected by   :
                                    :
EDWARD FLOREA                       :
                                    :   Child Protective Specialist:
                                    :   SHERIE MAXWELL
                                    :   ACS #: 6754887
                                    :   Unit #: 141-5
                                    :   Telephone: 718-720-2961
                                    :
_____   :
             Respondent (s)            :
------------------------------------x

**NOTICE: IF YOUR CHILD REMAINS IN FOSTER CARE FOR FIFTEEN (15) OF THE MOST
RECENT TWENTY-TWO (22) MONTHS THE AGENCY MAY BE REQUIRED BY LAW TO FILE A
PETITION TO TERMINATE YOUR PARENTAL RIGHTS AND MAY FILE BEFORE THE END OF
THE 15-MONTH PERIOD.**

       TO THE FAMILY COURT:

       The undersigned petitioner respectfully shows that:

1.  Petitioner Gladys Carrión, Esq., Commissioner of Administration for
    Children's Services, a Child Protective Agency with offices at 150
    William Street, New York, New York, is authorized to file a petition
    under Article 10 of the Family Court Act.

2.  ███  FLOREA   is a female child under the age of eighteen years,
    having been born on ███/2012.

3.    Said child resides at 208 BETHEL AVENUE, STATEN ISLAND, NY, 10307.

4.    The father of said child is
      or is alleged to be   EDWARD FLOREA    who resides at 208 BETHEL
      AVENUE, STATEN ISLAND, NY, 10307.

      The mother of said child is JONI YGLESIAS   who resides at 208 BETHEL
      AVENUE, STATEN ISLAND, NY, 10307.
      The mother's date of birth is ██████/1986.

5.    (Upon information and belief), said child is a neglected child in
      that: (Specify grounds of neglect under Section 1012 of the Family
      Court Act.)
      See Addendum I.

6.    (Upon information and belief),
      EDWARD FLOREA   , the Legal Father of said child
      is the person who is responsible for neglect of said child.


      Petitioner is required to obtain education information and to provide
that information to foster care providers and other parties to this
proceeding. Unless otherwise obtained by release, Petitioner thus seeks a
court order to obtain the education records (including special education
records) of each child named in this petition who is not placed with a
parent(s)/legal guardian(s), and a court order to provide such records to
service providers where such records are necessary to enable the service
provider to establish and implement a plan of service.

WHEREFORE, Petitioner prays that an order be made determining the said ▮▮▮▮ FLOREA to be a neglected child, otherwise dealing with said child in accordance with the provisions of Article 10 of the Family Court Act.

Dated: 06/17/2014

_____
Gladys Carrión, Esq.
Petitioner

Zachary W. Carter
Corporation Counsel
Alan W. Sputz
Special Assistant Corp Counsel

_____
Signature of Attorney

AMANDA  NATOLI of Counsel
Name

Administration for Children Services
350 ST MARKS PLACE
3RD FLOOR
STATEN ISLAND NY 10301
718-720-2791

<u>VERIFICATION</u>

STATE OF NEW YORK          )
COUNTY OF RICHMOND         SS.:


SHERIE MAXWELL, being duly sworn, deposes and says that (s)he is employed by Administration for Children's Services, a Child Protective Agency; and is acquainted with the facts and circumstances of the above-entitled proceeding; that (s)he has read the foregoing petition and knows the contents thereof; that the same is true to (his) (her) own knowledge except as to those matters therein stated to be alleged upon information and belief, and that as to those matters (s)he believes it to be true.

_____
                  Petitioner
Gladys Carrión, Esq., Commissioner
Administration for Children's
Services
By: SHERIE MAXWELL
Child Protective Specialist

Sworn to before me, this
17th day of June 2014

_____
Notary Public

**ANGELINA PETERS**
**Notary Public, State of New York**
**No. 01PE6133803**
**Qualified in STATEN ISLAND County**
**Commission Expires Sep 19, 2017**

**ADDENDUM I**

CASE NAME:      JONI YGLESIAS
CHILD NAME:    ███████ FLOREA
CASE NUMBER:  6754887
DATE PET FILED: 06/17/2014

| THE CHILD: | THE RESPONDENT: |
|---|---|
| ███ FLOREA (DOB ███/2012) | EDWARD FLOREA |

███ FLOREA (DOB: ████/2012) is a chld less than eighteen years of age whose physical, mental or emotional condition has been impaired or is in imminent danger of becoming impaired as a result of the failure of her FATHER, EDWARD FLOREA (DOB: 7/30/1980), to exercise a minimum degree of care in providing her with proper supervision or guardianship by unreasonably inflicting or allowing to be inflicted harm, or a substantial risk thereof, or by any other acts of a similarly serious nature requiring the aid of the Court within the purview of the FCA Section 1012 (f) (i) (b), in that:

1.   The respondent father has failed to provide the child with proper supervision and guardianship in that he perpetrated acts of domestic violence against the mother in the presence of the child, actions which subject the child to emotional and physical harm or risk thereof, in that:

a. On June 16, 2014, the mother told ACS CPS Sherie Maxwell that on or about May 7, 2014 the Respondent father threatened her and the subject child while holding a knife by saying "I will kill the both of you".  The mother stated that she was holding the subject child in her arms when the Respondent father threatened her.  The mother indcated that during this incident the child appeared fearful and was grabbing onto the mother's shirt.

b.  On or about May 30, 2014, the Respondent father admitted to ACS CPS Letitia Smith that on or about May 7, 2014 he grabbed the mother and shook her.

c.  According the the parent's therapist, Russel Skelkowitz, the Respondent father told him that in the past he had strangled the mother with a plastic bag.

WHEREFORE, the subject child ███████ FLOREA is a neglected child as defined in FCA 1012.

F.C.A.§§ 1017, 1033-b, 1040, 1044,                                          10-10 3/2009
1046, 1051, 1052, 1053,
1054, 1055, 1057, 1059

At a term of the Family Court of the
State of New York, held in and for
the County of Richmond, at 100
Richmond Terrace, Staten Island,
NY 10301, on March 9, 2015

**PRESENT:**   Hon. Arnold Lim

In the Matter of                                         **File #:**      30739
                                                         **Docket #:**  NN-02512-14
████ **Florea** (DOB: ████/2012),
                                                         **CPS #:**      6754887
A Child under Eighteen Years of Age
Alleged to be Neglected by                                     **ORDER OF DISPOSITION**

**Edward Florea**,
                                   Respondent.

**NOTICE: WILLFUL FAILURE TO OBEY THE TERMS AND CONDITIONS OF THIS
ORDER MAY RESULT IN COMMITMENT TO JAIL FOR A TERM NOT TO EXCEED
SIX MONTHS.**

**IF YOUR CHILD IS PLACED IN FOSTER CARE, YOU MAY LOSE YOUR RIGHTS TO
YOUR CHILD AND YOUR CHILD MAY BE ADOPTED WITHOUT YOUR CONSENT.**

**IF YOUR CHILD STAYS IN FOSTER CARE FOR 15 OF THE MOST RECENT 22
MONTHS, THE AGENCY MAY BE REQUIRED BY LAW TO FILE A PETITION TO
TERMINATE YOUR PARENTAL RIGHTS AND MAY FILE BEFORE THE END OF THE
15-MONTH PERIOD.**

**IF SEVERE OR REPEATED ABUSE IS PROVEN BY CLEAR AND CONVINCING
EVIDENCE, THIS FINDING MAY CONSTITUTE THE BASIS TO TERMINATE YOUR
PARENTAL RIGHTS.**

> **THE NEXT COURT DATE IS JUNE 30, 2015 at 02:30 PM.**

The petition of Admin. for Children's Services-Richmond under Article 10 of the Family
Court Act, having been filed in this Court on June 17, 2014 alleging that the above-named
Respondent neglected the above-named child; and

Notice having been duly given to the Respondent pursuant to section 1036 or 1037 of the
Family Court Act; and

**And the matter having thereafter duly come on for a DISPOSITIONAL HEARING
before the Court,**

And the child having been represented by an attorney and the Court having considered the position of the child regarding the permanency plan;

**NOW therefore, upon findings made in the dispositional hearings; and upon all proceedings had herein,**

<u>**Order of Disposition**</u>
**And the Court, having considered the best interests and safety of the child, including whether the child would be at risk of abuse or neglect if returned to the parent(s) or other person(s) legally responsible, hereby orders the following:**

ORDERED that the child is released to the custody of the non-respondent mother with supervision of a child protective agency, social services official, or duly authorized agency upon the following terms and conditions to be met by Respondent:
1- Respondent to complete a parenting skills class.
2- Respondent to comply with anger management counseling.
3- Respondent to complete a Batterers Program.
4- Respondent to complete a Mental Health evaluation and treatment.
5- Respondent to have pick up and drop off at Police Pct. if he earns unsupervised visits. ;and it is further

ORDERED that the Respondent is placed under the supervision of ACS-Richmond until March 9, 2016; and it is further

ORDERED that Edward Florea is required to comply with the terms and conditions specified in the order of protection, issued pursuant to Family Court Act §1056, annexed to this order and made a part thereof; and it is further

ORDERED that if the child absconds from the above-named custodial person or facility, written notice shall be given within 48 hours to the Clerk of Court by the custodial person or by an authorized representative of the facility, stating the name of the child, the docket number of this proceeding, and the date on which the child ran away; and it is further

ORDERED that, not later than 60 days prior to the expiration of this order, the Commissioner of Social Services shall report to the Court, the child's attorney, the parties, their attorneys and the non-respondent parent(s) on the status and circumstances of the child and family and any actions contemplated, if any, by the agency with respect to the child and family.

**Dated:** March 9, 2015            **ENTER**

_____

**Hon. Arnold Lim**

**PURSUANT TO SECTION 1113 OF THE FAMILY COURT ACT, AN APPEAL FROM THIS ORDER MUST BE TAKEN WITHIN 30 DAYS OF RECEIPT OF THE ORDER BY APPELLANT IN COURT, 35 DAYS FROM THE DATE OF MAILING OF THE ORDER TO APPELLANT BY THE CLERK OF COURT, OR 30 DAYS AFTER SERVICE BY A PARTY OR THE ATTORNEY FOR THE CHILD UPON THE APPELLANT, WHICHEVER IS EARLIEST.**

**Check applicable box:**
☐ Order mailed on [specify date(s) and to whom mailed]:_____
☐ Order received in court on [specify date(s) and to whom given]:_____

## APPENDIX A [22 NYCRR §205.83]

### § 205.83 Terms and Conditions of Order in Accordance With Sections 1053, 1054, and 1057 of the Family Court Act (Child Protective Proceeding)

(a) An order suspending judgment entered pursuant to section 1052 of the Family Court Act shall, where the child is in foster care, set forth the visitation plan between respondent and the child and between the child and his or her sibling or siblings, if any, and shall require the agency to notify the respondent of case conferences.  A copy of the order, along with the current service plan, shall be furnished to the respondent.  Any order suspending judgment shall contain at least one of the following terms and conditions that relate to the adjudicated acts or omissions of the respondent, directing the respondent to:

    (1)     refrain from or eliminate specified acts or conditions found at the fact-finding hearing to constitute or to have caused neglect or abuse;

    (2)     provide adequate and proper food, housing, clothing, medical care, and for the other needs of the child;

    (3)     provide proper care and supervision to the child and cooperate in obtaining, accepting or allowing medical or psychiatric diagnosis or treatment, alcoholism or drug abuse treatment, counseling or child guidance services for the child;

    (4)     take proper steps to insure the chid's regular attendance at school;

    (5)     cooperate in obtaining and accepting medical treatment, psychiatric diagnosis and

treatment, alcoholism or drug abuse treatment, employment or counseling services, or child guidance, and permit a child protective agency to obtain information from any person or agency from whom the respondent or the child is receiving or was directed to receive treatment or counseling.

(b) An order pursuant to section 1054 of the Family Court Act placing the person to whose custody the child is released under the supervision of a child protective agency, social services officer or duly authorized agency, or an order pursuant to section 1057 placing the respondent under the supervision of a child protective agency, social services official or authorized agency, shall contain at least one of the following terms and conditions requiring the respondent to:

    (1)    observe any of the terms and conditions set forth in subdivision (a) of this section;

    (2)    cooperate with the supervising agency in remedying specified acts or omissions found at the fact-finding hearing to constitute or to have caused the neglect or abuse;

    (3)    meet with the supervising agency alone and with the child when directed to do so by that agency;

    (4)    report to the supervising agency when directed to do so by that agency;

    (5)    cooperate with the supervising agency in arranging for and allowing visitation in the home or other place;

    (6)    notify the supervising agency immediately of any change of residence or employment of the respondent or of the child;

    (7)    do or refrain from doing any other specified act of omission or commission that, in the judgment of the court, is necessary to protect the child from injury or mistreatment and to help safeguard the physical, mental and emotional well-being of the child;

(c) When an order is made pursuant to section 1054 or 1057 of the Family Court Act:

    (1)    the court shall notify the supervising agency in writing of its designation to act and shall furnish to that agency a copy of the order setting forth the terms and conditions imposed;

    (2)    the order shall be accompanied by a written statement informing the respondent that a willful failure to obey the terms and conditions imposed may result in commitment to jail for a term not to exceed six months;

    (3)    the court may, if it concludes that it is necessary for the protection of the child, direct the supervising agency to furnish a written report to the court at stated intervals not to exceed six months setting forth whether, and to what extent:

        (i)    there has been any alteration in the respondent's maintenance of the child that is adversely affecting the child's health or well-being;

        (ii)    there is compliance with the terms and conditions of the order of supervision;

        (iii)    the supervising agency has furnished supporting services to the respondent.

(d) A copy of the order setting forth its duration and the terms and conditions imposed shall be furnished to the respondent.

At a term of the Family Court of the
State of New York, held in and for
the County of Richmond, at 100
Richmond Terrace, Staten Island,
NY 10301, on March 2, 2016

**PRESENT:**   Hon. Arnold Lim

| | |
|---|---|
| In the Matter of | **File #:**   30739 |
| | **Docket #:**   NN-02512-14 |
| ███ **Florea** (DOB: ███/2012), | NN-02512-14/16A |
| ███ **Florea** (DOB: ███/2012), | |
| | **CPS #:**   6754887 |
| Children under Eighteen Years of Age | |
| Alleged to be Neglected by | **ORDER** |
| | |
| **Edward Florea**, | |
| Respondent. | |

PURSUANT TO SECTION 1113 OF THE FAMILY COURT ACT, AN APPEAL FROM THIS
ORDER MUST BE TAKEN WITHIN 30 DAYS OF RECEIPT OF THE ORDER BY APPELLANT
IN COURT, 35 DAYS FROM THE DATE OF MAILING OF THE ORDER TO APPELLANT BY
THE CLERK OF COURT, OR 30 DAYS AFTER SERVICE BY A PARTY OR THE ATTORNEY
FOR THE CHILD UPON THE APPELLANT, WHICHEVER IS EARLIEST.

**IT IS ORDERED** that the Order of Supervision issued 06/09/2015 is temporarily
extended until 03/30/2016.

**Dated:** March 2, 2016                    **ENTER**

**Hon. Arnold Lim**

Check applicable box:
☐ Order mailed on [specify date(s) and to whom mailed]:_____
☐ Order received in court on [specify date(s) and to whom given]:_____

At a term of the Family Court of the
State of New York, held in and for
the County of Richmond, at 100
Richmond Terrace, Staten Island,
NY 10301, on May 2, 2016

**PRESENT:**   Hon. Arnold Lim

In the Matter of

████ **Florea** (DOB: ████/2012),

A Child under Eighteen Years of Age
Alleged to be Neglected by

**Edward Florea**,

Respondent.

**File #:**     30739
**Docket #:**   NN-02512-14/16A

**CPS #:**     6754887

**ORDER EXTENDING
ORDER OF SUPERVISION**

PURSUANT TO SECTION 1113 OF THE FAMILY COURT ACT, AN APPEAL FROM THIS
ORDER MUST BE TAKEN WITHIN 30 DAYS OF RECEIPT OF THE ORDER BY APPELLANT
IN COURT, 35 DAYS FROM THE DATE OF MAILING OF THE ORDER TO APPELLANT BY
THE CLERK OF COURT, OR 30 DAYS AFTER SERVICE BY A PARTY OR THE ATTORNEY
FOR THE CHILD UPON THE APPELLANT, WHICHEVER IS EARLIEST.

   **IT IS ORDERED that the Order of Supervision issued on 06/09/2015 is hereby
extended to 03/29/2017 at 4:00 p.m., with all terms and conditions remaining in full force and
effect.**

**Dated:** May 2, 2016                    **ENTER**


_____
                    **Hon. Arnold Lim**


**Check applicable box:**
☐ Order mailed on [specify date(s) and to whom mailed]:_____
☐ Order received in court on [specify date(s) and to whom given]:_____

F.C.A.§§ 1017, 1033-b, 1040, 1044,                                      10-10 3/2009
1046, 1051, 1052, 1053,
1054, 1055, 1057, 1059

                                          At a term of the Family Court of the
                                          State of New York, held in and for
                                          the County of Richmond, at 100
                                          Richmond Terrace, Staten Island,
                                          NY 10301, on July 14, 2016

**PRESENT:**   Hon. Arnold Lim

In the Matter of                          **File #:**    30739
                                          **Docket #:**  NN-01053-16
████████  **Florea** (DOB: ██/2016),
                                          **CPS #:**     6754887
A Child under Eighteen Years of Age
Alleged to be Neglected by                    **ORDER OF FACT-FINDING
                                                 AND DISPOSITION**
**Edward Florea**,
                        Respondent.

**NOTICE: WILLFUL FAILURE TO OBEY THE TERMS AND CONDITIONS OF THIS
ORDER MAY RESULT IN COMMITMENT TO JAIL FOR A TERM NOT TO EXCEED
SIX MONTHS.**

**IF YOUR CHILD IS PLACED IN FOSTER CARE, YOU MAY LOSE YOUR RIGHTS TO
YOUR CHILD AND YOUR CHILD MAY BE ADOPTED WITHOUT YOUR CONSENT.**

**IF YOUR CHILD STAYS IN FOSTER CARE FOR 15 OF THE MOST RECENT 22
MONTHS, THE AGENCY MAY BE REQUIRED BY LAW TO FILE A PETITION TO
TERMINATE YOUR PARENTAL RIGHTS AND MAY FILE BEFORE THE END OF THE
15-MONTH PERIOD.**

**IF SEVERE OR REPEATED ABUSE IS PROVEN BY CLEAR AND CONVINCING
EVIDENCE, THIS FINDING MAY CONSTITUTE THE BASIS TO TERMINATE YOUR
PARENTAL RIGHTS.**

The petition of Admin. for Children's Services-Richmond under Article 10 of the Family
Court Act, having been filed in this Court on March 14, 2016 alleging that the above-named
Respondent neglected the above-named child; and

Notice having been duly given to the Respondent pursuant to section 1036 or 1037 of the
Family Court Act; and

Respondent, Edward Florea, having appeared with counsel;

And Respondent, Edward Florea, having voluntarily, intelligently and knowingly consented
to the entry of an order of fact-finding without admission pursuant to Family Court Act §1051(a),
and the Petitioner, Child's attorney and all other parties having consented to the entry of such order

of fact-finding as well;

**And the Court, after** accepting the Respondent Edward Florea's consent to the entry of a order of fact finding without an admission,

**And the matter having thereafter duly come on for a DISPOSITIONAL HEARING before the Court,**

And the child having been represented by an attorney and the Court having considered the position of the child regarding the permanency plan;

**NOW therefore, upon findings made in the fact-finding and dispositional hearings; and upon all proceedings had herein, it is hereby**

<u>**Order of Fact-finding or Dismissal**</u>
ADJUDGED that the Respondent has consented to the entry of an order of fact-finding without admission; and it is hereby

ADJUDGED that the above-named child is a neglected child, as defined in section 1012 of the Family Court Act by Edward Florea.

<u>**Order of Disposition**</u>
**And the Court, having considered the best interests and safety of the child, including whether the child would be at risk of abuse or neglect if returned to the parent(s) or other person(s) legally responsible, hereby orders the following:**

ORDERED that the child is released to the custody of the non-respondent mother with supervision of a child protective agency, social services official, or duly authorized agency upon the following terms and conditions to be met by non-Respondent mother: Non respondent mother to enforce Order of Protection . Respondent father to complete same services as stated in disposition order for subject child ███ under docket #: NN-02512/14 ; and it is further ordered that ACS to submit reports to counsel on 9/14/16 , 12/14/16 and 2/14/17.

ORDERED that if the child absconds from the above-named custodial person or facility, written notice shall be given within 48 hours to the Clerk of Court by the custodial person or by an authorized representative of the facility, stating the name of the child, the docket number of this proceeding, and the date on which the child ran away; and it is further

ORDERED that, not later than 60 days prior to the expiration of this order, the Commissioner of Social Services shall report to the Court, the child's attorney, the parties, their attorneys and the non-respondent parent(s) on the status and circumstances of the child and family and any actions contemplated, if any, by the agency with respect to the child and family.

**Dated:** July 14, 2016                                  **ENTER**

_____

**Hon. Arnold Lim**

**PURSUANT TO SECTION 1113 OF THE FAMILY COURT ACT, AN APPEAL FROM THIS ORDER MUST BE TAKEN WITHIN 30 DAYS OF RECEIPT OF THE ORDER BY APPELLANT IN COURT, 35 DAYS FROM THE DATE OF MAILING OF THE ORDER TO APPELLANT BY THE CLERK OF COURT, OR 30 DAYS AFTER SERVICE BY A PARTY OR THE ATTORNEY FOR THE CHILD UPON THE APPELLANT, WHICHEVER IS EARLIEST.**

**Check applicable box:**
☐ Order mailed on [specify date(s) and to whom mailed]:_____
☐ Order received in court on [specify date(s) and to whom given]:_____

## APPENDIX A [22 NYCRR §205.83]

### § 205.83 Terms and Conditions of Order in Accordance With Sections 1053, 1054, and 1057 of the Family Court Act (Child Protective Proceeding)

(a) An order suspending judgment entered pursuant to section 1052 of the Family Court Act shall, where the child is in foster care, set forth the visitation plan between respondent and the child and between the child and his or her sibling or siblings, if any, and shall require the agency to notify the respondent of case conferences.  A copy of the order, along with the current service plan, shall be furnished to the respondent.  Any order suspending judgment shall contain at least one of the following terms and conditions that relate to the adjudicated acts or omissions of the respondent, directing the respondent to:

    (1)    refrain from or eliminate specified acts or conditions found at the fact-finding hearing to constitute or to have caused neglect or abuse;

    (2)    provide adequate and proper food, housing, clothing, medical care, and for the other needs of the child;

    (3)    provide proper care and supervision to the child and cooperate in obtaining, accepting or allowing medical or psychiatric diagnosis or treatment, alcoholism or drug abuse treatment, counseling or child guidance services for the child;

    (4)    take proper steps to insure the chid's regular attendance at school;

    (5)    cooperate in obtaining and accepting medical treatment, psychiatric diagnosis and

treatment, alcoholism or drug abuse treatment, employment or counseling services, or child guidance, and permit a child protective agency to obtain information from any person or agency from whom the respondent or the child is receiving or was directed to receive treatment or counseling.

(b) An order pursuant to section 1054 of the Family Court Act placing the person to whose custody the child is released under the supervision of a child protective agency, social services officer or duly authorized agency, or an order pursuant to section 1057 placing the respondent under the supervision of a child protective agency, social services official or authorized agency, shall contain at least one of the following terms and conditions requiring the respondent to:

 (1) observe any of the terms and conditions set forth in subdivision (a) of this section;
 (2) cooperate with the supervising agency in remedying specified acts or omissions found at the fact-finding hearing to constitute or to have caused the neglect or abuse;
 (3) meet with the supervising agency alone and with the child when directed to do so by that agency;
 (4) report to the supervising agency when directed to do so by that agency;
 (5) cooperate with the supervising agency in arranging for and allowing visitation in the home or other place;
 (6) notify the supervising agency immediately of any change of residence or employment of the respondent or of the child;
 (7) do or refrain from doing any other specified act of omission or commission that, in the judgment of the court, is necessary to protect the child from injury or mistreatment and to help safeguard the physical, mental and emotional well-being of the child;

(c) When an order is made pursuant to section 1054 or 1057 of the Family Court Act:

 (1) the court shall notify the supervising agency in writing of its designation to act and shall furnish to that agency a copy of the order setting forth the terms and conditions imposed;
 (2) the order shall be accompanied by a written statement informing the respondent that a willful failure to obey the terms and conditions imposed may result in commitment to jail for a term not to exceed six months;
 (3) the court may, if it concludes that it is necessary for the protection of the child, direct the supervising agency to furnish a written report to the court at stated intervals not to exceed six months setting forth whether, and to what extent:

  (i) there has been any alteration in the respondent's maintenance of the child that is adversely affecting the child's health or well-being;
  (ii) there is compliance with the terms and conditions of the order of supervision;
  (iii) the supervising agency has furnished supporting services to the respondent.

(d) A copy of the order setting forth its duration and the terms and conditions imposed shall be furnished to the respondent.

At a term of the Family Court of the
State of New York, held in and for
the County of Richmond, at 100
Richmond Terrace, Staten Island,
NY 10301, on June 26, 2017

**PRESENT:**   Hon. Arnold Lim

In the Matter of

████████ **Florea** (DOB: ██/2016),

████ **Florea** (DOB: ████/2012),

Children under Eighteen Years of Age
Alleged to be Neglected by

**Edward Florea**,

Respondent.

| | |
|---|---|
| **File #:** | 30739 |
| **Docket #:** | NN-01053-16/17B |
| | NN-02512-14/17C |
| **CPS #:** | 6754887 |
| | **ORDER** |

PURSUANT TO SECTION 1113 OF THE FAMILY COURT ACT, AN APPEAL FROM THIS ORDER MUST BE TAKEN WITHIN 30 DAYS OF RECEIPT OF THE ORDER BY APPELLANT IN COURT, 35 DAYS FROM THE DATE OF MAILING OF THE ORDER TO APPELLANT BY THE CLERK OF COURT, OR 30 DAYS AFTER SERVICE BY A PARTY OR THE ATTORNEY FOR THE CHILD UPON THE APPELLANT, WHICHEVER IS EARLIEST.

**IT IS ORDERED** that Respondent father's Order of Supervision dated 07/14/2016 is hereby extended to 03/29/2018 at 12:00 Noon under the same terms and conditions.

**Dated:** June 26, 2017                    **ENTER**

20170626154141A1IMB81A327D56564BB1930C726987CC0203

**Hon. Arnold Lim**

**Check applicable box:**
☐ Order mailed on [specify date(s) and to whom mailed]:_____
☐ Order received in court on [specify date(s) and to whom given]:_____

# **<u>EXHIBIT E</u>**

Joni Florea
6126 76th street 1st floor
Middle Village, NY, 11379

November 13, 2021

The Honorable Eric Komitee
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Re: United States v. Eduard Florea, 21-CR-37 (EK)

Your Honor:

I am writing to you today on behalf of my husband Eduard Florea. Before I begin, I want you to know that I am fully aware of the gravity of the crimes Eduard committed. It is still hard for me to wrap my head around his actions. This is not the man I married and I would like to give you a perspective that shows him as more than the sum of his actions on the day he committed those crimes.

I will begin by saying that the FBI handled this case with the most dignity a family could ask for. Having said that, this has been an extremely traumatic event for my children and me. I would have never had any contact with any law enforcement if the FBI had not come to our home. The fact is that our marriage as good or bad as it is, has nothing to do with this case. My only reason for explaining any part of that to the FBI was to exonerate myself from Eduard's crimes. That information was only vital to that aspect and nothing else. I would like for you to take into consideration that in my  last conversation with the FBI, I told them I did not want to be part of this case for various reasons. Which leads me to my next point.

My husband Eduard Florea has always been there for his family. He is the hardest working man I have ever met and is very responsible in that way. He is always willing to lend a helping hand in anyway he can. He especially loves his children and would do anything for his family.  Eduard has always worked tirelessly to support his family..

Eduard has always been extremely ambitious and never stops pushing himself to learn and grow. I believe he is  sorry for his actions.

Serving this time in jail has taken him away from his goals and has given him plenty of time to take accountability  for his actions and he has been working on himself. He wants to be a better person and role model to his children. Eduard continues to become more self-aware and in control of his actions and reactions.

The  most important thing I want to share with you is how badly I have been struggling to financially support our two children and myself, whom he was the sole provider for. I have

struggled this entire time fo find employment. I have had to resort to public assistance and apply for help from federal funding  with rent owed in the sum of thousands of dollars. Before, Eduard's arrest we had just begun saving and the little we had ran out before the dust settled.

One of the saddest parts for me aside from  my children losing their father, is having to receive help from his very hard working mother (she has also had financial loss due to the pandemic and closing her business). Eduard's mother has been our saving grace and without her nothing in our lives would be possible right now. It comes at the expense of her having to work twice as hard and much, when she should be planning her retirement. The savings that my children's grandmother has worked extremely hard for, was not meant to support her son's family. It was meant for her to take care of herself as she gets older so that she didn't become a burden to her son that has children of his own.

 My mother- in- law Valentina Florea worked very  hard from the moment she came to America, with the sole purpose of giving her son a better life. Eduard  grew up much more comfortable than most children in America. Eduard's mother is my role model.  She is the rock of our family and has taught me so many important life lessons. I have every good reason to believe that if you let Eduard come home to work while he  living in his mother's home, he is going to do the right thing and take care of his family. I remain very close friends with my  mother in law and trust her with mine and my children's life. After many conversations with her, I am confident Eduard will have all the support he needs to fulfill his parental obligations,  to continue his mental rehabilitation, and finally realize  his goals.

Your honor in closing, I thank you for  your time and understanding. Before deciding Eduard's sentence, I am begging you to consider that  there  is an entire family serving this sentence with Eduard. His  two children, ███ who is 8 (she will spend her 9th birthday without her father on November 19) and ███ who is 5 that miss and need their father very much.

Respectfully,
Joni Florea
(929) 610-0368

# **EXHIBIT F**

c.      Another cellphone, which is assigned call number 929-434-7415, is also subscribed to in the name of EDUARD FLOREA (the "7415 Phone").  As of January 8, 2021, geolocation data received pursuant to 18 U.S.C. § 2702 indicated that the 7415 Phone was located in Queens, New York, consistent with the vicinity of the Subject Premises.

13.     Based upon my review of criminal history records, I have learned that EDUARD FLOREA was convicted on or about July 22, 2014 in Richmond County Supreme Court of criminal possession of an assault weapon in the third degree, a felony offense in violation of New York Penal Law § 265.02, and sentenced to one year of imprisonment.  New York City Police Department records relating to FLOREA's underlying arrest indicate that FLOREA was found in possession of approximately 13 firearms, including at least one machine gun, as well as ammunition and high-capacity magazines.[2]

14.      Accordingly, I respectfully submit that there is probable cause to believe that EDUARD FLOREA, having been previously convicted of a felony, has engaged in the unlawful possession of firearms as described on Parler Account-1, and has engaged in making interstate threats using Parler Account-1, including threats against unnamed persons in Washington, D.C. and Senator-elect Warnock, who is based in Georgia.

15.     In addition, as set forth below, I respectfully submit that there is probable cause to believe that EDUARD FLOREA is acting in concert with others, including but not limited to,

---

[2] As described above, on or about January 7, 2021, Magistrate Judge Fox authorized a warrant for cellphone location information for the 0371 Phone.  The affidavit in support of that warrant states that, in connection with his 2014 conviction, FLOREA was found in possession of 30 firearms.  A further review of the New York City Police Department report reveals that the actual number of firearms was approximately 13, and the larger figure represented a count of both firearms and magazines found in FLOREA's possession.

EF000067

unspecified violent armed actors ("got a bunch of guys all armed and ready to deploy")

and his wife, JONI FLOREA.

16.     Based upon my review of records received pursuant to the authority set forth in 18

U.S.C. § 2702 from Facebook regarding a Facebook account believed to be used by JONI

FLOREA for the reasons that follow ("Facebook Account-1"), I have learned the following:

a.      Subscriber information for Facebook Account-1 reflects that the account

bears the name "Joni Florea" and that it is associated with several email accounts, including a

Gmail account incorporating the name of JONI FLOREA (joniflorea26@gmail.com).

b.      On or about September 2, 2020, the user of Facebook Account-1, believed

to be JONI FLOREA, provided alternate contact information in the form of a cellphone number,

347-749-9257, and an email address, joniflorea26@gmail.com, and described her husband's

contact information as: "Ed's email is Viper6277@gmail.com… Cell 917 658 0371," that is, the

0371 Phone subscribed to by EDUARD FLOREA.

c.      On or about December 6, 2020, the user of Facebook Account-1 exchanged

the following series of messages with another Facebook user ("Individual-1"), in substance and in

part:

| | |
|---|---|
| Individual-1: | Even if trump wins by some miracle, the dems and antifa will start a war and burn everything down. But then that's what you were saying about martial law stepping in. |
| Facebook Account-1: | Yes…. And it will happen…. We will out gun them by a longshot… Unfortunately some good men are going to have to do some bad things… But it may be a last resort... I pray not. |
| Individual-1: | What bad things? |

8

Facebook Account-1:   LOL omg…There is a civil war brewing…Don't you watch the news?

Individual-1:   ...either way there's gonna be a war and it ain't gonna be pretty

Facebook Account-1:   Yes that is what I mean unfortunately innocent people may have to fight for freedom.

d.       On or about December 11, 2020, another Facebook user sent a message asking if the user of Facebook Account-1 was currently working.  In response, the user of Facebook Account-1 stated, in substance and in part, that she used to work at Chase Bank, but was "currently working on a personal project with my husband."  The user of Facebook Account-1 declined to provide more details about the "personal project," stating in substance and in part, "I do not want to tell Facebook…they are watching."  The user of Facebook Account-1 asked if the other user was on Parler and identified the Parler account @ProudBabe ("Parler Account-2") as her Parler account.

e.       On or about January 6, 2021, the date of the violent events described above in Washington, D.C., another user asked the user of Facebook Account-1 if her husband was safe. The user of Facebook Account-1 stated, in substance and in part, "i dont want to talk about that on fb [Facebook]" [sic].

17.     Based on my review of the publicly available portions of Parler Account-2, believed to be used by JONI FLOREA as explained above, I have learned the following:

a.       On or about August 29, 2020, Parler Account-2 responded to an article about Kyle Rittenhouse, who I know from open source reporting shot two individuals during civil

9

unrest in Kenosha, Wisconsin in the summer of 2020, with the following statements: "And that was just a 17yr old white Male with a gun. Wait till they get the big boys mad enough." Also on or about August 29, 2020, in response to a "parley" (*i.e.*, a communication on Parler) describing that attorney Lin Wood would be representing Rittenhouse, Parler Account-2 posted, "For my son and all the sons of all white Americans!"

       b.    In addition, Parler Account-2 posted in response to a post linking to an article entitled "Leftists, Never Trumpers Begin Compiling Lists of Trump Supporters" that included a photograph of Congresswoman Alexandria Ocasio-Cortez, Parler Account-2 stated "Hahaha…. That's really funny, because she is on my list too…. Let's see who tags who first….." (ellipses in original).  Later, in response to another Parler user's comments on the same article, "I guess aim first and make them count," Parler Account-2 responded, "Hope you have enough ammo."

       c.    On or about December 13, 2020, in response to a parley asking "would you support [P]resident Trump if he now declared martial law," Parler Account-2 responded, "We are going to war either way. It is better to have the military on our side."

       d.    On or about January 7, 2021, at approximately 10:00 a.m., Parler Account-2 posted "@parlersupport why was my husband's account @viper6277 deleted?"  Later in the evening of January 7, 2020, at approximately 6:00 p.m., the post appears to have been deleted.

18.    Based upon my training, experience, and participation in this investigation, including review of the messages and subscriber data described above, I believe that the user of Facebook Account-1 and Parler Account-2 likely is the wife of EDUARD FLOREA, JONI FLOREA, and that she appears to be conspiring with or aiding and abetting EDUARD FLOREA in the commission of the Subject Offenses.

10

# **EXHIBIT G**

# Florea, Edward    83865 - 053                    MRN: 21340077

**Telehealth** 7/12/2021
Physicians Pavilion,
Nephrology

Provider: Priyanka Singh, MD (Nephrology)
Primary diagnosis: Essential hypertension
Reason for Visit: Hypertension; Referred by Bruce Bailor

## Progress Notes                    Priyanka Singh, MD (Physician) • Nephrology

### Subjective

**Patient ID:** Edward Florea is a 40 y.o. male. With known history of hypertension but was not on any medications prior to January 2021- was admitted to MDC, brooklyn in Jan 2021 . He was found to have elevated BP of 188/127 range at that time  Also was noted to have abnormal labs with elevated Creatinine at 1.6 with eGFR 48 at that time. He was stared on amlodipine 5 m once a day at that time and since then has very well controlled Blood pressure readings per EMR review - with readings as below-
2/21-130/80
3/21- 124/84
5/21- 123/79

Repeat lab work shows improving renal function with resolution of initial AKI( acute kidney injury)
2/21- Cr 1.6 eGFR 48
3/21- Cr 1.4 eGFR 54
6/21- Cr 1.2 eGFR > 60
UA - bland with no protein no blood

PMH- as above, no H/o DM, no HIV, ho hepatitis
Denied any active drug use, no alcohol or smoking
Family history not known , born in Romania per EMR
Allergies -NKDA

**Virtual visit and consultation with his MD at Metropolitan detention center Brooklyn - Dr AWD**
**He was been evaluated by Dr Awd at multiple occasions since then and has no significant physical examination findings.**

Review of Systems
All other systems reviewed and are negative.

### Assessment/Plan

# Florea, Edward    83865-053                          MRN: 21340077

**Telehealth** 7/12/2021
Physicians Pavilion,
Nephrology

Provider: Priyanka Singh, MD (Nephrology)
Primary diagnosis: Essential hypertension
Reason for Visit: Hypertension; Referred by Bruce Bailor

## Progress Notes                        Priyanka Singh, MD (Physician) • Nephrology

**Subjective**

**Patient ID:** Edward Florea is a 40 y.o. male. With known history of hypertension but was not on any medications prior to January 2021- was admitted to MDC, brooklyn in Jan 2021 . He was found to have elevated BP of 188/127 range at that time  Also was noted to have abnormal labs with elevated Creatinine at 1.6 with eGFR 48 at that time. He was stared on amlodipine 5 m once a day at that time and since then has very well controlled Blood pressure readings per EMR review - with readings as below-
2/21-130/80
3/21- 124/84
5/21- 123/79

Repeat lab work shows improving renal function with resolution of initial AKI( acute kidney injury)
2/21- Cr 1.6 eGFR 48
3/21- Cr 1.4 eGFR 54
6/21- Cr 1.2 eGFR > 60
UA - bland with no protein no blood

PMH- as above, no H/o DM, no HIV, ho hepatitis
Denied any active drug use, no alcohol or smoking
Family history not known , born in Romania per EMR
Allergies -NKDA

**Virtual visit and consultation with his MD at Metropolitan detention center Brooklyn - Dr AWD**
**He was been evaluated by Dr Awd at multiple occasions since then and has no significant physical examination findings.**

Review of Systems
All other systems reviewed and are negative.

**Assessment/Plan**

# **<u>EXHIBIT H</u>**



**Federal Bureau of Prisons**

# U.S. Medical Center for Federal Prisons
1900 W. Sunshine Street
Springfield, MO 65807
417-874-1621

*** Sensitive But Unclassified ***

| | | | | | |
|---|---|---|---|---|---|
| **Name** | FLOREA, EDWARD | **Facility** | MDC Brooklyn | **Collected** | 07/19/2021 11:33 EDT |
| **Reg #** | 83865-053 | **Order Unit** | I03-616U | **Received** | 07/20/2021 10:32 EDT |
| **DOB** | 07/29/1980 | **Provider** | Gina  Duncan, FNP-BC | **Reported** | 07/20/2021 12:57 EDT |
| **Sex** | M | | | **LIS ID** | 180212301 |

## CHEMISTRY

| | | | | |
|---|---|---|---|---|
| Sodium | | 139 | 136-145 | mmol/L |
| Potassium | | 4.7 | 3.5-5.1 | mmol/L |
| Chloride | | 102 | 98-107 | mmol/L |
| Carbon Dioxide | | 28 | 22-29 | mmol/L |
| Urea Nitrogen (BUN) | | 14 | 6-20 | mg/dL |
| Creatinine | H | 1.49 | 0.67-1.17 | mg/dL |
| eGFR (IDMS) | | 52 | | |

GFR units measured as mL/min/1.73 m^2. If African American multiply by 1.210.
A calculated GFR <60 suggests chronic kidney disease if found over a 3 month period.

| | | | | |
|---|---|---|---|---|
| Calcium | | 9.7 | 8.6-10.0 | mg/dL |
| Glucose | | 88 | 74-106 | mg/dL |
| Albumin | | 5.0 | 3.5-5.2 | g/dL |
| Phosphate (As Phosphorus) | | 3.9 | 2.5-4.5 | mg/dL |
| Anion Gap | | 9.0 | 9.0-19.0 | |

**FLAG LEGEND**     L=Low   L!=Low Critical   H=High   H!=High Critical   A=Abnormal   A! =Abnormal Critical

# EXHIBIT I

# Bureau of Prisons
## Health Services
## Immunizations

| Begin Date: | 11/12/2020 | | End Date: | 11/12/2021 |
|---|---|---|---|---|
| Reg #: | 83865-053 | | Inmate Name: | FLOREA, EDWARD B |

| Immunization | Immunization Date | Administered | Location | Dosage | Drug Mfg. | Lot # | Dose # | Exp Date |
|---|---|---|---|---|---|---|---|---|
| COVID-19 Pfizer-BioNTech | 05/13/2021 | Now | Left Deltoid | 0.3mL | Pfizer | EW0168 | 2 | 08/01/2021 |
| Administered by R. Beddoe | | | | | | | | |
| **Orig Entered:** 05/13/2021 12:45 EST | | Vasquez, Stacey HSA/NRP | | | | | | |
| COVID-19 Pfizer-BioNTech | 04/22/2021 | Now | Left Deltoid | 0.3mL | Pfizer | ew0172 | 1 | 08/01/2021 |
| **Orig Entered:** 04/22/2021 16:55 EST | | Vasquez, Stacey HSA/NRP | | | | | | |
| Hepatitis A and B (TwinRx) | | History Unknown | | | | | | |
| **Orig Entered:** 02/05/2021 12:55 EST | | Duncan, Gina FNP-BC | | | | | | |
| ~~Hepatitis A and B (TwinRx)~~ | | ~~History Unknown~~ | | | | | | |
| ~~**Orig Entered:** 02/03/2021 14:21 EST~~ | | ~~Duncan, Gina FNP-BC~~ | | | | | | |
| **Last Updated:** 02/05/2021 12:51 EST | | Duncan, Gina FNP-BC | | | | | | |
| Measles/Mumps/Rubella Series 02/05/2021 | | History Of | | | | | | |
| **Orig Entered:** 02/05/2021 12:55 EST | | Duncan, Gina FNP-BC | | | | | | |
| ~~Measles/Mumps/Rubella Series 02/03/2021~~ | | ~~History Of~~ | | | | | | |
| ~~**Orig Entered:** 02/03/2021 14:21 EST~~ | | ~~Duncan, Gina FNP-BC~~ | | | | | | |
| **Last Updated:** 02/05/2021 12:51 EST | | Duncan, Gina FNP-BC | | | | | | |
| Smallpox Series | 02/05/2021 | History Of | | | | | | |
| **Orig Entered:** 02/05/2021 12:55 EST | | Duncan, Gina FNP-BC | | | | | | |
| ~~Smallpox Series~~ | ~~02/03/2021~~ | ~~History Of~~ | | | | | | |
| ~~**Orig Entered:** 02/03/2021 14:21 EST~~ | | ~~Duncan, Gina FNP-BC~~ | | | | | | |
| **Last Updated:** 02/05/2021 12:51 EST | | Duncan, Gina FNP-BC | | | | | | |
| Tdap | 02/05/2021 | History Of | | | | | | |
| **Orig Entered:** 02/05/2021 12:55 EST | | Duncan, Gina FNP-BC | | | | | | |
| ~~Tdap~~ | ~~02/03/2021~~ | ~~History Of~~ | | | | | | |
| ~~**Orig Entered:** 02/03/2021 14:21 EST~~ | | ~~Duncan, Gina FNP-BC~~ | | | | | | |
| **Last Updated:** 02/05/2021 12:51 EST | | Duncan, Gina FNP-BC | | | | | | |
| Varicella Series | 02/05/2021 | History Of | | | | | | |
| **Orig Entered:** 02/05/2021 12:55 EST | | Duncan, Gina FNP-BC | | | | | | |

# EXHIBIT J

# Bureau of Prisons
# Health Services
# Clinical Encounter

| | | | |
|---|---|---|---|
| Inmate Name: | FLOREA, EDWARD B | | Reg #: 83865-053 |
| Date of Birth: | 07/29/1980 | Sex: M   Race: BLACK | Facility: BRO |
| Encounter Date: | 10/13/2021 14:41 | Provider: Jordan, Duvinka | Unit: J05 |

Admin Note - Chart Review encounter performed at Health Services.

**SUBJECTIVE:**

**Administrative Notes:**

ADMINISTRATIVE NOTE   **1**   Provider:  Jordan, Duvinka RN/IDC/IOP

c/o headache and bodyaches

**ROS:**

**Infectious Disease**

**COVID 19**

Yes: Known or possible exposure history, Known onset of symptoms, History of diabetes, obesity or immunocompromised (Describe: obesity), Similar symptoms in current housing unit (Unit/Describe: 10 other positive cases in the unit), Fatigue, aches and pains, Headache, persistent pain in chest (Describe: headache), Loss of taste and/or sense of smell, Contact with person having COVID, Contact with person having flu like symptoms, Meds, allergies and health problems reviewed

No: Known duration of symptoms, Age 65 or older, History of asthma or chronic lung disease, History of cardiac, liver or kidney disease, Cough or shortness of breath, Nasal congestion, runny nose, sore throat, Diarrhea, Vomiting, New medications started recently, Self-treatment incl. antipyretics in last 72 hrs

**OBJECTIVE:**

**Temperature:**

| Date | Time | Fahrenheit | Celsius | Location | Provider |
|---|---|---|---|---|---|
| 10/13/2021 | 14:41 BRO | 97.8 | 36.6 | | Jordan, Duvinka RN/IDC/IOP |

**Respirations:**

| Date | Time | Rate Per Minute | Provider |
|---|---|---|---|
| 10/13/2021 | 14:41 BRO | 16 | Jordan, Duvinka RN/IDC/IOP |

**SaO2:**

| Date | Time | Value(%) | Air | Provider |
|---|---|---|---|---|
| 10/13/2021 | 14:41 BRO | 98 | Room Air | Jordan, Duvinka RN/IDC/IOP |

**Exam:**

**Infectious Disease**

**COVID 19**

Yes: Vital Signs w/O2 sat recorded in flowsheet, Alert and oriented, Lung sounds clear bilaterally, Adequate respiratory effort

No: Using accessory muscles, Supplemental oxygen required

**ASSESSMENT:**

Condition Stable

Tylenol ordered earlier

| | | | | |
|---|---|---|---|---|
| Inmate Name:   FLOREA, EDWARD B | | | Reg #:   83865-053 | |
| Date of Birth:   07/29/1980 | Sex:   M   Race:   BLACK | | Facility:   BRO | |
| Encounter Date:   10/13/2021 14:41 | Provider:   Jordan, Duvinka | | Unit:   J05 | |

**PLAN:**

**Disposition:**

    Return Immediately if Condition Worsens

    Placed In Isolation

**Patient Education Topics:**

| Date Initiated | Format | Handout/Topic | Provider | Outcome |
|---|---|---|---|---|
| 10/13/2021 | Counseling | Access to Care | Jordan, Duvinka | Verbalizes Understanding |

**Copay Required:** No       **Cosign Required:** Yes

**Telephone/Verbal Order:**  No

Completed by Jordan, Duvinka RN/IDC/IOP on 10/13/2021 14:50

Requested to be cosigned by  Bialor, Bruce (MAT) MD.

Cosign documentation will be displayed on the following page.

# Bureau of Prisons
# Health Services
# Cosign/Review

| | | | | | |
|---|---|---|---|---|---|
| Inmate Name: | FLOREA, EDWARD B | | | Reg #: | 83865-053 |
| Date of Birth: | 07/29/1980 | Sex: | M | Race: | BLACK |
| Encounter Date: | 10/13/2021 14:41 | Provider: | Jordan, Duvinka | Facility: | BRO |

**Cosigned by Bialor, Bruce (MAT) MD on 11/04/2021 11:56.**

# Bureau of Prisons
# Health Services
# Clinical Encounter - Administrative Note

| | | | | | |
|---|---|---|---|---|---|
| Inmate Name: | FLOREA, EDWARD B | | | Reg #: | 83865-053 |
| Date of Birth: | 07/29/1980 | Sex: | M    Race: BLACK | Facility: | BRO |
| Note Date: | 10/13/2021 11:40 | Provider: | Granizo, Maria RN | Unit: | J05 |

Admin Note - Orders encounter performed at Housing Unit.
**Administrative Notes:**

ADMINISTRATIVE NOTE    **1**        Provider:  Granizo, Maria RN

Ordering Tylenol for management of symptoms of COVID-19


**Temperature:**

| **Date** | **Time** | **Fahrenheit** | **Celsius** | **Location** | **Provider** |
|---|---|---|---|---|---|
| 10/13/2021 | 11:37 BRO | 97.7 | 36.5 | | Granizo, Maria RN |

c/o headache, discussed with MD will order Tylenol

**New Medication Orders:**

| **Rx#** | **Medication** | **Order Date** |
|---|---|---|
| | Acetaminophen 325 MG Tablet | 10/13/2021 11:40 |

**Prescriber Order:**    650mg  Orally  -  three times a day PRN x 7 day(s)

Indication:   Confirmed case COVID-19


**Copay Required:** No            **Cosign Required:**  Yes

**Telephone/Verbal Order:**  Yes        **By:**  Bialor, Bruce (MAT) MD

**Telephone or Verbal order read back and verified.**


Completed by Granizo, Maria RN on 10/13/2021 11:42

Requested to be cosigned by  Bialor, Bruce (MAT) MD.

Cosign documentation will be displayed on the following page.

# Bureau of Prisons
## Health Services
## COVID-19 AG

| | | | |
|---|---|---|---|
| Begin Date: | 11/12/2020 | End Date: | 11/12/2021 |
| Reg #: | 83865-053 | Inmate Name: | FLOREA, EDWARD B |

(Reference Range - Negative)

| **Effective Date** | **COVID-19 AG** | | **Provider** |
|---|---|---|---|
| 10/12/2021 15:02 BRO | Positive | Symptomatic | Jordan, Duvinka RN/IDC/IOP |
| **Orig Entered:** | 10/12/2021 15:03 EST | Jordan, Duvinka RN/IDC/IOP | |
| ~~10/12/2021 15:00 BRO~~ | ~~Positive~~ | ~~Asymptomatic~~ | ~~Jordan, Duvinka RN/IDC/IOP~~ |

--symptomatic

| | | | |
|---|---|---|---|
| ~~**Orig Entered:**~~ | ~~10/12/2021 15:01 EST~~ | ~~Jordan, Duvinka RN/IDC/IOP~~ | |
| **Last Updated:** | 10/12/2021 15:03 EST | Jordan, Duvinka RN/IDC/IOP | |

**Total:** 2

# **<u>EXHIBIT K</u>**

November 11, 2021

Your Honor,

My name is Ioana Florea. I am the mother of Eduard Florea. I fully understand the very serious nature of the crime with which he has been charged. I am not only remorseful, but deeply ashamed of his actions.

This is a very difficult time for all of us, but particularly so for his two children: ███, age 8, and ███, age 5. They are suffering on several levels. The financial hardships the family has been enduring are overwhelming, as Eduard was the sole provider in the household. Also, as an unfortunate result of the rather public nature of this case, ███ and ███ have had to contend with teasing by many of their classmates.

As a child, Eduard was always happy. He was known by all of our neighbors to be extremely respectful and courteous; always ready to lend a helping hand.  He was a good, kind, and generous friend to all his peers, who were of a variety of ethnicities and backgrounds.  He always showed kindness to animals; he would adopt strays and do whatever he could to nurse any ill ones back to health.

I recall one occasion in which an elderly woman caused damage to his vehicle during a minor traffic accident. Despite it being entirely the woman's fault, Eduard refused compensation for the damages; he was concerned that the woman would have to spend her social security income, and consequently paid for the damages out of his own pocket.

Eduard was always hard working and responsible. He is a loving father and I know he wishes only to return home and again take care of his family, whom he misses terribly.

I promise to provide all the support Eduard needs to put his life back together. I am begging you to consider his children in your decision.  It is heartbreaking to see these innocents suffering this way.

Thank you, Your Honor.

Sincerely,

Ioana Florea

November 12, 2021

Your Honor,

My name is Jay Martin. I am a Mathematics Professor at Nassau Community College. I have been very close with Eduard and the entire Florea family for nearly two decades.

I write this letter on behalf of Eduard Florea; not to diminish the severity of the crime with which he's been accused, nor to deny his culpability therein. But rather to present another side of a young man, who was apparently swayed by the rhetoric to which he was unfortunately exposed.

Eduard is an intelligent young man; we have had many engaging discussions on mathematics, computer science, and physics. He loves learning.

When I first met Eduard, I felt at once that he was a kind and generous person. As I got to know him better, I came to feel more and more confident of this. He seemed always ready to help those in need, and I have many anecdotes that would substantiate my sentiments. One that comes to mind involves his finding a baby bird, that had apparently been abandoned by its mother. Eduard took the bird in, and did everything he could to save it, included purchasing special lights that were supposed to be therapeutic and facilitate healing. Sadly, the little bird did not survive. But my respect for his character certainly did.

This is an overwhelmingly difficult period for the entire Florea family, but especially for Eduard's two children: 8-year-old ███ and 5-year-old ███ They miss their father terribly. Also, Eduard was the sole breadwinner of the family, so the financial impact on them has been devastating. Adding insult to injury, the kids, I've been told, have been subjected to ridicule on the part of their schoolmates, who are aware of the charges against their father, due the publicity the incident received.

I know that Eduard's only wish is to return to work to support his family and be a loving father to his two children.

Thank you, Your Honor.

Sincerely,

Jay Martin

Your honor,

My name is George Kiouzellis. I am writing on behalf of my friend Edward Florea. I have known him since I was 12 years old, so in total 26 years. He lived a few blocks from my house and we grew up together playing sports, etc. Eddie was always a good friend to me. He was much like an older brother. As time past, I went away to college and he got married we did not spend as much time together but still remained friends.

After Edward had his first incident, he was definitely a changed person and was very focused on being a good father to his children. He worked very hard in the tech field and did the best he could to provide for his kids. He was very reserved and stayed away from firearms or anything that would compromise his time with his family. On one occasion, I had asked him to come on a hunting trip with me and he declined. I did not know that he was not allowed to be around firearms. I apologized to him and respected the fact he was trying to do the right thing.

As a friend speaking honestly, Edward has made some poor decisions. I'd be a hypocrite to say I have not either. But we all ask forgiveness and repent and try to move forward as better people. It was very easy during the pandemic to sit home and be indoctrinated into political ideologies. Depending what news channel was on, the story was polarized one way or the other. He was not the only person who acted or spoke out during this turbulent time. I do know this much about my friend, If he had realized the effect of his statements or the ammo would have separated him from his children, I would not be writing this letter.

Edward is not a malicious or evil person. He has never harmed anyone intentionally. Respectfully, I cannot see how Edward being incarcerated helps anyone. His son and daughter need him, they are the ones being punished. Please give him a chance to make it up to them.


Respectfully
George Kiouzellis

November 12, 2021

Your honor,

My Name is Victor Cadicamo. I write this letter on behalf of Eduard Florea. Understanding in full that the crimes he is accused of are terrible, I would like to discuss with you my experiences of knowing Eduard and the Florea family.

I've been fortunate enough to be a friend of Eduard and his family. When I met Eduard, I was at a very low point in my life. He and his family were the most supportive, loving and embracing people I've ever come to know. Eduard dedicated his own time on almost a daily basis for a couple of years and took me under his wing to show me the introductions to computer programming and electronic design and understanding. He was dedicated to helping me learn new skills that would help me advance in life. His mother Valentina and her boyfriend Jay had quickly become family to me. They were always looking out for me and helping me any way they can, all without me ever asking for help. They all just did, out of the good they have in their hearts. Eduards friendship and care helped me propel myself into a lucrative Etsy store where I design, build, and program my own inventions, devices, and gadgets.

Without Eduards care and knowledge, without his family's constant support and love, I'm not sure where I would be in life today. I owe a lot to Eduard and his family. I have witnessed Eduard go above and beyond for the ones he loves and cares about. I have witnessed Eduard take on new friends, people he doesn't even know and continue to go above and beyond for them as well. Eduard and I didn't know each other at all when we met, yet he still made it his goal to help me.

Eduard is a loving father and has worked so very hard to support and take care of his children. Watching him turn into a giant ball of mushy love when his kids are in front of him is a strong reflection of the love and care he has in his heart. To watch Eduard be a father and take such wonderful care of his children was an inspiration to be the best version of myself possible for my son. Eduard has made the most positive changes in my life that will remain with me forever.

Your honor, I ask you to please consider the things I've mentioned about Eduard and his family today. I am aware that this is a big ask, but please consider my letter and my experiences of knowing the version of Eduard others haven't gotten the opportunity to know and his loving family. I appreciate you taking the time to read my letter. Thank you.

-Sincerely,

Victor Cadicamo