

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

DMP:FJN/APW
F. #2021R00043

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

November 23, 2021

<u>By ECF and Email</u>

The Honorable Eric R. Komitee
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

> Re:   United States v. Eduard Florea
>        <u>Criminal Docket No. 21-037 (EK)</u>

Dear Judge Komitee:

The government respectfully submits this memorandum in advance of sentencing in the above-captioned case, which is scheduled for December 16, 2021, at 10:00 a.m., and in response to the defendant's factual objections to the Presentence Investigation Report ("PSR"). The defendant stands before the Court having been convicted of making interstate threats, in violation of 18 U.S.C. § 875(c), and possessing ammunition after having been convicted of a felony, in violation of 18 U.S.C. § 922(g). The defendant is a recidivist firearms offender with a violent history and a volatile disposition. The defendant has repeatedly demonstrated that he cannot control his temper, cannot follow the law or court orders, and that he will use violence and weapons to satiate his anger. There is little doubt that if the defendant had been able to get to the United States Capitol on January 6, 2021, he would have acted—based on his own words and stockpiling of weapons—as a violent accelerant on an already chaotic scene. For these reasons, and the reasons discussed below, the government recommends that the Court impose a sentence of 30-37 months' imprisonment. Such a sentence, which is above the advisory United States Sentencing Guidelines ("Guidelines" or "U.S.S.G.") range, is appropriate given the defendant's criminal conduct, prior firearms conviction, history of domestic abuse, and failure to abide by the law and court orders.[1]

---

[1]    In the plea agreement, the Government explicitly notified the defendant that it intended to seek an above-Guidelines sentence. <u>See</u> Plea Agreement at ¶ 2.

I.      Factual and Procedural Background

      A.      The 2020 Elections and the Attack on the United States Capitol

           On November 3, 2020, the United States held a presidential election in which the leading candidates were then-President Donald J. Trump and now-President Joseph R. Biden, Jr. On January 5, 2021, the State of Georgia held run-off elections for its two United States Senate seats.  PSR ¶ 9.  Raphael Warnock was a candidate for one of the Georgia Senate seats.  In the evening of January 5, 2021, the news media widely reported that Warnock had won election to the United States Senate.  Id.  On January 6, 2021, Congress gathered in joint session at the United States Capitol (the "Capitol") in Washington, D.C. to certify the results of the presidential election. PSR ¶ 10.  A group of individuals purporting to protest the presidential election results gathered and stormed the Capitol.  PSR ¶ 11.  The individuals illegally occupied the Capitol and disrupted the certification of the election for several hours.  Id.  Members of Congress and the Vice-President of the United States sheltered in place during the occupation.  The violent attack resulted in the deaths of multiple individuals, including a United States Capitol Police officer, as well as millions of dollars in damage to the Capitol.  Eventually, law enforcement officers expelled the attackers, the Capitol was secured, and Congress reconvened later that day and certified the presidential election results.

      B.      The Defendant Makes Illegal Threats Related to the Events in Washington, D.C.

           On January 5, 2021, at approximately 8:40 p.m., the defendant posted on Parler, "We need to all come to an agreement….and go armed… and really take back Washington."  PSR ¶ 14.  A few minutes later, the defendant posted on Parler, "Tomorrow may very be the day war kicks off . . ."[2]  Id.  At approximately 8:53 p.m., the defendant posted on Parler in response to another Parler user, "I catch one of you fuckers in DC tomorrow…. definitely slicing a throat….I fucking promise you…"  Id.  At 11:53 p.m., after media outlets had declared Raphael Warnock as the winner of one of the Georgia Senate seats, the defendant posted on Parler, "Warnock is going to have a hard time casting votes for communist policies when he's swinging with the fucking fish…."  Id.  In the early morning hours of January 6, 2021, at approximately 12:42 a.m., the defendant commented on another user's Parler post, which stated, "FUCK RAPHAEL WARNOCK LOSER," by posting in response, "Dead men can't pass shit laws . . . . ."  PSR ¶ 15.

           During the morning of January 6, 2021, at approximately 9:43 a.m., the defendant posted on Parler:

        "Let's go…I will be reaching out to patriots in my area so we can come up with a game plan… Here in New York we are target rich. . . . but there is only one that comes to my mind that is the starting point.  Not sure where you are… but I would

---

      [2]      The language cited herein, including spelling, grammar, punctuation and spacing, appears as originally stated by the defendant.

imagine you have one in mind too.  Dead men can't pass shit laws…. I will fight so help me god."

PSR ¶ 15.

Between approximately 2:02 p.m. and 4:35 p.m. —while the Capitol was under siege—the defendant posted a series of messages on Parler, stating in substance and in part:

a)      "Mine are ready….I am ready…. we need to regroup outside of DC and attack from all sides… talking to some other guys….I will keep watching for the signal."

b)      "I am awaiting my orders…armed and ready to deploy…."

c)      "Guns cleaned loaded . . . got a bunch of guys all armed and ready to deploy . . . we are just waiting for the word"

d)      "There 3 car full of armed patriots heading in from NY…."

e)      "3 cars of armed patriots heading into DC from NY"

f)      "3 cars full of armed patriots are enroute from NY"

g)      "The time for peace and civility is over. . . ."

h)      "100%.... peace time is over…. these fuckers are trampling our rights and they are twisting our words… they use the laws against us while our leaders run as cowards…. Fucking kill them all…. And anyone who stands in the way…."

i)      "Me and some guys are gearing up to head in. . . . where are you . . . 3 cars already are enroute . . . .all armed."

PSR ¶ 16.

Later that evening while the Capitol was still under occupation, the defendant posted on Parler, "It's time to unleash some violence."  At approximately 8:28 p.m., the defendant posted on Parler, "I don't know why we keep advocating to fight fair with these fucks…we need to take them out …one by one…"  PSR ¶ 17.

The defendant's wife, Joni Florea ("Ms. Florea") told the FBI that the defendant had intended to travel to Washington, D.C. to participate in the January 6 protest, but that his ride did not pick him up.  PSR ¶ 18.  Ms. Florea reported that the defendant watched the attack on the Capitol on television and was in a frenzy to join the siege.  Id.  Ms. Florea told FBI agents that the defendant got dressed in a tactical vest, armed himself with combat knives, packed a bag with more knives, and was ready to travel to Washington, D.C.  Id.  Ms. Florea's statements are corroborated by text messages sent by the defendant and other evidence showing that both before and after the attack on the Capitol began, the defendant contacted other individuals to try to get to

Washington, D.C.  Ultimately, the defendant was unable to get a ride and therefore was unable to join the attack on the Capitol.

In the days following the Capitol attack, the defendant physically attacked his wife because she refused to help him raise money for the Proud Boys.[3]  Specifically, the defendant wanted to raise money for the Proud Boys using a joint business account that he shared with his wife.  Ms. Florea refused and told the defendant that he would have to do that in his name only because she did not want to be associated with violence.  As a result of her refusal to support the Proud Boys, the defendant choked Ms. Florea, took out one of his combat knives and stated, in sum and substance, "what makes you think I won't fucking kill you?"  The defendant's 8-year-old daughter and then-4-year-old son walked into the room while the defendant had his hands around his wife's neck.  This was not the first time that the defendant had threatened to kill his wife or brandished a knife at her in the presence of children.[4]

C.    The Defendant Is Arrested and Ordered Detained Pending Trial

On January 12, 2021, the FBI executed a search warrant at the defendant's home in Queens.  The search revealed approximately 1,000 rounds of .22 caliber Winchester hollow point ammunition, 25 rounds of 12-gauge Remington shotgun slugs, and one round of .300 caliber Winchester Magnum ammunition.  PSR ¶ 19.  The FBI also recovered approximately 72 military-style combat knives, two hatchets, and two swords.  The defendant admitted to the FBI that he had posted the threatening messages described herein and that he was the owner of the ammunition and weapons found in his home.  PSR ¶ 18.  The defendant also told the FBI that he was a supporter of the Proud Boys and hoped to join their group.  The defendant stated that he had traveled with Proud Boys members to Washington, D.C. in December 2020, where he saw Proud Boys members vandalize a church on December 12, 2020.  The investigation revealed that in December 2020, the defendant—who is a software engineer—was working on a secure communications platform for the Proud Boys so that they could communicate without infiltration.

The FBI arrested the defendant for possessing ammunition as a previously convicted felon, in violation of 18 U.S.C. § 922(g).  On January 22, 2021, a grand jury indicted the defendant on one count of transmitting threats to injure, in violation of 18 U.S.C. § 875(c), and one count of possessing ammunition as a previously convicted felon, in violation of 18 U.S.C. 922(g).  On August 9, 2021, the defendant pleaded guilty before Chief United States Magistrate

---

[3]    The Proud Boys is a nationalist organization with multiple U.S. chapters and potential activity in other Western countries.  The group describes itself as a "pro-Western fraternal organization for men to refuse to apologize for creating the modern world; aka Western Chauvinists."  Proud Boys members routinely attend rallies, protests, and other First Amendment-protected events, where certain of its members sometimes engage in acts of violence against individuals whom they perceive as threats to their values.  The group has an initiation process for new members, which includes the taking of an "oath."

[4] Ms. Florea reported this incident to the New York City Police Department ("NYPD") after the FBI had arrested the defendant and he had been ordered detained.  On or about January 17, 2021, Ms. Florea signed a supporting deposition to support state criminal charges.

Judge Cheryl L. Pollak to both counts of the Indictment.  PSR. ¶ 1.  The Court accepted the defendant's guilty plea to both counts on November 18, 2021.  The defendant has been in federal custody since his arrest.

>   D.   The Defendant's Criminal History, History of Domestic Abuse, and Prior Violations of Court Orders

The defendant has a prior firearms felony conviction, is a serial domestic abuser, and recidivist violator of the law and court orders.

>   a.   The Defendant's Prior Criminal History

On June 14, 2014, the NYPD arrested the defendant in Staten Island for illegally possessing 13 firearms, including an AR-15 assault rifle, and a semi-automatic shotgun.  PSR ¶ 44.  In that case, the police also recovered hundreds of rounds of ammunition.[5]  On July 22, 2014, the defendant pleaded guilty to a felony—criminal possession of a weapon in the third degree—in violation of New York Penal Law ("P.L.") 265.02.  The defendant was subsequently sentenced to one year imprisonment.  See Defendant's Sentencing Memorandum ("Def. Memo."), Ex. C.

The day after the defendant was arrested on the firearms charges, Ms. Florea reported to the NYPD that the defendant had choked her on or about May 7, 2014, while she was holding her then-19-month-old daughter in her lap.  See Def. Memo., Ex. B2.  Ms. Florea reported that after choking her, the defendant stood over her and her daughter with a knife in his hand and stated, "I will fucking kill you both.  First her (the child) and then you."  See Def. Memo., Exs. B2-B3.

Ms. Florea's allegations are corroborated by an audio recording made by her.  See Ex. 1 (recording) and Ex. 1-T (transcript of recording).[6]  During the incident, the defendant and Ms. Florea got into an argument over a cup of water.  After the defendant choked Ms. Florea and threatened to kill their daughter with a knife, Ms. Florea surreptitiously activated an audio recorder that captured the remainder of the incident.  In the recording, the defendant admits to multiple acts of physical violence against Ms. Florea, including the threat to kill her and their daughter.  The defendant can also be heard physically and emotionally abusing Ms. Florea on the recording for nearly an hour, to include the following:

- In response to Ms. Florea stating that the defendant may have broken her arm, the defendant responded, "[y]ou know what, you mother fucker, you know what man.  Keep fucking

---

[5] Notably, the defendant's mother was charged as a co-conspirator though the case against her was ultimately disposed of via a non-criminal disposition.  PSR ¶ 44.  Ms. Florea has told the FBI that the defendant's mother was aware that her son illegally possessed the firearms.

[6] The government obtained the recording as part of its investigation of the instant case.  The government is unaware whether the recording was available to the Richmond County District Attorney's Office or the NYPD in 2014.

pissing me off.  Keep fucking pissing me off.  You're fucking lucky your fucking face isn't fucking smashed." Ex. 1 at 03:15; Ex. 1-T at 2.

- In response to Ms. Florea complaining that the defendant put his hands on her, the defendant responded, "And I'm gonna keep putting my fucking hands on you, because you—because—look at me.  Because you have no fucking respect.  You have no fucking respect.  You want me to treat you with respect but you're not going to fucking respect me?  Is that what you want?  You want to say whatever the fuck it is you want to say to me, and me fucking do nothing?  You want me to call you some fucking names right now?  Is it going to make you feel better if I start calling you some fucking names?"  Ex. 1 at 07:32; Ex. 1-T at 3.

- In response to Ms. Florea audibly crying, telling the defendant to stop touching her, and saying that the defendant was hurting her, the defendant stated, "What the fuck do you wanna do?  I'm gonna keep fucking hurting you until you make a fucking decision . . . I'm gonna put my sword through you." Ex. 1 at 18:43; Ex. 1-T at 8-9.

- In response to Ms. Florea pleading with the defendant to stop his physical violence, the defendant stated, "Yes, you're right.  You're right.  And I'm gonna keep fucking hurting you until you fucking understand what the fuck I'm trying to tell you.  Do you understand me?  Do you fucking understand me?" Ex. 1 at 50:05; Ex. 1-T at 20-21.

- In response to additional pleas from Ms. Florea, the defendant began physically assaulting her, and stated, "Please fucking say something to me . . . before I break your fucking skull open. . . .Motherfucker I am going to break your arm.  You fucking, you fucking piece of shit.  Now I'm gonna call you some fucking names . . . you cunt, whore, piece of fucking garbage . . . You like that?  You like these words?  You like these fucking words?  Miserable, fucking scumbag, fucking—you want me to say nasty fucking words to you?  Do you like that?  Does, do these words feel good?" Ex. 1 at 54:04; Ex. 1-T at 22-23.

Notably, Ms. Florea can be heard screaming and crying in physical pain in various portions of the recording.  The defendant has admitted the veracity of the recording.  Def. Memo. at 9.

        On June 19, 2014, Ms. Florea signed a supporting deposition that was filed in Richmond County Criminal Court stating that the defendant had choked her and threatened the daughter and child, as described above.  See Def. Memo, Ex. B3.  As a result, the Richmond County District Attorney's Office charged the defendant with:

- strangulation in the second degree, in violation of P.L. 121.12;
- criminal obstruction of breathing or blood circulation, in violation of P.L. 121.11(a);
- assault in the 3rd degree, in violation of P.L. 120.00(1);
- menacing in the second degree, in violation of P.L. 120.14(1);
- criminal possession of a weapon in the 4th degree, in violation of P.L. 265.01(2);
- endangering the welfare of a child, in violation of P.L. 260.10(1); and
- harassment in the 2nd degree, in violation of P.L. 240.26(1).

On March 27, 2015, the Richmond County District Attorney's Office dismissed these charges after Ms. Florea cast doubt on her own allegations.  See Def. Memo at 8.[7]

       Ms. Florea recantation is symptomatic of the domestic abuse that the defendant has inflicted on her, sometimes in front of their two minor children.  After the defendant's arrest in this case, Ms. Florea reported to the FBI that the defendant began abusing her years ago, and that this abuse continued until mere days before the defendant's incarceration on the instant charges. Ms. Florea reported additional instances of abuse, to include the following:

- Prior to the confiscation of his illegal firearms in 2014, the defendant regularly pointed the firearms at Ms. Florea.

- After he was released from prison on the firearms charges, the defendant regularly choked Ms. Florea and threatened her with one of his combat knives.  In one incident, the defendant threw his wife onto their daughter's bed and then stabbed the bed with knife right next to her head.  The knife went through the comforter, sheets, and into the mattress mere inches from his wife's head.  FBI agents observed a stab wound in the daughter's mattress and linens that corroborates Ms. Florea's account.

- In approximately 2015, when Ms. Florea was pregnant with their son, she asked the defendant to promise that he would never lay hands on her again.  The defendant replied, "or else what?"  Ms. Florea replied "or else" she would call the police.  The defendant then grabbed a kitchen knife, pinned Ms. Florea to the floor, and stated, in sum and substance, "there won't be a fucking next time."

- In 2016, approximately two months after the defendant's son was born via C-section, the defendant became angry at Ms. Florea.  Though she was recovering from labor and the C-section incision, the defendant grabbed Ms. Florea's wrist and held up his fist (as though he would strike her) to compel her to answer questions.  The defendant continued this abuse despite Ms. Florea's protestations that the stress position he was holding her in was hurting her C-section wound.

- In August 2020, Ms. Florea was recovering from surgery.  Approximately two weeks after the surgery, the defendant threw her to the ground.

- Ms. Florea also reported that the defendant frequently abused the family dog.  In one particularly gruesome incident in 2014, the family dog nipped the defendant's finger.  In response, the defendant took one of his combat knives and cut the dog's back so deeply that the dog's skin was visibly flapping.

---

[7] It is unclear whether the recording was available to law enforcement at the time of the dismissal.

- Most recently, since the defendant's arrest, the defendant's children reported to Ms. Florea that that the defendant had threatened to kill them with a metal ruler because the children had been misbehaving.

Additionally, the defendant self-reported to a therapist, that in the past he had strangled Ms. Florea with a plastic bag.  Def. Memo., Ex. D at Addendum 1.

These instances of abuse continued until mere days before the defendant's arrest in this case when he once again choked his wife and threatened her with a knife because she refused to help the defendant raise money for the Proud Boys.

### b.  Family Court Orders Issued Against the Defendant

Ms. Florea's reports of abuse are corroborated by multiple orders issued by the New York State Family Court against the defendant.  See Def. Memo., Ex. D.[8]  These orders mandated that the defendant stop abusing his wife, attend anger management classes, and, in some instances, stay away from his wife and children as follows:

- On March 9, 2015, Ms. Florea was given custody of their daughter and the defendant was ordered to complete a parenting skills class, anger management counseling, a batterers program, and a mental health evaluation.  See Def. Memo., Ex. D.  The Court also issued an Order of Protection that ordered the defendant to stay away from Ms. Florea and their daughter except for Court-ordered visitations and sanctioned visits.  The defendant was further ordered to "refrain from assault, stalking, harassment, aggravated harassment, menacing, reckless endangerment, strangulation, criminal obstruction of breathing," and other criminal offenses against Ms. Florea.  See Ex. 2.

- On or about July 14, 2016, the defendant admitted to violating an Order of Protection.  Ex. 3.  The defendant was again ordered to stay away from Ms. Florea, their two children, the family home, Ms. Florea's workplace, and the children's school.  The defendant was further ordered to "refrain from assault, stalking, harassment, aggravated harassment, menacing, reckless endangerment, strangulation, criminal obstruction of breathing," and other criminal offenses against Ms. Florea.  Ex. 4.

- On or about March 27, 2017, the defendant was again ordered to stay away from Ms. Florea, their two children, the family home, Ms. Florea's workplace, and the children's school.  The defendant was further ordered to "refrain from assault, stalking, harassment, aggravated harassment, menacing, reckless endangerment, strangulation, criminal obstruction of breathing," and other criminal offenses against Ms. Florea.  Ex. 5.

---

[8]      The Family Court orders submitted by defense counsel and the government were obtained from New York Family Court and/or Ms. Florea unsigned.  However, the defendant, see Def. Memo. at 8-9, and Ms. Florea have confirmed their authenticity.

- On or about June 26, 2017, the defendant was ordered "NOT TO COMMIT ANY ACTS OF DOMESTIC VIOLENCE AGAINST NON-RESPONDENT MOTHER."  Ex. 6 (emphasis in original).

c.   Ms. Florea's History of Reporting Domestic Abuse by the Defendant

As explained above, after the defendant's arrest on firearms charges in 2014, Ms. Florea reported the defendant's abuse to law enforcement.  Specifically, Ms. Florea reported the defendant's threats to kill her and her daughter, as well as graphic physical abuse, to the NYPD. Ms. Florea also signed a supporting deposition to support criminal charges against the defendant. A few months later, despite possessing a recording that proved her claims, Ms. Florea expressed doubts to law enforcement about her allegations, which resulted in a dismissal of the charges against the defendant.  Ms. Florea told the FBI that she backtracked on her claims, in part, because after the defendant's arrest, the defendant's mother—who was aware of the defendant's physical abuse of Ms. Florea—financially pressured Ms. Florea to support the defendant.

This troubling pattern has repeated itself in the instant case.  Shortly after the FBI arrested the defendant, Ms. Florea reported serious, recent physical abuse to the NYPD and the FBI.  Again, Ms. Florea signed a supporting deposition to support criminal charges against the defendant.  On September 20, 2021—approximately two months ago—Ms. Florea told the FBI that she was having nightmares that the defendant would be sentenced to time served and would "come after her."   Ms. Florea also told the FBI that the defendant's mother asked her if she was going to testify against the defendant.  According to Ms. Florea, the defendant's mother then stated that she would cut off Ms. Florea financially and never help her again if she continued to help or talk to the FBI.  As a result, Ms. Florea told the FBI that she did not want to be involved in anything that would upset the defendant.  Ms. Florea reiterated that she did not want the defendant to kill her and kidnap her children upon being released.  Ms. Florea also stated that she did not have confidence in court orders because the defendant had violated a prior Order of Protection almost immediately upon its issuance.

In connection with the defendant's sentencing submission, Ms. Florea submitted a letter praising the defendant's mother for financially supporting her.  Ms. Florea also claimed to now support the defendant's release.  See Def. Memo., Ex. E.  When the FBI subsequently reached out to Ms. Florea, she—after initially being hesitant to speak with the FBI—told the FBI on November 22, 2021, that she wrote the letter in support of the defendant because the defendant's mother had told Ms. Florea that if she ever spoke to the FBI again, she would be cut off entirely. Ms. Florea also reported that the defendant's mother made a slicing motion against her own throat as she stated this to Ms. Florea.  Ms. Florea stated that the defendant's mother also told her that the defendant was trying to change, and that Ms. Flore should support him.  Ms. Florea has now informed the FBI that she does not believe that the defendant has reformed and does not support the defendant being sentenced to time served.

9

II.     The Defendant's Factual Objections to the PSR

The defendant raises multiple, frivolous objections to PSR, which do not affect the advisory Guidelines range.

First, the defendant moves to strike paragraphs 10-13, which describe the events that took place at the Capitol on January 6, 2021.  Def. Memo. at 7.  The defendant's claim that the events of January 6, 2021 are irrelevant is wrong.  The defendant did not make his threats in a vacuum.  The defendant's threats included direct references to the attack on the Capitol and were made while the attack was ongoing.  This made the threats even more frightening.  Indeed, the defendant used the publicity surrounding the attack on the Capitol to amplify his own threats to a larger audience and make people think that an armed caravan of men were coming to Washington, D.C. to carry out further acts of violence.  The Court should deny the defendant's request to omit these paragraphs.

Second, the defendant claims that the PSR misapprehends that he was arrested on June 16, 2014 on felony abuse charges and moves to strike PSR ¶ 98, which seeks an upward variance because the defendant has not been held accountable for this additional criminal conduct. Def. Memo. at 7-8.  The government agrees that the PSR should be amended to reflect that defendant was arrested on June 16, 2014 and charged with multiple domestic violence offenses following his attack on Ms. Florea and their infant daughter, as described above. See Def. Memo, Ex. B2.  The government disagrees, however, that the defendant has been held responsible for this criminal conduct.  As a threshold matter, there is little doubt that the defendant committed the offense.  The May 2014 recording contains multiple admissions of guilt by the defendant.  See Ex. 1 and 1-T.  Additionally, the defendant admits in his sentencing memorandum that "he does not deny the veracity of the recording."  Def. Memo at 9.  The Richmond County District Attorney's Office dismissed the charges arising from the May 2014 incident in March 2015 without reason. See Def. Memo, Ex. B.  Put simply, the defendant has never been held criminally responsible for the violent and reprehensible abuse against his wife, both prior to and during the instant offense. Nevertheless, the government does not seek an upward departure pursuant to U.S.S.G. § 4A1.3, based on the defendant's criminal history category underrepresenting his history as recommended by PSR ¶ 98.  Instead, the government believes that an upward variance pursuant to application of the § 3553(a) factors as requested herein will result in an appropriate sentence.

Third, the defendant moves to strike paragraphs 58-60 of the PSR because he claims that his violent past is not relevant to the instant charges.  Def. Memo. at 9.  The defendant is wrong.  The defendant is not charged with domestic abuse in this case and the government does not seek to punish him for his prior domestic abuses.  That does not make his history of violence irrelevant.  To the contrary, the violent history is directly relevant to the Court's evaluation of the history and characteristics of the defendant under § 3553(a).  The defendant's prior violence and disobedience of the law and court orders is also directly relevant to the issue of whether he has respect for the law and to his likelihood of re-offending.  Notably, "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing

an appropriate sentence."  18 U.S.C. § 3661.  As such, the defendant's motion to strike his history of violence should be denied.

III.    Guidelines Calculation

> The government agrees with the Guidelines calculation set forth in the PSR, which estimates a Total Offense Level of 13, which, based on a Criminal History Category of II, carries an advisory Guidelines sentencing range of 15 to 21 months in custody.  (PSR ¶¶ 23-42, 86.)

> However, the government believes that the advisory Guidelines range undercounts the criminal conduct in this case and that an upward variance is appropriate.  See United States v. Rigas, 583 F.3d 108, 114 (2d Cir. 2009) ("A sentencing judge "has broad latitude to impose either a Guidelines sentence or a non-Guidelines sentence.")  In this case, the defendant made threats to kill now-Senator Raphael Warnock, kill other individuals, and to commit other acts of violence. U.S.S.G. § 3A1.2 provides that if the victim of a threat is a present or former government officer or employee (or an immediate family member of one), and the offense of conviction was motivated by such status, a six-level enhancement applies.  The guideline punishes the victimization of individuals, not the government, an agency, or an organization.  See § 3A1.2, comment. (n.1).  The enhancement does not depend on any disruption of governmental functioning.  See United States v. Cole, 135 F.3d 114, 116 (2d Cir. 1998).

> Notably, this enhancement does not apply to the defendant's conduct because, at the time the defendant made his threats, Senator Warnock had not yet been sworn into office or certified as the winner of the Georgia Senate race.

> The defendant made specific threats regarding now-Senator Warnock immediately after the media announced his election to office.  See PSR ¶ 15.  The threats were specifically tied to Senator Warnock's soon to be vested power to vote for legislation.  Id. ("Warnock is going to have a hard time casting votes for communist policies when he's swinging with the fucking fish . . . [d]ead men can't pass shit laws.");  PSR ¶ 15-16.  As a result, there is little doubt that the defendant's threats were motivated by Senator Warnock's impending status as a United States Senator.  The harm inflicted by the threats is the same as if they had been made two weeks later when Senator Warnock was sworn into office.[9]  The defendant should not be permitted to avoid the full consequences of his conduct merely because Senator Warnock was not yet a "government officer" for purposes of U.S.S.G. § 3A1.2.  If the enhancement applied to the defendant's conduct, the defendant's total offense level would be 21 (instead of 13), which would result in an advisory Guidelines range of 30-37 months' imprisonment, which the government believes to be an appropriate sentence based on the § 3553(a) factors set forth below.

---

[9]     Senator Warnock was sworn into office on January 20, 2021.  See "Democrats Take Control of the Senate as Warnock, Ossoff, Padilla sworn in," Fox News, https://www.foxnews.com/politics/democrats-take-control-of-the-senate-as-warnock-ossoff-padilla-sworn-in (last visited November 16, 2021)

IV.     The Section 3553(a) Factors

        The government respectfully submits that a sentence of 30-37 months'
imprisonment is sufficient, but not greater than necessary, to achieve the purposes of sentencing
in this case for the following reasons.  See 18 U.S.C. § 3553(a).

        First, an above-Guidelines sentence will accurately reflect the seriousness of the
defendant's conduct in repeatedly threatening to murder Senator Warnock and elected officials
and to commit other violent acts on January 6, 2021.  See 18 U.S.C. § 3553(a)(1), (a)(2)(A).  The
evidence demonstrates that the defendant made his threats over a period of two days that gave him
the opportunity to reflect on the wrongfulness of his conduct and reconsider his course of action.
But despite the time that the defendant had to consider his actions, he persisted, and in fact
escalated his threats.  The defendant's threats to murder elected officials and carry out violence in
Washington, D.C. are even more serious because he made the threats while angry individuals
violently stormed the Capitol on January 6, 2021.  The defendant deliberately used the shock of
that event to amplify his own threats by invoking the breach of the Capitol building and calling on
supporters to, "[f]ucking kill them all…. And anyone who stands in the way".  Additionally, the
defendant did not stop at mere threats.  Instead, the defendant got dressed in a tactical vest, armed
himself with combat knives and attempted to get to Washington, D.C., demonstrating that he had
the intent to engage in violent conduct.

        Second, an above-Guidelines sentence will also accurately reflect that the defendant
committed a second serious offense by possessing ammunition after having been convicted of a
felony.  The defendant minimizes this serious crime by flippantly stating that he "clearly broke the
law when, among boxes of assorted junk in his basement, he knowingly possessed old bullets."
Def. Memo at 1.  The Court should reject the defendant's justifications for illegally possessing
ammunition.  First, the defendant claims that he did not throw the ammunition away because "it
was dangerous to throw ammunition in the trash, where it could be recovered by a child."  Def.
Memo. at 3.  The defendant, of course, declines to mention that his two small children lived in the
home with the unsecured ammunition.  Likewise, the defendant claims that he did not alert the
police to the ammunition because he would be "effectively implicating himself in a federal crime."
Id.  This statement demonstrates to the Court that the defendant would prefer to commit a
continuing crime rather than secure the ammunition.  The defendant could have easily called the
police and explained that he was not permitted to own ammunition and that he had just discovered
that a family member had unknowingly brought some to the house.  Or he could have given the
ammunition to his mother or his wife to turn into the police.  He did not.  Instead, he chose to keep
the stockpile of ammunition to go along with his stockpile of combat knives and edged weapons.
The defendant's claim that his possession of ammunition was "useless without firearms with which
to shoot them" is exceedingly glib.  The reality is that the mere possession of ammunition can be
integral to crimes where firearms and ammunition are shared by individuals.   Given the
defendant's admitted association with the Proud Boys, which included accompanying them while
they desecrated a church in Washington, D.C., the notion that he stored ammunition for further
illegal ends is not unfounded.

        Third, an above-Guidelines sentence is necessary in light of the history and
characteristics of the defendant and to deter him from committing future crimes and to protect the
public.  The defendant's extreme response over the result of the 2020 elections is only the latest

example in a pattern of menacing behavior in which the defendant verbally or physically lashes out against others.  The PSR documents a pattern of behavior in which the defendant spirals out of control over minor perceived slights and frustrations and retaliates by threatening violence or by attacking those physically weaker than him.  PSR ¶¶ 58-60.  Among the most relevant examples of this behavior in the PSR is the defendant's repeated physical abuse of his wife, including while she was pregnant and recovering from surgery.  Id. at ¶ 63.  The defendant has even gone so far as to threaten to murder his own infant daughter.  Id. at ¶ 60.  The defendant's history of menacing behavior and demonstrated inability to control his anger indicate that he is a higher risk to re-offend, and that a substantial term of imprisonment is warranted to afford adequate deterrence to criminal conduct and to protect the public from further crimes of the defendant.  18 U.S.C. §§ 3553(a)(2)(B) and (C).

Tellingly, the defendant has not put forth any facts indicating that his 10 months in prison have changed him in any meaningful way.  Instead, the defendant has submitted letters from individuals and family members who claim that he is a good man based on his pre-arrest conduct—without addressing his incredibly violent and law-breaking past.  The perfunctory nature of those letters suggests that the authors do not know the defendant well—or in the case of his mother—enabled his behavior.  The defendant's decision to obtain and submit a letter from Ms. Florea—a letter she now disavows—is particularly concerning.  As explained above, just two months ago, Ms. Florea told the FBI that she was terrified of the defendant and what he could do to her and her children upon his release.  Ms. Florea also reported that the defendant's mother had threatened to ruin her financially if she did not support the defendant.  As a result of this pressure, Ms. Florea submitted a letter supporting the defendant's release—the same event that she had nightmares about two months ago—and praising the defendant's mother and the financial support provided by her.  Notwithstanding this pressure, Ms. Florea has now disavowed the letter she was pressured to write.  This situation reveals that the defendant has not changed, but rather remains willing to do anything to get out of prison.

Fourth, the defendant's history of disobeying the law and court orders demonstrates that a substantial term of imprisonment is necessary to impress upon the defendant the seriousness of his offense and deter the defendant from again using threats or weapons as a means to an end.  The defendant's claim that he was "swept up in an unprecedented frenzy, intentionally fomented by government officials in an upside-down, toxic political environment" only increases the need for the sentence imposed by the Court to promote respect for the law and to adequately deter the defendant from further criminal conduct.  18 U.S.C. §§ 3553(a)(2)(B) and (C).  The defendant's sentencing memorandum characterizes his unlawful threats as deliberately outlandish statements that were "well within the norms of social media."  Def. Memo. at 5-6.  For example, the defendant quotes statements made by various public figures that suggest or imply that listeners or readers should commit violent acts against political opponents and asserts that this rhetoric by political leaders led the defendant astray.  Def. Memo. at 6.  This, of course, ignores the millions of Americans who did not threaten to murder elected officials or commit acts of violence in January 2020.  The defendant, in effect, admits that he is easily swayed by the rhetoric of others and is unable to constrain his behavior.  More importantly, the defendant's guilty plea conclusively

13

establishes that the defendant's statements were not merely incendiary political speech, but intentional and unlawful threats.

Fifth, an above-Guidelines sentence is appropriate in this case for purposes of general deterrence. The prevalence of angry rhetoric on the Internet is, of course, not a defense to a Section 875(c) or 922(g) violation, and the frequency with which others across the political spectrum make threats is not a mitigating factor in this case. To the contrary, the government respectfully submits that, in sentencing this defendant, the Court should heavily weigh the extent to which the sentence it imposes will deter those in the future who seek to threaten elected officials or threaten violence against the electoral process, particularly while in possession of a stockpile of ammunition. The sentence imposed by the Court must make clear that the threats prohibited by Section 875(c) are not protected political speech, and that threatening to murder elected officials and carry out violence against the electoral process will be met with significant punishment. Likewise, the sentence should make clear that the felons are not permitted to possess firearms or ammunition under any circumstances.

V.    The Other Sentences Identified by the Defendant Are Not Comparable

In support of his request that the Court impose a time-served sentence—approximately 10 months' imprisonment—a sentence that would reflect a roughly 33% variance below the low-end of the already low 15-to-21-month Guidelines sentencing range calculated in the PSR, defendant cites recent sentences imposed in six cases in which the defendants were charged with several different offenses that the defendant believes are comparable to his offenses. Def. Memo. at 10-12. They are not comparable. As discussed above, in addition to being convicted for his abhorrent threats in violation of 18 U.S.C. § 875(c), the defendant stands convicted of the separate crime of possessing ammunition as a previously convicted felon, in violation of 18 U.S.C. § 922(g)(1).[10] That conviction, combined with the unique facts of this case and the defendant's prior criminal conduct—including his documented history of domestic violence and weapons' possession—distinguishes this case from the cases cited in the defendant's memorandum, which are discussed in detail below.

In United States v. Troy Smocks, No. 21-CR-198, ECF No. 64 (D.D.C. Nov. 4, 2021) (defense motion to correct sentence), the defendant was sentenced to 14 months' imprisonment, at the top of the 8–14-month range advised by the Guidelines. Additionally, Smock's prior convictions were for non-violent crimes (e.g. bank fraud, unlawful use of a bank card, larceny) and the vast majority of his convictions were more than 20 years old—a significant difference from the defendant, who was convicted of illegally possessing 13 firearms in 2014 and, in the instant case, also pleaded guilty to illegally possessing ammunition. In United States v. James Dale Reed, No 20-CR-406, ECF No. 35, 37 (D.Md.), the defendant was sentenced to 7 months' imprisonment, again within the sentencing range of 6-12 months' imprisonment advised by the Guidelines. Moreover, the Court imposed the 7-month sentence to run consecutively to a 4-month sentence the defendant was already serving. Additionally, Reed, unlike the defendant, was in Criminal History Category I, and not prohibited from possessing weapons at the time he

---

[10] Indeed, the maximum punishment for a violation of 18 U.S.C. § 922(g)(1) is double the maximum punishment for a violation of 18 U.S.C. § 875(c).

was arrested; therefore, he was not convicted of the separate felony set forth in 18 U.S.C. § 922(g)(1). Furthermore, unlike the defendant, Reed did not have a protracted and documented history of domestic violence.

Moreover, some of the cases cited by the defendant dealt with defendants who—unlike the defendant—had serious mitigating (instead of aggravating) circumstances. For example, nearly a quarter of the defendant's sentencing submission in United States v. Celli, No. 19-CR-127, ECF No. 172 (E.D.N.Y. Jul. 9, 2021), in which the government agreed to a below-Guidelines sentence of time-served, is a redacted submission of the defendant's mental health treatment. Celli also was in Criminal History Category I. In United States v. Brogan, No. 19-CR-207, ECF No. 21 (E.D.N.Y. Sep. 13, 2019), the government acknowledged in its sentencing letter that it had erred in the plea agreement when it initially estimated the Guidelines range at 6-12 months and conceded that the Probation Department had correctly calculated the range at 18-24 months. Brogan argued for a lower Guidelines range and sought a downward departure because he provided essential caretaking and financial support to his elderly mother who had dementia and his older brother who had sever autism and an intellectual disability. See id., ECF No. 22. The court ultimately imposed a sentence of three years' probation. By contrast, the defendant, has a history of abusing his family members and being ordered to stay away from his wife and children. Additionally, Brogan was in Criminal History Category I and was not in illegal possession of ammunition.

In United States v. Mish, 21-CR-112 (D.D.C.), the defendant was convicted of a misdemeanor offense for Parading, Demonstrating, or Picketing in the Capitol Building. For this misdemeanor conviction the government requested a sentence of 30 days' incarceration. See ECF No. 38 (government's sentencing letter). Unlike the defendant, Mish was not alleged to have made any threats or possess any weapons or ammunition and was not convicted of two separate felonies as a result of his guilty plea. [11] In United States v. Bancroft, No. 21-CR-271 (D.D.C.), the defendant was also convicted of a misdemeanor offense for Parading, Demonstrating, or Picketing in the Capitol Building. Specifically, on January 6, 2021, Bancroft unlawfully entered the Capitol through a broken window and remained inside for one minute. Unlike the defendant, Bancroft was not convicted of two felonies, did not possess any ammunition, and there is no indication that she had any prior criminal history, let alone a prior conviction for illegally possessing thirteen firearms.

A more comparable case to the defendant is United States v. Hunt, No. 21-CR-086 (PKC) (E.D.N.Y. 2021). In Hunt, the defendant was convicted of making threats against Members of Congress in connection with the January 6 attack on the Capitol. Hunt, like the defendant, attempted to dismiss his threats as mere internet blather and to blame others who allegedly made

---

[11] As the defendant mentions in his sentencing memorandum, attached to the government's sentencing memorandum in Mish was a chart detailing 32 other convictions related to the January 6 attack on the Capitol. See ECF No. 38., Ex. 1. However, the defendant fails to mention that 30 of those individuals were convicted of misdemeanors: a significant difference from the defendant, who has plead guilty to two separate felony convictions, including his second firearms-related felony conviction.

similar comments online.  On November 22, 2021, Judge Pamela K. Chen rejected Hunt's attempt to blame-shift and sentenced Hunt to 19 months' imprisonment and three years' supervised release. Notably, Hunt, unlike the defendant, had no criminal history and committed no acts of violence against others.  The defendant was also convicted of another charge (possessing ammunition as a convicted felon), unlike Hunt, whose only crime of conviction was the threat. As such, the government respectfully submits that application of the Section 3553(a) factors warrants a significantly greater sentence for the defendant than the 19-month sentence that Judge Chen imposed on Hunt.

In sum, the cases identified by the defendant in his sentencing submission are not comparable to the sentencing considerations presented to this Court by this defendant's conduct. As a result, they provide no basis for the kind of sentence the defendant seeks.

VI.    The Conditions at MDC Do Not Justify a Time-Served Sentence

Finally, the defendant's conditions of confinement at the Metropolitan Detention Center ("MDC") do not warrant the time-served sentence that he seeks.  In June of 2020, the defendant complained of having blood in his urine as well as a heightened eGFR (Estimate Glomerular Filtration Rate), suggesting elevated creatine levels in his blood.  Throughout the time he was incarcerated at the MDC the defendant's urine and renal function were tested and monitored regularly.  After initially showing a mildly elevated level of creatine in February of 2021, the defendant was regularly monitored, and his tests showed improvement.  By June 2021, his creatine levels had lowered, and his urine was negative for blood.  See ECF No. 27.  By July of 2020, medical records show that the defendant's renal ailment had resolved, and there was no protein in his blood.  Tellingly, the defendant has not made any complaints to the MDC about his renal condition since July 2020.  As such, this should not factor into the Court's decision of an appropriate sentence.

Similarly, the defendant's sentence should not be reduced because of the COVID-19 pandemic.  COVID-19 has undoubtedly had a significant impact on everyone's lives.  In the face of the global pandemic, the MDC modified operations and adopted precautionary measures to safeguard the health and safety of its inmates, staff, and the community at large.  As of May 2021, all BOP inmates, including those at the MDC, had been offered the COVID-19 vaccine, including the defendant, who was fully vaccinated by the end of May 2021.  Regrettably, despite taking these precautions, the defendant contracted a breakthrough case of COVID-19 in October of 2021.  This is not unlike the breakthrough infections suffered by thousands of Americans who were not incarcerated.  Fortunately, likely due to the vaccinations that the BOP provided to the defendant, his breakthrough case was mild and he has now recovered.

For these reasons, the defendant's conditions of confinement do not warrant a time-served sentence, particularly in light of the other aggravating factors described above that warrant an above-Guidelines sentence.

VII.    Conclusion

For the foregoing reasons, the government respectfully submits that the time-served sentence requested by the defendant would fail to adequately serve the purposes of sentencing.

The government submits that the Court should impose a term of imprisonment within the Guidelines range of 30 to 37 months' imprisonment to provide just punishment for this serious offense, to promote respect for the law, to deter the defendant from future criminal conduct, to protect the public from further crimes of the defendant, and to deter others from engaging in similar conduct in the future.

Respectfully submitted,

BREON PEACE
United States Attorney

By:    /s/ Francisco J. Navarro
       Francisco J. Navarro
       Andrew P. Wenzel
       Assistant United States Attorney
       (718) 254-7000

cc:    Clerk of Court (EK) (by ECF)
       Mia Eisner-Grynberg, Esq. (by ECF and Email)
       Steven S. Guttman, United States Probation Officer (by Email)

17

# EXHIBIT 1

# Under Seal

# EXHIBIT 1-T

## Under Seal

# **EXHIBIT 2**

F.C.A §§ 446, 551, 656, 842 & 1056                                          GF5a 12/2013

**ORI No:** ███████

**Order No:** ███████

**NYSID No:** ███████

At a term of the Family Court of the State of New York,
held in and for the County of Richmond, at 100 Richmond Terrace,
Staten Island, NY 10301, on March 09, 2015

**PRESENT:  Honorable Arnold Lim**

**In the Matter of a NEGLECT Proceeding**

████████████████

**File #** ███████

**Docket #** ███████████

**Order of Protection**

**Child/ren under Eighteen Years of Age Alleged to be Neglected By**

**Both Parties Present in Court**

**Edward Florea (DOB:** █████**),**
                    **Respondent.**

**NOTICE:  YOUR  FAILURE TO OBEY THIS ORDER MAY SUBJECT  YOU TO MANDATORY ARREST AND CRIMINAL PROSECUTION, WHICH MAY RESULT IN YOUR INCARCERATION FOR UP TO SEVEN YEARS FOR CRIMINAL  CONTEMPT,  AND/OR  MAY  SUBJECT  YOU  TO  FAMILY  COURT  PROSECUTION  AND INCARCERATION   FOR  UP  TO  SIX  MONTHS  FOR  CONTEMPT  OF  COURT.**

**THIS ORDER OF PROTECTION WILL REMAIN IN EFFECT EVEN IF THE PROTECTED PARTY HAS, OR CONSENTS TO HAVE, CONTACT OR COMMUNICATION WITH THE PARTY AGAINST WHOM THE ORDER IS ISSUED. THIS ORDER OF PROTECTION CAN ONLY BE MODIFIED OR TERMINATED BY THE COURT. THE PROTECTED PARTY CANNOT BE HELD TO VIOLATE THIS ORDER NOR BE ARRESTED FOR VIOLATING THIS ORDER .**

A petition under Article 10 of the Family Court Act, having been filed on June 17, 2014 in this Court and On Consent, and Edward Florea having been present in Court and advised of the issuance and contents of this Order,

**NOW, THEREFORE, IT IS HEREBY ORDERED**  that Edward Florea (DOB █████) observe the following conditions of behavior:

[01] Stay away from:

[A] Joni Yglesias (DOB: █████) and ████████████████ 2012) at all times, except for Court Ordered Visitation and ACS sanctioned visits on consent of Law Guardian.;

[02] Refrain from assault, stalking, harassment, aggravated harassment, menacing, reckless endangerment, strangulation, criminal obstruction of breathing or circulation, disorderly conduct, criminal mischief, sexual abuse, sexual misconduct, forcible touching, intimidation, threats, identity theft, grand larceny, coercion or any criminal offense against Joni Yglesias (DOB: █████) and ████████ (DOB: ███ 2012);

**It is further ordered** that this order of protection shall remain in force until and including March 09, 2016.

**Dated:**     March 09, 2015                                    **ENTER**

[State of New York United Court System seal]

**Honorable Arnold Lim**

GF-5a Page 2

PURSUANT TO SECTION 1113 OF THE FAMILY COURT ACT, AN APPEAL FROM THIS ORDER MUST BE TAKEN WITHIN 30 DAYS OF RECEIPT OF THE ORDER BY APPELLANT IN COURT, 35 DAYS FROM THE DATE OF MAILING OF THE ORDER TO APPELLANT BY THE CLERK OF COURT, OR 30 DAYS AFTER SERVICE BY A PARTY OR THE ATTORNEY FOR THE CHILD UPON THE APPELLANT, WHICHEVER IS EARLIEST.

**The Family Court Act** provides that presentation of a copy of this order of protection to any police officer or peace officer acting pursuant to his or her special duties authorizes, and sometimes requires such officer to arrest a person who is alleged to have violated its terms and to bring him or her before the court to face penalties authorized by law.

**Federal law requires** that this order is effective outside, as well as inside, New York State. It must be honored and enforced by state and tribal courts, including courts of a state, the District of Columbia, a commonwealth, territory or possession of the United States, if the person restrained by the order is an intimate partner of the protected party and has or will be afforded reasonable notice and opportunity to be heard in accordance with state law sufficient to protect due process rights (18 U.S.C §§ 2265, 2266).

**It is a federal crime to:**
 • cross state lines to violate this order or to stalk, harass or commit domestic violence against an intimate partner or family member;
 • buy, possess or transfer a handgun, rifle, shotgun or other firearm or ammunition while this Order remains in effect (Note: there is a limited exception for military or law enforcement officers but only while they are on duty) ; and
 • buy, possess or transfer a handgun, rifle, shotgun or other firearm or ammunition after a conviction of a domestic violence-related crime involving the use or attempted use of physical force or a deadly weapon against an intimate partner or family member, even after this Order has expired (18 U.S.C. §§ 922(g)(8), 922(g)(9), 2261, 2261A, 2262).

**Check Applicable Box(es):**

[x] Party against whom order was issued was advised in Court of issuance and contents of Order

[x] Order personally served in Court upon party against whom order was issued

[ ] Service directed by other means[specify]: _____

[ ] [Modifications or extensions only]: Order mailed on [specify date and to whom mailed]:

[ ] Warrant issued for party against whom order was issued[specify date]: _____

[ ] ADDITIONAL SERVICE INFORMATION [specify]: _____

# **EXHIBIT 3**

At a term of the Family Court of the
State of New York, held in and for
the County of Richmond, at 100
Richmond Terrace, Staten Island,
NY 10301, on July 14, 2016

**PRESENT:**   Hon. Arnold Lim

In the Matter of

█████████████████████████████

███████████████████

Children under Eighteen Years of Age
Alleged to be Neglected by

**Edward Florea,**

Respondent.

**File #:**   ██████

**Docket #:**   ████████████

███████████████

**CPS #:**   6██████

**ORDER**

PURSUANT TO SECTION 1113 OF THE FAMILY COURT ACT, AN APPEAL FROM THIS
ORDER MUST BE TAKEN WITHIN 30 DAYS OF RECEIPT OF THE ORDER BY APPELLANT
IN COURT, 35 DAYS FROM THE DATE OF MAILING OF THE ORDER TO APPELLANT BY
THE CLERK OF COURT, OR 30 DAYS AFTER SERVICE BY A PARTY OR THE ATTORNEY
FOR THE CHILD UPON THE APPELLANT, WHICHEVER IS EARLIEST.

   **IT IS ORDERED that Violation Petiton is settled as follows: Respondent father admits
to violating the final order of protection and the Court suspends the two(2)month
incarceration so long as he does not violate the final order of protection again.**

**Dated:** July 15, 2016                    **ENTER**

_____

**Hon. Arnold Lim**

**Check applicable box:**
☐ Order mailed on [specify date(s) and to whom mailed]:_____
☐ Order received in court on [specify date(s) and to whom given]:_____

# **EXHIBIT 4**

F.C.A §§ 446, 551, 656, 842 & 1056                                    GF5a 12/2013

**ORI No:** 
**Order No:**
**NYSID No:**

At a term of the Family Court of the State of New York,
held in and for the County of Richmond, at 100 Richmond Terrace,
Staten Island, NY 10301, on July 14, 2016

**PRESENT:  Honorable Arnold Lim** _____

**In the Matter of a NEGLECT Proceeding**

███████████████████████████                   **File #** ████████

                                               **Docket #** ████████████

**Child/ren under Eighteen Years of Age Alleged to be Neglected By**    **Order of Protection**

**Edward Florea (DOB:** ████████ **),**                  **Both Parties Present in Court**
                        **Respondent**

_____

**NOTICE:  YOUR  FAILURE TO OBEY THIS ORDER MAY SUBJECT  YOU TO MANDATORY ARREST AND CRIMINAL PROSECUTION, WHICH MAY RESULT IN YOUR INCARCERATION FOR UP TO SEVEN YEARS FOR CRIMINAL  CONTEMPT,  AND/OR  MAY SUBJECT YOU TO FAMILY COURT PROSECUTION  AND INCARCERATION  FOR UP TO SIX MONTHS FOR CONTEMPT OF COURT.**

**THIS ORDER OF PROTECTION WILL REMAIN IN EFFECT EVEN IF THE PROTECTED PARTY HAS, OR CONSENTS TO HAVE, CONTACT OR COMMUNICATION WITH THE PARTY AGAINST WHOM THE ORDER IS ISSUED. THIS ORDER OF PROTECTION CAN ONLY BE MODIFIED OR TERMINATED BY THE COURT. THE PROTECTED PARTY CANNOT BE HELD TO VIOLATE THIS ORDER NOR BE ARRESTED FOR VIOLATING THIS ORDER .**

A petition under Article 10 of the Family Court Act, having been filed on March 14, 2016 in this Court and On Consent, and Edward Florea having been present in Court and advised of the issuance and contents of this Order.

**NOW, THEREFORE, IT IS HEREBY ORDERED**  that Edward Florea (DOB ████████) observe the following conditions of behavior:



[01] Stay away from:

[A]   ████████████   (DOB:████ 2016) and Joni Yglesias (DOB: ████████);

[B]   the home of ████████████ (DOB: ████ 2016) and Joni Yglesias (DOB: ████████);

[C]   the school of ████████████ (DOB: ████ 2016) and Joni Yglesias (DOB: ████████);

[E]   the place of employment of Joni Yglesias (DOB: 1████████);

[02] Refrain from assault, stalking, harassment, aggravated harassment, menacing, reckless endangerment, criminal obstruction of breathing or circulation, disorderly conduct, criminal mischief, sexual abuse, sexual misconduct, forcible touching, intimidation, threats, identity theft, grand larceny, coercion or any criminal offense against ████████████ (DOB:████ 2016) and Joni Yglesias (DOB: ████████);

[99] Observe such other conditions as are necessary to further the purposes of protection: Respondent is to stay away from the child(ren), their temporary residences and schools at all times, except for Court ordered ACS sanctioned visitation upon Attorney For the Child notice and consent and any services requiring respondent and non respondent mother .;

GF-5a Page 2

**It is further ordered** that this order of protection shall remain in force until and including March 29, 2017.

**Dated:**    July 14, 2016                                                    **ENTER**



_____
**Honorable Arnold Lim**

PURSUANT TO SECTION 1113 OF THE FAMILY COURT ACT, AN APPEAL FROM THIS ORDER MUST BE TAKEN WITHIN 30 DAYS OF RECEIPT OF THE ORDER BY APPELLANT IN COURT, 35 DAYS FROM THE DATE OF MAILING OF THE ORDER TO APPELLANT BY THE CLERK OF COURT, OR 30 DAYS AFTER SERVICE BY A PARTY OR THE ATTORNEY FOR THE CHILD UPON THE APPELLANT, WHICHEVER IS EARLIEST.

**The Family Court Act** provides that presentation of a copy of this order of protection to any police officer or peace officer acting pursuant to his or her special duties authorizes, and sometimes requires such officer to arrest a person who is alleged to have violated its terms and to bring him or her before the court to face penalties authorized by law.

**Federal law requires** that this order is effective outside, as well as inside, New York State. It must be honored and enforced by state and tribal courts, including courts of a state, the District of Columbia, a commonwealth, territory or possession of the United States, if the person restrained by the order is an intimate partner of the protected party and has or will be afforded reasonable notice and opportunity to be heard in accordance with state law sufficient to protect due process rights (18 U.S.C §§ 2265, 2266).

**It is a federal crime to:**
• cross state lines to violate this order or to stalk, harass or commit domestic violence against an intimate partner or family member;
• buy, possess or transfer a handgun, rifle, shotgun or other firearm or ammunition while this Order remains in effect (Note: there is a limited exception for military or law enforcement officers but only while they are on duty) ; and
• buy, possess or transfer a handgun, rifle, shotgun or other firearm or ammunition after a conviction of a domestic violence-related crime involving the use or attempted use of physical force or a deadly weapon against an intimate partner or family member, even after this Order has expired (18 U.S.C. §§ 922(g)(8), 922(g)(9), 2261, 2261A, 2262).

**Check Applicable Box(es):**

[x] Party against whom order was issued was advised in Court of issuance and contents of Order

[x] Order personally served in Court upon party against whom order was issued

[ ] Service directed by other means[specify]: _____

[ ] [Modifications or extensions only]: Order mailed on [specify date and to whom mailed]:

[ ] Warrant issued for party against whom order was issued[specify date]: _____

[ ] ADDITIONAL SERVICE INFORMATION [specify]: _____

# **EXHIBIT 5**

F.C.A §§ 430, 550, 655, 828, 1029

GF5 12/2013

**ORI No:**
**Order No:**
**NYSID No:**



At a term of the Family Court of the State of New York,
held in and for the County of Richmond, at 100 Richmond Terrace,
Staten Island, NY 10301, on March 27, 2017

**PRESENT: Honorable Arnold Lim**

**In the Matter of a NEGLECT Proceeding**

**File #**

**Docket #**

**Child/ren under Eighteen Years of Age Alleged to be Neglected By**

**Temporary Order of Protection**

**Edward Florea (DOB: 07/29/1980),**
                    **Respondent**

**Both Parties Present in Court**

**NOTICE:  YOUR  FAILURE TO OBEY THIS ORDER MAY SUBJECT  YOU TO MANDATORY ARREST AND CRIMINAL PROSECUTION, WHICH MAY RESULT IN YOUR INCARCERATION FOR UP TO SEVEN YEARS FOR CRIMINAL CONTEMPT, AND/OR MAY SUBJECT YOU TO FAMILY COURT PROSECUTION AND INCARCERATION  FOR UP TO SIX MONTHS FOR CONTEMPT OF COURT. IF YOU FAIL TO APPEAR IN COURT WHEN YOU ARE REQUIRED TO DO SO, THIS ORDER MAY BE EXTENDED IN YOUR ABSENCE AND THEN CONTINUES IN EFFECT UNTIL A NEW DATE SET BY THE COURT.**

**THIS ORDER OF PROTECTION WILL REMAIN IN EFFECT EVEN IF THE PROTECTED PARTY HAS, OR CONSENTS TO HAVE, CONTACT OR COMMUNICATION WITH THE PARTY AGAINST WHOM THE ORDER IS ISSUED. THIS ORDER OF PROTECTION CAN ONLY BE MODIFIED OR TERMINATED BY THE COURT. THE PROTECTED PARTY CANNOT BE HELD TO VIOLATE THIS ORDER NOR BE ARRESTED FOR VIOLATING THIS ORDER .**

A petition under Article 10 of the Family Court Act, having been filed on March 27, 2017 in this Court and good cause having been shown, and Edward Florea having been present in Court and advised of the issuance and contents of this Order.

　　　**NOW, THEREFORE, IT IS HEREBY ORDERED** that Edward Florea (DOB ███████) observe the following conditions of behavior:

[01] Stay away from:

[A] ███████ (DOB:██ 2016), Joni Yglesias (DOB:███ 1986) and ███████ (DOB:███ 2012) EXCEPT FOR COURT ORDERED / ACS SANCTIONED VISITATION;

[B] the home of ███████ (DOB:███ 2016), Joni Yglesias (DOB:███████) and ███████ (DOB:███████);

[02] Refrain from assault, stalking, harassment, aggravated harassment, menacing, reckless endangerment, strangulation, criminal obstruction of breathing or circulation, disorderly conduct, criminal mischief, sexual abuse, sexual misconduct, forcible touching, intimidation, threats, identity theft, grand larceny, coercion or any criminal offense against ███████ (DOB:███ 2016), Joni Yglesias (DOB:███ 1986) and ███████ (DOB:███ 2012);

[99] Observe such other conditions as are necessary to further the purposes of protection: RESPONDENT FATHER MAY HAVE LIMITED CONTACT WITH THE NON-RESPONDENT MOTHER AS TO ATTEND COUPLES COUNSELING TOGETHER;

GF-5 Page 2



**It is further ordered** that this temporary order of protection shall remain in force until and including May 02, 2017, but if you fail to appear in court on this date, the order may be extended and continue in effect until a new date set by the Court.

**Dated:**   March 27, 2017                                   ENTER

                                                            _____
                                                            **Honorable Arnold Lim**

PURSUANT TO SECTION 1113 OF THE FAMILY COURT ACT, AN APPEAL FROM THIS ORDER MUST BE TAKEN WITHIN 30 DAYS OF RECEIPT OF THE ORDER BY APPELLANT IN COURT, 35 DAYS FROM THE DATE OF MAILING OF THE ORDER TO APPELLANT BY THE CLERK OF COURT, OR 30 DAYS AFTER SERVICE BY A PARTY OR THE ATTORNEY FOR THE CHILD UPON THE APPELLANT, WHICHEVER IS EARLIEST.

**The Family Court Act** provides that presentation of a copy of this order of protection to any police officer or peace officer acting pursuant to his or her special duties authorizes, and sometimes requires such officer to arrest a person who is alleged to have violated its terms and to bring him or her before the court to face penalties authorized by law.

**Federal law requires** that this order is effective outside, as well as inside, New York State. It must be honored and enforced by state and tribal courts, including courts of a state, the District of Columbia, a commonwealth, territory or possession of the United States, if the person restrained by the order is an intimate partner of the protected party and has or will be afforded reasonable notice and opportunity to be heard in accordance with state law sufficient to protect due process rights (18 U.S.C §§ 2265, 2266).

**It is a federal crime to:**
• cross state lines to violate this order or to stalk, harass or commit domestic violence against an intimate partner or family member;
• buy, possess or transfer a handgun, rifle, shotgun or other firearm or ammunition while this Order remains in effect (Note: there is a limited exception for military or law enforcement officers but only while they are on duty) ; and
• buy, possess or transfer a handgun, rifle, shotgun or other firearm or ammunition after a conviction of a domestic violence-related crime involving the use or attempted use of physical force or a deadly weapon against an intimate partner or family member, even after this Order has expired (18 U.S.C. §§ 922(g)(8), 922(g)(9), 2261, 2261A, 2262).

**Check Applicable Box(es):**

[x] Party against whom order was issued was advised in Court of issuance and contents of Order

[x] Order personally served in Court upon party against whom order was issued

[ ] Service directed by other means[specify]: _____

[ ] [Modifications or extensions only]: Order mailed on [specify date and to whom mailed]:

[ ] Warrant issued for party against whom order was issued[specify date]: _____

[ ] ADDITIONAL SERVICE INFORMATION [specify]: _____

# **EXHIBIT 6**

F.C.A §§ 446, 551, 656, 842 & 1056

GF5a 12/2013

**ORI No:** ████
**Order No:** ████
**NYSID No:** ████

At a term of the Family Court of the State of New York,
held in and for the County of Richmond, at 100 Richmond Terrace,
Staten Island, NY 10301, on June 26, 2017

**PRESENT: Honorable Arnold Lim**

In the Matter of a NEGLECT Proceeding

████████████

**File #** ████

**Docket #** ████

Child/ren under Eighteen Years of Age Alleged to be Neglected By

**Order of Protection**

Edward Florea (DOB: ████ ),
              **Respondent**

**Both Parties Present in Court**

**NOTICE:  YOUR  FAILURE TO OBEY THIS ORDER MAY SUBJECT  YOU TO MANDATORY ARREST AND CRIMINAL PROSECUTION, WHICH MAY RESULT IN YOUR INCARCERATION FOR UP TO SEVEN YEARS FOR CRIMINAL CONTEMPT, AND/OR MAY SUBJECT YOU TO FAMILY COURT PROSECUTION AND INCARCERATION  FOR UP TO SIX MONTHS FOR CONTEMPT OF COURT.**

**THIS ORDER OF PROTECTION WILL REMAIN IN EFFECT EVEN IF THE PROTECTED PARTY HAS, OR CONSENTS TO HAVE, CONTACT OR COMMUNICATION WITH THE PARTY AGAINST WHOM THE ORDER IS ISSUED. THIS ORDER OF PROTECTION CAN ONLY BE MODIFIED OR TERMINATED BY THE COURT. THE PROTECTED PARTY CANNOT BE HELD TO VIOLATE THIS ORDER NOR BE ARRESTED FOR VIOLATING THIS ORDER .**

A petition under Article 10 of the Family Court Act, having been filed on March 27, 2017 in this Court and After Hearing, and Edward Florea having been present in Court and advised of the issuance and contents of this Order.

    **NOW, THEREFORE, IT IS HEREBY ORDERED**  that Edward Florea (DOB ████ ) observe the following conditions of behavior:

[99] Observe such other conditions as are necessary to further the purposes of protection: RESPONDENT FATHER IS NOT TO COMMIT ANY ACTS OF DOMESTIC VIOLENCE AGAINST NON-RESPONDENT MOTHER;

    **It is further ordered** that this order of protection shall remain in force until and including March 29, 2018.

**Dated:**   June 26, 2017

**ENTER**



**Honorable Arnold Lim**

PURSUANT TO SECTION 1113 OF THE FAMILY COURT ACT, AN APPEAL FROM THIS ORDER MUST BE TAKEN WITHIN 30 DAYS OF RECEIPT OF THE ORDER BY APPELLANT IN COURT, 35 DAYS FROM THE DATE OF MAILING OF THE ORDER TO APPELLANT BY THE CLERK OF COURT, OR 30 DAYS AFTER SERVICE BY A PARTY OR THE ATTORNEY FOR THE CHILD UPON THE APPELLANT, WHICHEVER IS EARLIEST.

GF-5a Page 2

     **The Family Court Act** provides that presentation of a copy of this order of protection to any police officer or peace officer acting pursuant to his or her special duties authorizes, and sometimes requires such officer to arrest a person who is alleged to have violated its terms and to bring him or her before the court to face penalties authorized by law.

     **Federal law requires** that this order is effective outside, as well as inside, New York State. It must be honored and enforced by state and tribal courts, including courts of a state, the District of Columbia, a commonwealth, territory or possession of the United States, if the person restrained by the order is an intimate partner of the protected party and has or will be afforded reasonable notice and opportunity to be heard in accordance with state law sufficient to protect due process rights (18 U.S.C §§ 2265, 2266).

     **It is a federal crime to:**
 • cross state lines to violate this order or to stalk, harass or commit domestic violence against an intimate partner or family member;
 • buy, possess or transfer a handgun, rifle, shotgun or other firearm or ammunition while this Order remains in effect (Note: there is a limited exception for military or law enforcement officers but only while they are on duty) ; and
 • buy, possess or transfer a handgun, rifle, shotgun or other firearm or ammunition after a conviction of a domestic violence-related crime involving the use or attempted use of physical force or a deadly weapon against an intimate partner or family member, even after this Order has expired (18 U.S.C. §§ 922(g)(8), 922(g)(9), 2261, 2261A, 2262).

**Check Applicable Box(es):**

[x] Party against whom order was issued was advised in Court of issuance and contents of Order

[x] Order personally served in Court upon party against whom order was issued

[ ] Service directed by other means[specify]: _____

[ ] [Modifications or extensions only]: Order mailed on [specify date and to whom mailed]:

[ ] Warrant issued for party against whom order was issued[specify date]: _____

[ ] ADDITIONAL SERVICE INFORMATION [specify]: _____